Rakhee V. Patel   (Pro Hac Vice Pending)
Frances A. Smith (Pro Hac Vice Pending)
SHACKELFORD, MELTON, McKINLEY
& NORTON, LLP
3333 Lee Parkway, Tenth Floor
Dallas, TX 75219
Telephone:  214.780.1400
Facsimile:  214.780.1401

Sarah Link Schultz (Pro Hac Vice Pending)
Michael P. Cooley (Bar. No. MC-1214)
AKIN GUMP STRAUSS HAUER & FELD, LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX  75201-4624
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

**Presentment Date and Time:**
**January 8, 2015 at 2:00 p.m.**

Proposed Counsel to the Debtors and Debtors-in-Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) ) ) Chapter 11 |
| J&B PARTNERS MANAGEMENT LLC, et al.,[1] | ) ) Case No. 15-22017 (RDD) |
| Debtors. | ) ) (Joint Administration Requested) ) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
### (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING,
### (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDER, AND
### (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: J & B Partners Management LLC (1366), J & B Restaurant Partners of Long Island Holding Co., LLC (8712), J & B Restaurant Partners of NYDMA LLC (7161), J & B Restaurant Partners of Massapequa Park, LLC (5849), J & B Restaurant Partners of Middle Island, LLC (4746), J & B Restaurant Partners of Shirley, LLC (3799), J & B Restaurant Partners of Long Island, LLC (8717), J & B Restaurant Partners of Long Island II, LLC (9901), J & B Real Estate Partners of Long Island, LLC (4550), J & B Real Estate Partners of Long Island II, LLC (9904),  and J & B Restaurant Partners of NJ, LLC (4102).  The location of the Debtors' corporate headquarters and the Debtors' service address is 4000 Veterans Memorial Hwy., 2nd Floor, Bohemia, New York, 11716.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a final order (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"),[2] (a) authorizing the Debtors to obtain postpetition financing on a senior secured, superpriority basis; (b) authorizing the Debtors to use Cash Collateral (as defined herein); and (c) granting adequate protection to certain Prepetition Lender (as defined herein) for Debtors' use of the Cash Collateral.  In support of this Motion, the Debtors respectfully state as follows:

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules").

4.      The facts and circumstances supporting this Motion are set forth in the Declaration of Dawn Petite, Chief Operating Officer of the Debtors in Support of the Debtors' Chapter 11 Petitions and First Day Motions (the "First Day Declaration"), filed contemporaneously herewith.

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Facility Agreement (as defined herein) or the DIP Orders (as defined herein), as applicable.

## Introduction

5.      Prior to filing these chapter 11 cases, the Debtors successfully negotiated the approximately $1.5 million postpetition financing package provided by the DIP Facility (as defined herein) with their existing secured creditors.  The DIP Facility, coupled with cash flow from operations, will permit the Debtors to fund the administration of these chapter 11 cases.

6.      Without access to the DIP Facility, the Debtors could experience a liquidity shortfall and would be deprived of the capital necessary to operate their businesses.  The DIP Facility will provide the funding necessary to allow the Debtors to, among other things, maintain their businesses in the ordinary course, thereby preserving value for the benefit of all creditor constituencies.  The DIP Facility also will enhance the Debtors' ability to minimize disruption to their businesses and instill confidence in their various creditor constituencies, including customers, employees, vendors, and service providers.  In sum, approval of the DIP Facility is necessary to avoid erosion of value and to accomplish a seamless transition into chapter 11 and, ultimately, through confirmation of a chapter 11 plea of reorganization.

## Summary of Relief Requested

7.      By this Motion, the Debtors request entry of the DIP Orders, which among other things, provide the Debtors with the following relief:[3]

- Cash Collateral:  authority to use the Debtors' cash on hand, cash proceeds of Prepetition Collateral (as defined herein), and other cash that constitutes the Prepetition Lender's "cash collateral," as that term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral"), subject to and consistent with an Interim Period Budget;

- DIP Facility:  authority to obtain postpetition revolving loans in a principal amount not to exceed $1,500,000 on an interim and final basis (the "DIP Facility") and other financial accommodations, pursuant to the terms and conditions of the Senior Secured Superpriority Debtor-in-Possession Credit Agreement, substantially in the form

---

[3]   This summary is qualified in its entirety by reference to the actual DIP Facility Documents and the DIP Orders. The DIP Facility Documents and the DIP Orders shall control if there is any conflict between them and this summary.

attached hereto as **Exhibit B** (the "DIP Agreement").  Borrowings under the DIP Facility will be used, among other things, for payment of (a) postpetition operating expenses and other working capital and financing requirements of the Borrower subject to the Interim Period Budget or as otherwise agreed to by the DIP Lender, (b) certain transaction and bankruptcy fees, costs and expenses, (c) the Carve-Out, and (d) certain Prepetition claims to the extent consistent with the Interim Period Budget and allowed by the Bankruptcy Court;

- DIP Financing Documents:  authority to execute and deliver the DIP Agreement and all agreements, documents, and instruments contemplated by each (collectively, the "DIP Financing Documents"), and to take all actions necessary, appropriate, or required to comply with the Debtors' obligations thereunder and under the DIP Orders, including obligations to pay certain fees and expenses owed to the DIP Lender thereunder;

- DIP Liens and Claims:  authority to grant the DIP Lender, senior, first priority DIP liens on the Collateral (as defined in the Interim DIP Order) securing, and the superpriority claims in respect of, the DIP Facility (the "DIP Liens");

- Adequate Protection:  approval of the Adequate Protection (as defined herein) to be provided to the Debtors' prepetition secured lenders (the "Prepetition Lender") to protect the Prepetition Lender's interests in the personal and real property of such Debtors constituting "Collateral" under, and as defined in, the Prepetition Loan Documents (as defined herein) (collectively, together with the Cash Collateral, the "Prepetition Collateral"); and

- Final Hearing:  a date for a hearing on this Motion to consider entry of the Final DIP Order, to be held no sooner than 14 days after the date of service of this Motion, and no later than 46 days after the Petition Date.

## Summary of Principal Terms of DIP Facility

8.    Pursuant to Bankruptcy Rules 4001(b), (c), and (d), and Local Bankruptcy Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the Debtors' Motion s', the DIP Facility Documents and DIP Orders:[4]

| MATERIAL TERMS | |
|---|---|
| **Prepetition Lender** | General Electric Capital Corporation and other lender parties |

---

[4]    This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Facility Documents (as may be amended or modified) or the DIP Orders, as applicable. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Facility Documents or the DIP Orders, the provisions of the DIP Facility Documents or the DIP Orders, as applicable, shall control.

| MATERIAL TERMS | |
|---|---|
| *FED. R. BANKR. P. 4001(b)(1)(B)(i)* | |
| **Parties to DIP Facility Agreement**<br><br>*FED. R. BANKR. P. 4001(C)(1)(B)* | **Debtor Parties**:<br><br>Borrower:  J & B Partners Management LLC, J & B Restaurant Partners of Long Island Holding Co., LLC, J & B Restaurant Partners of NYDMA, LLC, J & B Restaurant Partners of Massapequa Park, LLC, J & B Restaurant Partners of  Middle Island, LLC, J & B Restaurant Partners of  Shirley, LLC, J & B Restaurant Partners of  Long Island, LLC, J & B Restaurant Partners of  Long Island II, LLC, J & B Real Estate Partners of Long Island, LLC, J & B Real Estate Partners of Long Island II, LLC, J & B Restaurant Partners of NJ, LLC (the "Borrowers" or "Debtors")<br><br>DIP Lender:  General Electric Capital Corporation (the "DIP Lender") |
| **Maturity**<br><br>*FED. R. BANKR. P. 4001(C)(1)(B)* | The earliest to occur of (i) the date that is thirty (30) days after the date on which an order confirming a plan of reorganization is entered by the Bankruptcy Court, (ii) the effective date of a plan of reorganization for the Debtors, (iii) any sale or transfer of a substantial portion of the DIP Collateral except as otherwise contemplated by the Plan Term Sheet, (iv) upon the occurrence of a Commitment Termination Event (as defined on page 6 and § 8.2 of the DIP Facility Documents and as set forth in further detail below) after written notice to the Debtors and election by the DIP Lender to terminate the DIP Facility.<br><br>(DIP Facility Agreement § 3.1.1(b)) |

| MATERIAL TERMS | |
|---|---|
| **Purpose**<br><br>*FED. R. BANKR. P. 4001(b)(1)(B)(ii)-(iii), 4001(C)(1)(B), LBR 4001-2(A)(1)* | The Borrowers will use cash collateral and the proceeds of the DIP Facility in a manner consistent with the Interim Period Budget (subject to any variances otherwise permitted by DIP Lender) for payment of (a) postpetition operating expenses and other working capital and financing requirements of the Borrower subject to the Interim Period Budget or as otherwise agreed to by the DIP Lender, (b) certain transaction and bankruptcy fees, costs and expenses, (c) the Carve-Out, and (d) Prepetition claims (including under the Prepetition Loan Document) to the extent consistent with the Interim Period Budget approved by the DIP Lender and allowed by the Bankruptcy Court.<br><br>(DIP Facility Agreement § 2.2) |
| **Interest Rates**<br><br>*FED. R. BANKR. P. 4001(C)(1)(B)* | **Interest Rate DIP Loan**.  Ten percent (10%) per annum.<br><br>**Default Interest Rate**.  Eighteen percent (18%) per annum.<br><br>(DIP Facility Agreement §§ 3.2.1, 3.2.2) |
| **Commitments**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | Total aggregate revolving loan facility of $1,500,000.<br><br>(DIP Facility Agreement § 2.1) |
| **Funding Conditions**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B); LBR 4001-2(a)(2)* | (a)  Conditions precedent to initial borrowings under the DIP Facility include:  (i) each of the DIP Facility Documents shall have been duly executed and delivered by the respective parties thereto, shall be in full force and effect and shall be in form and substance reasonably satisfactory to the DIP Lender; (ii) the Debtors shall have delivered  a copy of the Interim Period Budget that is satisfactory to the Existing Lender and to the DIP Lender; (iii) the Debtors shall have released the Existing Lender, its former and current affiliates and its respective officers, directors, employees, advisors and agents, in a form of release that is satisfactory to the Existing Lender; (iv) the Existing Lender and the DIP Lender shall have received all fees required to be paid, and all expenses for which invoices have been presented on or before the date on which all conditions precedent shall be satisfied or waived; (v) the Court shall have entered the Interim DIP Order no later than five (5) days after the Petition Date; (vi) the Interim DIP Order shall not have been reversed, modified or amended without the prior written consent of the Existing Lender and the DIP Lender or stayed, vacated or subject to any pending appeal; (vii) the Debtors shall be in compliance with the Interim DIP Order; (viii) all of the First Day Orders shall have been entered in the Chapter 11 Cases and shall be in form and substance |

## MATERIAL TERMS

reasonably satisfactory to the Existing Lender and DIP Lender. In addition, the Existing Lender and DIP Lender shall have approved the form of motion and proposed order authorizing the engagement by the Debtors of a Chief Restructuring Officer ("CRO") as the person responsible for managing the Debtors during the pendency of the Cases and maximizing the long-term value of the Debtors for the benefit of all stakeholders, which CRO shall have substantially all the powers vested in the Board of Managers of each of the Debtors and the following additional duties and responsibilities: (1) evaluate the Debtors' liquidity situation and assist Debtors' management with the preparation of the Budget; (2) assist the Debtors in preparing rolling 13 week cashflow projections and other reporting required pursuant to the DIP Financing Documents; (3) manage the Debtors' operations within the parameters of the Budget and the Business Plan (as defined in the Plan Term Sheet); (4) work with the Debtors' management, and other professionals and stakeholders to manage any sale of the Debtors' assets as contemplated by the Plan Term Sheet; (5) assist the Debtors and direct legal counsel as necessary throughout the Cases including, without limitation, assisting the Debtors in the post-petition process and fulfilling their duties under the Bankruptcy Code, Court Orders and the DIP Financing Documents; (6) participate in the development of a marketing plan and remodeling plan in consultation with existing senior management; and (7) assist with the preparation of the Debtors' monthly operating reports and other periodic reporting required to be performed by the Debtors to comply with the applicable provisions of the Bankruptcy Code; provided, however that nothing contained herein shall limit the Debtors' or the reorganized Debtors', as applicable, right to seek an order from the Bankruptcy Court to remove and replace the CRO, and the Plan shall provide that the Bankruptcy Court shall retain, for a period of not less than thirty-six (36) months following the Effective Date of the Plan, the authority to remove and replace the CRO; and further provided, however, that any such removal of the CRO by the Bankruptcy Court may, in accordance with the applicable loan documents, constitute an Event of Default under the DIP Facility and the GE Note, unless a replacement CRO is appointed in accordance with the CRO Replacement Procedures (as defined in the Plan Term Sheet).

(DIP Facility Agreement § 5.1)

(b)  The DIP Loan shall not be available for direct borrowings unless the Debtors shall at the time of drawing thereunder have first used all of the cash available to them (the "Available Cash") in excess of $200,000 (the "Minimum Amount").

## MATERIAL TERMS

(DIP Facility Agreement § 2.2)

(c) Except as otherwise agreed by the DIP Lender, the Debtors shall have paid all taxes then due and payable that are liens against all or a portion of the Collateral, and no action shall have been taken against any portion of the Collateral with regard to eminent domain.

(DIP Facility Agreement § 5.1.4)

(d)   Thereafter, the making of each extension of credit shall be conditioned upon (a) the accuracy of all representations and warranties in the DIP Financing Documents (including, without limitation, the material adverse change and litigation representations), (b) there being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit, and (c) receipt by the DIP Lender of a certificate (a "Borrowing Request") executed by the CRO to the effect that (i) the proposed extension of credit and its intended use are consistent in all material respects with the terms of the DIP Financing Documents and the Budget and are necessary, after utilization and application of Available Cash, to satisfy their obligations, (ii) the Debtors have observed or performed all of their covenants and other agreements and have satisfied in all material respects every condition contained in the DIP Financing Documents and the Interim Order or the Final Order (as applicable) to be observed, performed or satisfied by the Debtors, and (iii) such officer has no knowledge of any Event of Default or event, but for the passing of time or notice, that will result in an Event of Default under the DIP Financing Documents.  As used herein and as set forth in the DIP Financing Documents a "material adverse change" shall mean any event, development or circumstance, including a significant weather event, that has had or could reasonably be expected to have a material adverse effect on (a) the business, assets, property or financial condition of the Debtors, or (b) the validity or enforceability of any of the DIP Financing Documents or the rights or remedies of the DIP Lender thereunder; provided, however, that no events related to the commencement and continuation of these bankruptcy cases shall be deemed to constitute a material adverse change, and the existence of the automatic stay pursuant to Bankruptcy Code § 362 shall be considered in determining materiality.

(DIP Facility Agreement § 5.2)

(e)   The making of each extension of credit after sixty (60) days following the date on which the Bankruptcy Court enters the Interim Order, shall be subject to the further condition that the Final Order shall

| MATERIAL TERMS | |
|---|---|
| | have been entered by the Bankruptcy Court. The Final Order shall be in form and substance satisfactory to the Existing Lender and the DIP Lender, and shall approve and authorize on a final basis the matters and containing the provisions described in clause (a) above, prohibit the assertion of claims arising under Bankruptcy Code § 506(c) against the Existing Lender or the DIP Lender by the Debtors or any person claiming through the Debtors including, without limitation, the Debtors' legal counsel, advisors, investment bankers, and principals, and the Final Order shall not have been reversed, modified or amended without the prior written consent of the DIP Lender, stayed, vacated or subject to any pending appeal.<br><br>(DIP Facility Agreement § 5.3) |
| **Fees**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B), LBR 4001-2(a)(3)* | **Commitment Fee**.  1.0 percent (1%) of the aggregate DIP Facility commitment.<br><br>(DIP Facility Agreement § 3.3.1)<br><br>**Unused Facility Fee**.  1.0 percent per annum during the term of the DIP Facility.<br><br>(DIP Facility Agreement § 3.3.2)<br><br>**Exit Fee**.  1.0 percent of the original aggregate amount of the DIP Facility commitments.<br><br>(DIP Facility Agreement § 3.3.3) |
| **Liens, Priorities and Adequate Protection**<br><br>*FED. R. BANKR. P. 4001(b)(1)(B)(iv), 4001(c)(1)(B)(i), (ii); LBR 4001-2(a)(4)* | Pursuant to Bankruptcy Code § 364(c)(1), the DIP Lender will be granted a superpriority administrative claim over any and all administrative claims of the kind specified in Bankruptcy Code § 503(b) and § 507(b).  As collateral for the DIP Loan, the DIP Lender will be granted: (i) pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first priority Lien on all assets of the Debtors that are unencumbered as of the commencement of the Cases (other than Avoidance Actions) and all proceeds therefrom; (ii) pursuant to Section 364(c)(3) of the Bankruptcy Code, a perfected Lien on all other assets of the Debtors (other than the assets referred to in the following clause (iii) and other than Avoidance Actions), junior only to the valid, perfected and non-avoidable Liens on such assets as of the Petition Date and to valid Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code and all proceeds therefrom; and (iii) (iv) subject to any valid pre-petition Liens other than Liens granted |

| MATERIAL TERMS | |
|---|---|
| | under the Prepetition Loan Documents, pursuant to Sections 364(c)(1), 364(c)(2), 364(c)(3), and 503(b) of the Bankruptcy Code, a claim and Liens on any pre-petition and post-petition improvements (all of which being hereinafter collectively referred to as the "DIP Collateral").<br><br>(DIP Facility Agreement §§ 2.4, 9.1)<br><br>The Prepetition Lender will be granted adequate protection to the extent of any diminution in the value of their Pre-Petition Collateral as of the Petition Date, including but not limited to any diminution in value resulting from (i) the use of the cash collateral pursuant to Bankruptcy Code § 363(a), (ii) the use, sale or lease of Pre-Petition Collateral (other than the cash collateral) pursuant to Bankruptcy Code § 363(c), or (iii) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a), in the form of (a) the reimbursement of all reasonable and documented fees and expenses incurred by professionals for the Prepetition Lender including, without limitation, the reasonable disbursements of counsel and any financial consultant, advisor or expert advising the Prepetition Lender, (b) a lien immediately junior only to the lien granted to the DIP Lender on the DIP Collateral, (c) subject to payment of the Carve-Out Expenses, a superpriority claim pursuant to Bankruptcy Code § 507(b), (d) engagement by the Debtors of a CRO with the powers and duties set forth herein, (e) inclusion of the Exit Milestones (defined below) and (f) inclusion of credit bidding rights in favor of the Prepetition Lender in connection with the sale of any of the Debtors' assets, whether conducted pursuant to Bankruptcy Code §§ 363 and 1129(b)(2)(A), or otherwise.<br><br>(DIP Facility Agreement § 9.3) |
| **Carve-Out**<br><br>*LBR 4001-2(a)(5)* | (a) As used in the Interim DIP Order, the term "Carve-Out Expenses" shall mean, collectively: (i) the unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of title 28 of the United States Code (the "U.S. Trustee and Clerk Fees"); (ii) to the extent allowed by final order of the Bankruptcy Court (whether such allowance occurs before or after the receipt of the Carve-Out Trigger Notice, as defined below), all unpaid fees, disbursements, costs and expenses (collectively, the "Debtor Professional Fees") actually incurred at any time before the delivery of the Carve-Out Trigger Notice (including amounts actually incurred but not invoiced or approved prior to such day) by the Debtors' professionals pursuant to section 327 of the Bankruptcy Code (the "Debtor Professional Persons"); plus (iii) the reasonable Debtor Professional Fees of Professional Persons actually incurred immediately from and after delivery of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, |

| MATERIAL TERMS | |
|---|---|
| | procedural order or otherwise, in an aggregate amount not to exceed $50,000. As used in the Interim DIP Order, "Carve-Out Trigger Notice" shall mean a written notice expressly stating that the Carve-Out has been triggered and delivered by the DIP Lender to counsel for the Debtors following the occurrence of an Event of Default under the DIP Loan Documents or DIP Facility.<br><br>(b)  Upon delivery of a Carve-Out Trigger Notice, the DIP Lender shall fund an amount equal to the unpaid portion of the Carve-Out Expenses, including accrued and unpaid Debtor Professional Fees through the date of delivery of the Carve-Out Trigger Notice; provided, however, that nothing contained herein shall require the DIP Lender to advance an amount in excess of the aggregate DIP Facility commitments or to pay the Debtors Professional Fees in excess of the limits set forth in the Budget.  Any amount funded pursuant to the foregoing that is not utilized for the payment of fees and expenses of the professionals of the Debtors shall be returned to the DIP Lender within 180 days after delivery of the Carve-Out Trigger Notice.<br><br>(c) Nothing herein shall constitute a waiver by the DIP Lender of it right to object to the Debtor Professional Fees, all such rights being specifically reserved.<br><br>(d) No Budget shall include any fees or expenses incurred by any party, including the Debtors, or its or their professionals, in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings, contested matter, objection, other litigation, or discovery against the Prepetition Lender and the DIP Lender or their advisors, agents or subagents, including, without limitation, challenging the amount, validity, perfection, priority or enforceability of, or asserting any defense, counterclaim or offset to, the obligations arising under the DIP Facility and the liens and claims thereunder in favor of the Prepetition Lender and the DIP Lender.<br><br>(DIP Facility Agreement § 2.1.1) |
| **Payments on Prepetition Debt**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B(ii)* | None. |
| **Covenants** | **Affirmative Covenants.**  Usual and customary for financings of this type, including, without limitation:   delivery of monthly financial statements, reports and officers' certificates as required by the DIP Financing Documents and the Prepetition Loan Documents; timely |

| MATERIAL TERMS | |
|---|---|
| *FED. R. BANKR. P. 4001(C)(1)(B)* | payment of other material post-petition obligations; periodic reporting packages and other information reasonably requested by the Prepetition Lender and the DIP Lender including delivery of weekly updates and extensions to the Budget and delivery of the Weekly Cash Flow Variance Report and explanation (in each case in a form that is acceptable to the Prepetition Lender and the DIP Lender); continuation of business and maintenance of existence and material rights and privileges (including all permits and licenses); compliance with laws and material contractual obligations; maintenance of property and insurance; maintenance of books and records; right of the Prepetition Lender and the DIP Lender periodically to inspect property and books and records; notices of defaults, litigation and other material events; taxes; use of proceeds; collateral and security interests; perfection of security interests; separate corporate existence; and compliance with environmental laws, in the case of each of the foregoing, subject to materiality thresholds and  exceptions set forth in the DIP Financing Documents.<br><br> (DIP Facility Agreement, §§ 7.1.1-7.1.12)<br><br>**Negative Covenants.**  Usual and customary for financings of this type, including, without limitation, limitations on indebtedness; liens (except as permitted under the DIP Financing Documents); guarantee obligations; mergers, consolidations, liquidations and dissolutions; sales of assets; leases; dividends and other payments in respect of capital stock; capital expenditures; investments, loans and advances; optional payments and modifications of other indebtedness and obligations; transactions with affiliates; sale and leasebacks; changes in fiscal year; negative pledge clauses; changes in lines of business; payment of pre-petition claims except as authorized by order of the Bankruptcy Court; and existence of any claims other than those of the Prepetition Lender and the DIP Lender entitled to superpriority under the Bankruptcy Code, in each case, subject to materiality thresholds and exceptions as mutually agreed by the Prepetition Lender and the DIP Lender and the Debtors.<br><br>In addition, the Debtors shall not spend any available cash or proceeds from the DIP Loan or incur debts or liabilities, except as set forth in the DIP Financing Documents and the Budget.<br><br>(DIP Facility Agreement §§ 7.2.1-7.2.16) |
| **Limitations** | The Debtors will use Available Cash to fund any Interim Period Budget items before drawing on the DIP Facility unless, after giving effect to such funding with Available Cash, the amount of such Available Cash |

| MATERIAL TERMS | |
|---|---|
| *LBR 4001-2(a)(9)* | would be less than the Minimum Amount.  Except for the accrual and payment of the Carve-Out Expenses, the Debtors shall not spend any cash, including cash collateral and Available Cash and shall not incur any debt or liability, except as approved pursuant to the Budget or permitted under the DIP Financing Documents.  The DIP Loan shall not be available for direct borrowings unless the Debtors shall at the time of drawing thereunder have first used all of the Available Cash in excess of the Minimum Amount.  The use of Available Cash by the Debtors shall terminate from and after acceleration of the DIP Facility by the DIP Lender upon the occurrence of an Event of Default under the DIP Financing Documents. |
| | (DIP Facility Agreement § 2.1.1) |
| | The Debtors shall not be permitted to include in any Interim Budget any fees or expenses incurred by any party, including the Debtors, or its or their professionals, in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings, contested matter, objection, other litigation, or discovery against the Existing Lender and the DIP Lender or their advisors, agents or subagents, including, without limitation, challenging the amount, validity, perfection, priority or enforceability of, or asserting any defense, counterclaim or offset to, the obligations arising under the DIP Facility and the liens and claims thereunder in favor of the Existing Lender and the DIP Lender. |
| | (DIP Facility Agreement § 2.1.1) |
| | Subject to the Interim Period Budget, the Debtors shall maintain a cash management system substantially identical to the cash management system that they maintained immediately prior to the Petition Date, including but not limited to, the maintenance of the accounts established in connection with the Prepetition Loan Documents and the related agreements.  In connection with the foregoing, the Debtors shall seek the entry of appropriate first day orders, satisfactory to the Existing Lender and the DIP Lender in their discretion, providing for the continuation of the cash management system. |
| | (DIP Facility Agreement § 7.1.11) |
| **Events of Default**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B); LBR 4001-2(a)(10)* | Usual and customary for financings of this type, including, without limitation, nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed upon; material inaccuracy of representations and warranties; violation of covenants; failure to comply with the Budget provisions; failure to satisfy the Exit Milestones; material judgments (after taking into account insurance); |

| MATERIAL TERMS | |
|---|---|
| | filing of an objection or challenge by any party in interest in the Cases to the Existing Lender's liens and security interests in the Pre-Petition Collateral that is not dismissed or otherwise resolved in favor of the Existing Lender within 30 days; actual invalidity of any post-petition lien or security document; the entry of an order dismissing any Chapter 11 Case or converting any such case to a Chapter 7 case; the entry of an order appointing a trustee in any Chapter 11 Case; except for the Carve-Out Expenses, the entry of an order granting any other superpriority claim or lien equal or superior in priority to those granted for the benefit of the DIP Lender and the Existing Lender; the entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any material asset or assets of the Debtors; the entry of an order staying, reversing, vacating or otherwise modifying (except with the prior written consent of the DIP Lender) the DIP Financing Documents, the Interim Order or the Final Order; the entry of an order appointing an examiner having enlarged powers (beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4)); the entry of an order under Bankruptcy Code § 506(c) surcharging the DIP Collateral or the Pre-Petition Collateral; the issuance of any order by any governmental authority having or asserting jurisdiction over the Debtors or its business which adversely affects in any material respect the Debtors' business as currently operated; the filing of any pleading by the Debtors seeking, or otherwise consenting to, certain of the matters set forth above; failure of the Bankruptcy Court to enter an order authorizing the engagement of a CRO with the powers, duties and responsibilities set forth herein; failure of the Bankruptcy Court to enter the Final Order within 60 days after the date of entry of the Interim Order; failure by the Debtors to fulfill their obligations under the Interim Order and the Final Order; change of control; payment of prepetition claims without Bankruptcy Court order; proposal of any sale of the Debtors' assets outside the ordinary course that is not contemplated by the Plan Term Sheet, absent consent by the Existing Lender and the DIP Lender; and proposal of any sale of the Debtors' assets that does not preserve the Existing Lender's right to credit bid its pre-petition claim.<br><br>(DIP Facility Agreement §§ 8.1.1-8.1.11) |
| **Acknowledgements**<br><br>FED. R. BANKR. P.<br>*4001 (c)(1)(B) (iii)* | The Debtors make certain customary admissions and stipulations with respect to (a) the aggregate amount of prepetition indebtedness owing to the Prepetition Lender, (b) the validity, enforceability and priority of the liens and security interests granted to the Prepetition Lender, (c) the binding nature of the obligations under the Prepetition Loan Documents in respect of the Debtors, and (d) the waiving of claims and defenses against the Prepetition Lender regarding the obligations under the Prepetition Loan Documents (Interim DIP Order, ¶¶ D - G); <u>provided</u> |

| MATERIAL TERMS | |
|---|---|
| | that following formation of a Committee, if any, the Committee shall be entitled to investigate the validity, amount, perfection, priority, and enforceability of the Prepetition Liens and Prepetition Secured Indebtedness, or to assert any other claims or causes of action held by the Debtors' estates against any Prepetition Lender.<br><br>(Interim DIP Order ¶¶ F, 22.) |
| **Automatic Stay**<br><br>*FED. R. BANKR. P. 4001(c) (1)(B)(iv)* | The automatic stay is modified as necessary to (i) permit the Debtors to grant the DIP Liens and to incur all liabilities and obligations to GE Capital under and in connection with the DIP Financing Documents, the DIP Facility and this Interim Order, and (ii) authorize GE Capital to retain and apply payments hereunder.<br><br>(Interim DIP Order ¶¶ 2(i)) |
| **Establishment of Deadlines**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vi); LBR 4001-2(a)(12)* | In addition, the Debtors shall satisfy the following milestones (the "Exit Milestones"): (i) the Debtors shall file a plan of reorganization (the "Plan") within thirty (30) days of the Petition Date; (ii) the Bankruptcy Court shall have entered an order approving the disclosure statement (the "Disclosure Statement") within sixty (60) days of the filing of the Plan; (iii) the Bankruptcy Court shall have commenced the confirmation hearing with respect to the Plan within sixty (60) days of the approval by the Bankruptcy Court of the Disclosure Statement; and (iv) the Bankruptcy Court shall have entered an order confirming the Plan within thirty (30) days of the commencement of the confirmation hearing. The parties expressly acknowledge and agree that the foregoing Exit Milestones are subject to Bankruptcy Court availability, and that no Termination Event shall occur where the Debtors' failure to satisfy one of the foregoing Exit Milestones was solely the result of the unavailability of necessary time on the Bankruptcy Court's calendar and such Exit Milestone is nevertheless satisfied not more than 7 days after the deadline set forth above.<br><br>(DIP Facility Agreement § 8.1.11) |
| **Waivers and Consents**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(v), (vii-x)* | **Non-Bankruptcy Law.** The DIP Liens, Adequate Protection liens and other interests granted to the DIP Lender or the Prepetition Lender are deemed valid, binding, enforceable, and fully perfected as of the date of the Interim DIP Order.<br><br>(Interim DIP Order ¶¶ D-G, 2(g), 5)<br><br>**Indemnification.** Usual and customary for financings of this type, including that Debtors shall pay immediately upon written demand |

| MATERIAL TERMS | |
|---|---|
| | from the DIP Lender and without application to the Bankruptcy Court all reasonable and documented out-of-pocket expenses of the DIP Lender (including the reasonable and documented fees, disbursements and other charges of advisors or of counsel) in connection with the enforcement of the DIP Financing Documents; provided, however, that the legal fees and expenses of counsel to the DIP Lender (on a going forward basis commencing on the Petition Date) shall not exceed $75,000 in the aggregate. The DIP Lender (and its affiliates and its respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, bad faith or willful misconduct of the indemnified party).<br><br>(DIP Facility Agreement §§ 10.3, 10.4) |

## Key Provisions

9.      The DIP Facility includes certain provisions the Debtors are required to highlight pursuant to Local Bankruptcy Rule 4001-2 in addition to those contained in Federal Rule of Bankruptcy Procedure 4001(b) and (c).  As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved.

- **Local Bankruptcy Rule 4001-2(f) – Committee Challenge Period, Interim DIP Order at ¶ 22**.  Until the later of (a) ninety (90) days following the engagement of counsel by the Committee or (b) if no counsel or no Committee is appointed, within one-hundred twenty (120) days following the Petition Date, the Committee shall be have commenced an adversary proceeding for the purpose of challenging the validity, extent, priority, perfection or enforceability of the Prepetition Loan Documents, the Prepetition Claims, the Liens, or the Prepetition Collateral.

- **Local Bankruptcy Rule 4001-2(a)(i)(F) – Treatment of Committee Professionals, Interim DIP Order at ¶ 5**.  The Interim DIP Order does not provide for the inclusion of allowed fees and expenses of any official committee in the Carve-Out.  The Debtors' largest unsecured creditor has reached an agreement with the Debtors with respect to the treatment of its claim.  The majority of the remaining unsecured creditors have claims that are relatively small.  In light of this, the Debtors would submit that not

16

including fees and expenses of any official committee in the interim order is reasonable and appropriate.

**Background**

10.     On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code to permit them to restructure their balance sheets and operations to restore profitability.   The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.   Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.

11.     A detailed description of the Debtors' business, capital structure, and the events leading to these chapter 11 cases is fully set forth in the First Day Declaration and is incorporated herein by reference.

**I.     Prepetition Indebtedness.**

12.     As of the Petition Date, the Debtors have outstanding secured debt obligations in the aggregate principal amount of approximately $14.6 million.

**A.     First Lien Indebtedness**

13.     The First Day Declaration of Dawn Petite, Chief Operating Officer, sets forth the terms of the Prepetition Loan Agreements with the Prepetition Lender.

**B.     Owner Loans and Unsecured Debts**

14.     The First Day Declaration of Dawn Petite, Chief Operating Officer, sets forth the terms of certain Owner Loans.   The remainder of Debtors' debt is landlord, trade or vendor debt.

## II.     The Debtors' Marketing Efforts for Postpetition Financing.[5]

15.     As described in the First Day Declaration, the Debtors began restructuring negotiations with their existing secured creditors approximately one year ago.

16.     The Debtors recognized early that any attempt to secure debtor-in-possession financing from any source outside the Debtors' existing capital structure may have required the consent of the Debtors' Prepetition Lender as a condition to effectiveness, or would have required a contested priming fight in the first day of these chapter 11 cases.  Accordingly, to avoid this high risk of distracting (and potentially extremely costly) priming and adequate protection disputes, the Debtors determined that a DIP Facility from the existing Prepetition Lender was the most viable alternative.

17.     After duly considering other potential sources of debtor-in-possession financing, the Debtors' advisors believe that the DIP Facility is the best debtor-in-possession financing package available to the Debtors.  The DIP Facility provides an attractive financing package, with market terms comparable to those in similar debtor-in-possession financing packages.

### Basis for Relief

## I.     The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Facility Documents.

### A.     Entering into the DIP Facility Documents Is an Exercise of the Debtors' Sound Business Judgment.

18.     The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Facility Documents, obtain access to the DIP Facility, and to continue using the Cash Collateral.

---

[5]     This subsection describes the Debtors' efforts to obtain financing, the basis on which the Debtors determined that the proposed financing is on the best terms available, and the material facts bearing on the issue of whether the credit is being extended in good faith.

19.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See, e.g., Trans World Airlines, Inc.* v. *Travellers Int' I AG (In re Trans World Airlines, Inc.),* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *In re Barbara K. Enters., Inc.,* No. 0811474, 2008 WL 2439.649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.,* 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment."); *see also Bray* v. *Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that "[t]he statute imposes no duty to seek from every possible lender before concluding that such credit is unavailable").

20.     Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under

similar circumstances." *In re Exide Techs.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

21.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.,* 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.,* 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames,* 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

22.     The Debtors' execution of the DIP Facility Documents is an exercise of their sound business judgment that warrants approval by the Court.  Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of these chapter 11 cases, and determined that the Debtors would require significant postpetition financing to support their operational and restructuring activities.  Further, while the Debtors' vendors typically allow the Debtors to purchase goods on credit, the Debtors' ability to continue this practice is dependent upon their having access to sufficient liquidity to assure business counterparties that the Debtors are not a credit risk.  Accordingly, the Debtors negotiated the DIP

Facility Documents with the DIP Lender in good faith, at arm's- length, and with the assistance of their advisors, to obtain the required postpetition financing on terms favorable to the Debtors. Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Facility Documents provide a greater amount of financing on more favorable terms than any other reasonably available alternative. The Debtors' advisors have canvassed the market to find interested parties to participate in the debtor-in-possession financing and have assisted the Debtors in negotiations to obtain the best terms available to ensure that the DIP Facility was fully subscribed.

23. Specifically, as noted above, the DIP Facility will provide the Debtors with access to up to approximately $1.0 million in incremental liquidity immediately after entry of the Interim DIP Order and satisfaction of other conditions precedent to funding as set forth in the DIP Facility, which the Debtors and their advisors have independently determined should be sufficient to demonstrate their credit-worthiness to their vendors and other business counterparties and support the Debtors' ongoing operations and reorganization activities through the pendency of these chapter 11 cases.

**B.     The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.**

24. Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];

      (2)        secured by a lien on property of the estate that is not otherwise subject to a lien; or

      (3)        secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

25.      To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray* v. *Shenandoah Fed. Savs. & Loan Ass 'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd.* v. *Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

26.      The Debtors' knowledge of their financial situation coupled with their knowledge of the general lending market available to them revealed that such financing on a junior or unsecured basis was not available. The Debtors' significant secured debt obligations and lack of unencumbered assets precludes them from obtaining postpetition financing in the amount they require on terms other than on a secured and superpriority basis. The Court should therefore authorize the Debtors to provide the DIP Lender, senior liens on the Debtors' unencumbered

property as provided in section 364(c)(2) of the Bankruptcy Code, and junior liens on the Debtors'

property that is subject to valid, perfected, and unavoidable liens in existence immediately prior to

the Petition Date (other than the Permitted Encumbrances) or to valid and unavoidable liens in

existence immediately prior to the Petition Date that are perfected after the Petition Date as

permitted by section 546(b) of the Bankruptcy Code, as provided in section 364(c)(2) of the

Bankruptcy Code; as well as to grant the Debtors' repayment obligations under the DIP Facility

Documents superpriority administrative expense status as provided for in section 364(c)(1) of the

Bankruptcy Code.

### C.   The Interests of the Prepetition Lender Is Adequately Protected.

27.    A debtor may obtain postpetition credit "secured by a senior or equal lien on

property of the estate that is subject to a lien only if' the debtor, among other things, provides

"adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B).  What

constitutes adequate protection is decided on a case-by-case basis, and adequate protection may

be provided in various forms, including payment of adequate protection fees, payment of interest,

or granting of replacement liens or administrative claims.  *See, e.g., In re Continental Airlines Inc.,*

154 B.R. 176, 180-181 (Bankr. D. Del. 1993); *In re Columbia Gas Sys., Inc.,* Nos. 91-803, 91-804,

1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); see *also In re Mosello,* 195 B.R. 277, 289

(Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact- specific inquiry . . .

left to the vagaries of each case"); *In re Realty Sw. Assocs.,* 140 B.R. 360 (Bankr. S.D.N.Y. 1992);

*In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate

protection "is left to the vagaries of each case, but its focus is protection of the secured creditor

from diminution in the value of its collateral during the reorganization process") (citation omitted).

28.     The Debtors have offered a fair and reasonable adequate protection package to the

Prepetition Lender (collectively, the "Adequate Protection").  The Prepetition Lender shall receive

Adequate Protection including, without limitation, the following:

- valid, binding, enforceable, and fully perfected replacement liens in the Collateral, subordinate only to the Carve-Out and the DIP Liens;

- the reimbursement of all reasonable and documented fees and expenses incurred by Professionals for the Lender including, without limitation, the reasonable disbursements of counsel and any financial consultant, advisor or expert;

- subject to the Carve-Out, a superpriority claim under Section 507(b) of the Bankruptcy Code;

- engagement by the Debtors of the CRO;

- completion of the Exit Milestones; and

- credit bidding rights in favor of the Lender in connection with the sale of any of the Debtors' assets, whether conducted pursuant to Section 363 or Section 1129(b)(2)(A) of the Bankruptcy Code or otherwise.

29.     The Adequate Protection summarized above and set forth in the DIP Orders is fair

and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the

Bankruptcy Code.  Accordingly, the Court should find that the Adequate Protection is fair and

reasonable and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**II.     The Debtors Should Be Authorized to Use the Cash Collateral.**

30.     Section 363(c) of the Bankruptcy Code restricts a debtor's use of a secured

creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

The trustee may not use, sell, or lease cash collateral... unless—

(A)     each entity that has an interest in such cash collateral consents; or

(B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an

interest in property... proposed to be used, sold or leased, by the trustee, the court, with or without

a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral.

31.      *First,* the use of Cash Collateral here is consensual.  Pursuant to the DIP Facility Documents, the DIP Lender and the Prepetition Lender have consented to the Debtors' use of the Cash Collateral.

32.      *Second,* even in the absence of consent, the Prepetition Lender's interest in the Cash Collateral is adequately protected in satisfaction of section 363(e) of the Bankruptcy Code.[6] As described above, the Debtors are providing the Prepetition Lender with Adequate Protection, which is fair and reasonable, and adequately protects the Prepetition Lender's interests in the Prepetition Collateral from diminution caused by the DIP Facility, including by the Debtors' use of the Cash Collateral pursuant to the terms thereof.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

33.      The Debtor will be operating pursuant to a budget, attached hereto as **Exhibit __**. The Debtor believes that the budget will be adequate, considering all available assets and the DIP Facility, to pay all administrative expenses due or accruing during the period covered by the budget and the DIP Facility.

**III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lender Under the DIP Facility Documents.**

34.      Under the DIP Facility Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lender.  In particular, as noted above, the Debtors have agreed to pay a Commitment Fee of 1% of the aggregate DIP Facility commitment.  The Debtors

---

[6]    The Debtors are not aware of any entity other than the Debtors and the Prepetition Lender that has or purports to have an interest in the Cash Collateral.

have also agreed to an Unused Facility Fee of 1% per annum during the term of the DIP Facility

and an Exit Fee of 1% of the original aggregate amount of the DIP Facility commitment.

35.     Courts routinely authorize debtors to pay fees similar to those the Debtors propose

to pay, where the associated financing is, in the debtor's business judgment, beneficial to the

debtors' estates—indeed, the fees here are significantly smaller than fees approved in many other

cases.[7] *See, e.g.*, *In re Insight Health Services Holdings Corp.*, No. 10-16564 (AJG) (Bankr.

S.D.N.Y. Jan. 4, 2011) (approving 2.0% DIP closing fee); *In re NR Liquidation III Co. (f/k/a Neff

Corp.)*, No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1% DIP and exit

facility fee); *In re The Reader's Digest Ass'n*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009)

(approving 3% exit fee), *In re Lear Corp.*, No. 14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009)

(approving 5.0% up-front fee and a 1.0% exit/conversion fee); *In re Gen. Growth Prop., Inc.*, No.

09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75% exit fee); *In re Aleris Int'l. Inc.*, No.

09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5% exit fee and 3.5% front-end net

adjustment against each lender's initial commitment); *In re Tronox Inc.*, No. 09-10156 (Bankr.

S.D.N.Y. Jan. 13, 2009) (approving an up-front 3% facility fee); *In re Lyondell Chem. Co.*, No.

09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (approving exit fee of 3%); *In re DJK Residential*, No.

08-10375 (Bankr. S.D.N.Y. Feb. 29, 2008) (approving 3% fee in connection with postpetition

financing).[9]   Accordingly, the Court should authorize the Debtors to pay the fees provided under

the DIP Facility Documents in connection with entering into those agreements.

## IV.     The DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e).

36.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

---

[7]     Because of the voluminous nature of the orders cited herein, they are not attached to the Motion. Copies of these
orders are available on request of the Debtors' proposed counsel.

of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

37.     As explained in detail herein and in the First Day Declaration, the DIP Facility Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length, good faith negotiations between the Debtors and the DIP Lenders.  The terms and conditions of the DIP Facility Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Facility Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.     The Debtors Require Immediate Access to the Cash Collateral and DIP Facility.**

38.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2), (c)(2).   In examining requests for interim relief under this rule, courts in this

jurisdiction generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores,* 115 B.R. at 36.

39.    Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than [15] days after service of the motion. If the motion so requests, the court may conduct a hearing before such [15] day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

40.    In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g., Ames Dep't Stores,* 115 B.R. at 36; *Simasko,* 47 B.R. at 449.  Under this standard, the Debtors' request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate.

41.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to borrow up to approximately $1.0 million under the DIP Facility is not granted promptly after the Petition Date.  The Debtors have no material source of liquidity other than the DIP Facility.  To continue to operate their businesses, maintain operations, and fund their cash management system to a sufficient level, the Debtors require access to the DIP Facility.

42.    Moreover, substantially all of the Debtors' cash is subject to the dominion of the Prepetition Lender.  Thus, the Debtors have insufficient cash to fund operations without immediate use of Cash Collateral and access to the DIP Facility.  Access to the DIP Facility also should allow the Debtors to continue to satisfy obligations arising from the ordinary-course operation of their businesses.  The Debtors' ability to procure goods on credit is entirely based on the Debtors' liquidity and the perception of the Debtors' ability to repay and general merchandise vendors for

providing their products on credit.  The DIP Facility will signal the Debtors' ability to satisfy any and all obligations to vendors and contribute to what the Debtors hope and expect will be a smooth restructuring and sale process.

43.    Further, the Debtors anticipate that the commencement of these chapter 11 cases may significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these chapter 11 cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these chapter 11 cases.  Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain their relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest.

## Request for a Final Hearing

44.    Pursuant to Bankruptcy Rules 4001 (b)(2) and 4001 (c)(2), the Debtors request that the Court set a date, which is no sooner than 14 days after the date of this Motion and no later than 25 days after the Petition Date, to hold a hearing to consider entry of the Final DIP Order and the permanent approval of the relief requested in this Motion.[8] The Debtors also request authority to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of objections, if any, to entry of the Final DIP Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final DIP Order under Bankruptcy Rule 4001(c)(2).

---

[8]    The DIP Facility Documents require that the Final DIP Order be entered no later than 35 days after the Petition Date.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

45.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

46.     No trustee or examiner has been appointed in these chapter 11 cases.  Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the Southern District of New York; (b) General Electric Capital Corporation, GE Capital Commercial of Utah LLC, GE Capital Bank, and their counsel; (c) Friendly's Franchising, LLC; (d) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims; (e) the Internal Revenue Service; (f) all landlords of the Debtors; and (g) those parties who have formally filed a request for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

47.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the

relief requested herein and granting such other further relief as is just and proper.

Dated: January 6, 2015
White Plains, New York

**SHACKELFORD MELTON McKINLEY & NORTON LLP**

*/s/ Rakhee V. Patel*
Rakhee V. Patel, Pro Hac Vice Motion Pending
Frances A. Smith, Pro Hac Vice Motion Pending
3333 Lee Parkway, Tenth Floor
Dallas, TX 75219
Telephone:  214.780.1400
Facsimile:  214.780.1401
Email:  rpatel@shackelfordlaw.net
        fsmith@shackelfordlaw.net

**AKIN GUMP STRAUSS HAUER & FELD LLP**

*/s/ Michael P. Cooley*
Sarah Link Schultz, Pro Hac Vice Motion Pending
Michael P. Cooley (Bar No. MC-1214)
1700 Pacific Avenue, Suite 4100
Dallas, TX  75201-4624
Telephone:     (214) 969-2800
Facsimile:     (214) 969-4343
Email: sschultz@akingump.com
        mcooley@akingump.com

*Proposed Counsel to the Debtors and Debtors-in-Possession*

## EXHIBIT A

**Proposed Interim DIP Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| J&B PARTNERS MANAGEMENT | ) | Case No. |
| LLC, *et al.* | ) | |
| | ) | |
| | ) | Jointly Administered. |
| Debtors. | ) | |
| | ) | |

**INTERIM ORDER APPROVING DEBTORS' MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION
FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (Ill) GRANTING
ADEQUATE PROTECTION TO PREPETITION LENDER, AND (IV) GRANTING
LIENS AND SUPERPRIORITY CLAIMS**

Upon consideration of the Motion (the "Financing Motion") dated January 6, 2015, filed

in the above-captioned jointly administered bankruptcy cases (the "Bankruptcy Cases") of J & B

PARTNERS MANAGEMENT LLC, a New York limited liability company, J & B

RESTAURANT PARTNERS OF LONG ISLAND HOLDING CO., LLC, a New York limited

liability company, J & B RESTAURANT PARTNERS OF NYDMA LLC, a New York limited

liability company, J & B RESTAURANT PARTNERS OF MASSAPEQUA PARK, LLC, a New

York limited liability company, J & B RESTAURANT PARTNERS OF MIDDLE ISLAND, LLC,

a New York limited liability company, J & B RESTAURANT PARTNERS OF SHIRLEY, LLC,

a New York limited liability company, J & B RESTAURANT PARTNERS OF LONG ISLAND,

LLC, a New York limited liability company, J & B RESTAURANT PARTNERS OF LONG

ISLAND II, LLC, a New York limited liability company, J & B REAL ESTATE PARTNERS OF

LONG ISLAND, LLC, a New York limited liability company, J & B REAL ESTATE PARTNERS

OF LONG ISLAND II, LLC, a New York limited liability company, and J & B RESTAURANT

PARTNERS OF NJ, LLC, a New York limited liability company, the debtors and debtors-in-

possession (collectively, the "Debtors"), for authority to execute the DIP  Agreement (defined

below), pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364, with General Electric Capital

Corporation ("GE Capital" or "DIP Lender"); and a hearing having been held on January __, 2015

(the "Interim Hearing"); and upon consideration of the evidence and the arguments of counsel;

and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.     **The Petition Date.**   On January 6, 2015 (the "Petition Date") the Debtors

commenced these cases (the "Bankruptcy Cases") by filing voluntary petitions under chapter 11

of title 11 of the United States Code (the "Bankruptcy Code").  Since the Petition Date, the Debtors

have remained in possession and control of their assets as debtors-in-possession pursuant to

sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in

the Bankruptcy Cases.

B.     **Jurisdiction and Venue.**  This Court has jurisdiction to hear the Financing Motion

pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the Financing Motion constitutes a core

proceeding under 28 U.S.C. § 157(b).  Venue for the Bankruptcy Cases and proceedings on the

Financing Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     **Notice.**  Notice of the Interim Hearing and the relief requested in the Financing

Motion has been provided by the Debtors as set forth in the Financing Motion.   Under the

circumstances, such notice of the Interim Hearing and the relief requested in the Financing Motion

constitutes due, sufficient and appropriate notice and complies with section 102(1) of the

Bankruptcy Code, Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002 and

4001(b), and applicable local rules.

**D.**  **The Prepetition Loans.**  On September 26, 2008, December 23, 2009, September 23, 2011 and September 30, 2011, GE Capital, other lender parties thereto (collectively with GE Capital, the "<u>Prepetition Lender</u>"), and the Debtors entered into various loan agreements (collectively, as amended, supplemented, amended and restated, or otherwise modified through the date hereof, the "<u>Prepetition Loan Documents</u>"; the Prepetition Obligations thereunder, the "<u>Prepetition Loans</u>" and the collateral securing the Prepetition Loans, the "<u>Prepetition Collateral</u>"). True and correct copies of the Prepetition Loan Documents are retained by Prepetition Lender and the Debtors, and will be available to interested parties upon request.  Without prejudice to the rights of any official committee of unsecured creditors (any such committee, if formed, the "<u>Committee</u>") as set forth below, the Debtors agree that the Prepetition Loan Documents are genuine, valid, existing, and legally enforceable.

**E.**  **The Prepetition Liens.**  Pursuant to the Prepetition Loan Documents and applicable law, the Debtors agree (without prejudice and subject to the rights of a Committee set forth below) that Prepetition Lender holds valid, enforceable, and allowable claims against the Debtors, as of the Petition Date, in an aggregate amount equal to at least $15,716,924 in unpaid principal, including accrued but unpaid interest, plus any and all other fees, cost, expenses, charges, other debts or obligations of the Debtors to Prepetition Lender under the Prepetition Loan Documents and applicable law (including all professional fees that are chargeable or reimbursable under the Prepetition Loan Documents now or hereafter due under the Prepetition Loan Documents) (collectively, the "<u>Prepetition Claims</u>").[9]  Without prejudice and subject to the rights

---

[9] The amounts set forth herein are provided by the Debtors and have not been adopted by Prepetition Lender. Prepetition Lender may rely on this filing as if it were a proof of claim, and in such an instance, the Debtors shall acknowledge the claims set forth herein, as if they were submitted by way of a proof of claim.  Prepetition Lender shall have the right, but not the obligation, to subsequently file a proof of claim with the amounts that it shows as due and owing on the Petition Date.  Prepetition Lender and any Committee appointed each reserve all of their respective rights in connection with the claim amount.

of a Committee set forth below, the Debtors agree that Prepetition Lender holds perfected first priority liens and security interests (the "Liens") in, inter alia, the Prepetition Collateral, as more fully described in the Prepetition Loan Documents, as security for the payment and performance of the Debtors' obligations under the Prepetition Loan Documents.

**F.        Enforceability of Obligations Arising Under Prepetition Loan Documents.**

The Debtors, individually and on behalf of the Debtors' bankruptcy estates ("Bankruptcy Estates"), admit, agree and stipulate, without prejudice to the rights of a Committee to object and challenge, among other things, the amount, extent and validity of Prepetition Lender's liens, claims and interests under the Pre-Petition Loan Documents or otherwise, that the obligations of the Debtors under the Prepetition Loan Documents are (a) legal, valid, binding, and enforceable against each of the Debtors and the Bankruptcy Estates, and (b) not subject to any contest, attack, objection, recoupment, defense, counterclaim, offset, subordination, re-characterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  Without prejudice and subject to the rights of a Committee set forth below, the Debtors do not have, hereby forever release, and are forever barred from bringing any claims, counterclaims, causes of action, defenses or setoff rights relating to the Prepetition Claims, whether arising under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise, against Prepetition Lender and its respective affiliates, subsidiaries, agents, officers, directors, employees and attorneys.

**G.        Enforceability of Liens and Security Interests Granted Pursuant to the Prepetition Loan Documents.**   The Debtors, individually and on behalf of the Bankruptcy Estates, admit, agree and stipulate, without prejudice to the rights of a Committee to object and

challenge, among other things, the amount, extent and validity of Prepetition Lender's liens, claims

and interests under the Pre-Petition Loan Documents or otherwise, that the Liens are legal, valid,

enforceable, non-avoidable, and duly perfected and are not subject to avoidance, attack, offset,

recharacterization or subordination under the Bankruptcy Code, under applicable non-bankruptcy

law or otherwise and, as of the date hereof, there are no liens or security interests having priority

over the Liens.

      **H.**    **Need for Post-Petition Financing.**  An immediate need exists for the

Debtors to obtain funds in order to continue operations and to administer and preserve the value

of the Bankruptcy Estates.  The ability of the Debtors to finance their operations, to preserve and

maintain the value of their assets and maximize the return for all creditors requires the availability

of working capital under the terms of the debtor-in-possession financing transaction described in

the Senior Secured Superpriority Debtor-In-Possession Credit Agreement attached hereto as

Exhibit A (the "DIP Agreement")[10].  The debtor-in-possession financing transaction described in

the DIP Agreement shall hereinafter be referred to as the "DIP Facility".  The DIP Facility and the

documents and instruments governing the DIP Facility shall hereinafter be referred to as the "DIP

Financing Documents".  In the absence of the availability of such funds in accordance with the

terms hereof and the DIP Agreement, the continued operation of the Debtors' businesses would

not be possible, and serious and irreparable harm to the Debtors, the Bankruptcy Estates, their

creditors and equity holders would occur.

      **I.**    **No Credit Available on More Favorable Terms.**  The Debtors have been unable

to obtain (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code

as an administrative expense; or (b) credit with priority over any or all administrative expenses of

---

[10] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Agreement.

the kind specified in sections 503(b) or 507(b), in each case, on more favorable terms and conditions than those set forth in the DIP Agreement and this Interim Order.

**J.**      **Use of Proceeds of the DIP Facility.**   Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Documents) shall be used in a manner consistent with the DIP Agreement, the DIP Financing Documents, and this Interim Order.

**K.**      **Business Judgment and Good Faith Pursuant to Section 364(e).**   The terms and conditions of the DIP Facility, as set forth in the DIP Financing Documents, and the fees paid and to be paid thereunder (i) are fair, reasonable, and the best available under the circumstances; (ii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; and (iii) are supported by reasonably equivalent value and consideration.  The DIP Facility was negotiated in good faith and at arm's length between the Debtors and GE Capital.  GE Capital has indicated its willingness to provide financing to the Debtors pursuant to the DIP Financing Documents.  The funds to be extended under the DIP Facility will be extended by GE Capital in good faith, and for valid business purposes and uses by the Debtors, and, as a consequence, GE Capital is entitled to the protection and benefits afforded by section 364(e) of the Bankruptcy Code. The DIP Superpriority Claim (as defined herein), the DIP Liens (as defined herein) and other protections granted pursuant to this Interim Order (and the Final DIP Order), the DIP Financing Documents and the DIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order or the Final DIP Order, as provided in section 364(e) of the Bankruptcy Code.

**L.**      **Relief Essential; Best Interests.**   The relief requested in the Financing Motion (and as provided in this Interim Order) is necessary, essential, and appropriate for the continued

operation of the Debtors' businesses and management and preservation of the Bankruptcy Estates. It is in the best interests of the Bankruptcy Estates that the Debtors be allowed to obtain credit pursuant to the DIP Facility and the DIP Financing Documents.

**M.      Entry of Interim Order.**  For the reasons stated above, the Debtors have requested and are entitled to immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

**NOW, THEREFORE,** upon the Financing Motion and the record before this Court with respect to the Financing Motion, including the record made during the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      **Motion Granted.**  The Financing Motion is granted to the extent and in accordance with the terms and conditions set forth in this Interim Order.  Any objections to the Financing Motion with respect to the entry of this Interim Order to the extent not withdrawn, waived or otherwise resolved, and all reservations of rights included therein (but subject to all reservation of rights included herein), if any, are hereby denied and overruled.

2.      **DIP Financing Documents.**

(a)      **Approval of Entry into the DIP Financing Documents.**  The Debtors are expressly and immediately authorized, empowered and directed to execute and deliver the DIP Financing Documents and to incur and to perform in accordance therewith, and to execute and deliver all instruments, certificates, agreements and documents which may be required or necessary for the performance by the Debtors in connection with the DIP Facility and the creation and perfection of the liens and security interests granted pursuant to the DIP Financing Documents (the "DIP Liens" and together  with the Liens, the "GE Capital Liens") described in and provided for by this Interim Order and the DIP Financing Documents.  The Debtors are hereby authorized

and directed to do and perform all acts, satisfy all obligations, and to pay all principal, interest,

fees, expenses and other amounts described in the DIP Financing Documents as such become due

(collectively with all other obligations under and as defined in the DIP Financing Documents, the

"<u>DIP Obligations</u>"), which amounts shall not otherwise be subject to further approval of this Court.

Upon execution and delivery, the DIP Financing Documents shall represent valid and binding

obligations of the Debtors in accordance with their terms enforceable against the Debtors and the

Bankruptcy Estates.

(b)    **<u>Authorization to Borrow on an Interim Basis.</u>**   Subject to, and in

accordance with, the terms and conditions of the DIP Financing Documents, the Debtors are

immediately authorized to borrow between the date of entry of this Interim Order and the date of

the Final DIP Hearing (as defined herein), (the "<u>Interim Period</u>") up to $1,000,000 (the "<u>Interim</u>

<u>DIP Facility Amount</u>"). .

(c)    **<u>Use of the Interim DIP Facility Amount.</u>**   The Interim DIP Facility

Amount advanced by GE Capital to the Debtors thereafter shall be used by the Debtors in the

amounts and for the purposes identified in the Budget attached hereto as <u>Exhibit B</u> (the "<u>Interim</u>

<u>Period Budget</u>")to (i) pay related transaction costs, fees and expenses of the DIP Facility in

accordance with the DIP Financing Documents; and (ii) fund ongoing working capital needs of

the Debtors, including payments of administrative expenses incurred by the Debtors.  All advances

by GE Capital to the Debtors of the Interim Facility Amount during the Interim Period, shall be

subject to the Interim Period Budget.

(d)    **<u>Authorization to Use Cash Collateral and Proceeds of DIP Financing</u>**
**<u>Documents</u>**.  "Cash Collateral" shall mean as defined under section 363 of the Bankruptcy Code.
During the Interim Period, pursuant to section 363 of the Bankruptcy Code, Debtors are hereby
expressly authorized to use Cash Collateral and the proceeds of the Interim DIP Facility Amount
in the amounts and for the purposes identified in the Interim Period Budget, including to (i) pay
related transaction costs, fees and expenses of the DIP Facility in accordance with the DIP

Financing Documents; and (ii) fund ongoing working capital needs of the Debtors, including payments of administrative expenses incurred by the Debtors.

(e) **Conditions Precedent.** During the Interim Period, GE Capital shall have no obligation to make any loan or any other financial accommodations under the DIP Financing Documents unless the conditions precedent to make such loans or financial accommodations under the DIP Financing Documents have been satisfied in full or waived in accordance with the DIP Financing Documents. For avoidance of doubt, no loans or other extensions of credit will be available to the Debtors, (i) unless GE Capital and the Debtors execute and deliver the DIP Financing Documents, and (ii) in excess of the Interim DIP Facility Amount, until entry of a final order authorizing the Borrowers to borrow the full amount of the DIP Facility in accordance with the DIP Financing Documents (the "Final DIP Order").

(f) **DIP Superpriority Claim.** Provided that GE Capital advances the Interim DIP Facility Amount, effective immediately upon the entry of this Interim Order, and subject to the terms of the DIP Financing Documents, GE Capital, as adequate protection and security for the obligations of the Debtors under the DIP Facility and the DIP Financing Documents, is hereby granted (x) a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code superior to any and all administrative expenses in the Bankruptcy Cases, including without limitation, any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b) 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code (the "DIP Superpriority Claim"); provided, however, that the DIP Superpriority Claim shall be subordinate to: (i) all unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); plus (ii) an amount equal to the allowed fees and expenses of retained professionals of the Debtors ("Debtor Professional Fees") incurred before the delivery of a Carve-

Out Trigger Notice (as defined below) that are ultimately allowed by final order of the Court

(whether allowed before or after the delivery of such notice), but solely to the extent the same are

incurred in accordance with the Budget on a cumulative basis with respect to each professional;

plus (iii) all allowed Debtor Professional Fees that are incurred from and after the delivery of a

Carve-Out Trigger Notice in an aggregate amount of not more than $50,000 (collectively, the

"Carve-Outs").  The "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP

Lender to counsel for the Debtors following the occurrence of an Event of Default expressly stating

that the Carve-Out Expenses have been triggered (the "Carve-Out Trigger Notice").

       (g)     **DIP Liens.**  As and for security of the DIP Obligations, GE Capital is

granted security interests and liens against the assets of the Debtors, all of which shall immediately

be valid, binding, permanent, continuing, enforceable and non-avoidable (collectively, the "DIP

Liens"), including: (I) a first priority security interest and lien, pursuant to section 364(c)(2) of the

Bankruptcy Code, on all unencumbered property of the Debtors and the Bankruptcy Estates; and

(II)    a second priority security interest and lien, pursuant to section 364(c)(3), on all property of

Debtors that is subject to valid and unavoidable liens that are in existence as of the date hereof and

that under applicable law are senior to, and have not been subordinated to, the liens and security

interests of GE Capital (collectively, "Prior Liens")or Prior Liens that are perfected subsequent to

the Petition Date as permitted by section 546(b) of the Bankruptcy Code, if any.  The foregoing

property described in paragraphs (I) and (II) above shall hereinafter be referred to as the "DIP

Collateral"; and, collectively with the Prepetition Collateral, and any replacement liens granted in

connection with the use of cash collateral, the "Collateral."  Notwithstanding anything contained

herein, any successful challenge by a Committee of the validity, extent, priority, perfection or

enforceability of the Prepetition Loan Documents, the Prepetition Claims, the Liens, or the

Prepetition Collateral, shall have no effect on or with respect to the DIP Superpriority Claim or DIP Liens.

(h)    **Authorization to Perfect Liens.**  GE Capital shall be and hereby is authorized to take any action it deems necessary or appropriate to perfect the liens and security interests granted to GE Capital pursuant to the DIP Financing Documents and this Interim Order, including but not limited to filing financing statements, all of which shall be deemed to have been filed on the date of entry of this Order.

(i)    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to (i) permit the Debtors to grant the DIP Liens and to incur all liabilities and obligations to GE Capital under and in connection with the DIP Financing Documents, the DIP Facility and this Interim Order, and (ii) authorize GE Capital to retain and apply payments hereunder.

3.    **DIP Lien Priority and DIP Collateral.**  The DIP Liens shall have the priorities set forth in this Interim Order and, except as may otherwise be expressly set forth herein, shall in each and every instance, subject to the Carve-Outs and the Prior Liens, be first priority senior liens. The DIP Liens shall secure all of the Debtors' obligations under the DIP Financing Documents and the DIP obligations.  Subject to the Carve-Outs and/or the Prior Liens, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Bankruptcy Cases and shall be valid and enforceable against any trustee appointed in the Bankruptcy Cases, upon the conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Cases"), and/or upon the dismissal of any of the Bankruptcy Cases.  Without prejudice to the rights of a Committee to object and challenge, among other things, the amount,

extent and validity of GE Capital's liens, claims and interests under the Prepetition Loan

Documents or otherwise, the GE Capital Liens, the DIP Obligations and the Prepetition Claims

and any proceeds, products, offspring or profits of any of the foregoing, shall not be subject to

sections 510, 549, 550 or 551 of the Bankruptcy Code or the "equities of the case" exception of

section 552 of the Bankruptcy Code or section 506(c) of the Bankruptcy Code.

4.     **Maturity**.  The DIP Facility will mature (the "<u>Maturity Date</u>") on the DIP Facility

Termination Date.  All obligations and liabilities of the Debtors to GE Capital that remain

outstanding or are in existence on the last day of the term of the DIP Facility shall be due and

payable on the last day of the Maturity Date.

5.     **Enforceable Obligations**.  Without prejudice to the rights of a Committee to object

and challenge, among other things, the amount, extent and validity of Prepetition Lender's liens,

claims and interests under the Prepetition Loan Documents or otherwise, the DIP Financing

Documents shall constitute and evidence the valid and binding obligations of the Debtors, which

obligations shall be enforceable against the Debtors, the Bankruptcy Estates and any successors

thereto and their creditors, in accordance with their terms.

6.     **Use of Interim Facility Amount**.  From and after the date hereof, the Debtors shall

use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically

set forth in the DIP Financing Documents, this Interim Order and the Interim Period Budget.

7.     **Superpriority Administrative Claim Status.**  The DIP Obligations, pursuant to

section 364(c)(1) of the Bankruptcy Code, shall at all times constitute the DIP Superpriority Claim

and be payable from and have recourse to all DIP Collateral.  Other than as provided in the DIP

Financing Documents and this Interim Order and subject to the Carve-Outs, no costs or expenses

of administration, including, without limitation, professional fees allowed and payable under

Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726, or

otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and

no priority claims are, or will be, senior to, prior to or on a parity with the DIP Liens and the DIP

Superpriority Claims or the DIP Obligations, or with any other claims of GE Capital arising

hereunder.

8.     **Authorization to Use Cash Collateral and Proceeds of DIP Financing**

**Documents**.  Pursuant to the terms and conditions of this Interim Order, the DIP Facility and the

DIP Financing Documents, and in a manner consistent with the Interim Period Budget (as the same

may be modified, supplemented or updated from time to time with the agreement of GE Capital

consistent with the terms and conditions of the DIP Financing Documents), the Debtors are

authorized to use the advances under the DIP Financing Documents.  The Debtors' rights to use

the extensions of credit under the DIP Financing Documents shall terminate upon the earlier of (i)

the occurrence of an Event of Default in accordance with the provisions of paragraph 19 hereof,

or (ii) upon the occurrence of the Maturity Date.  Nothing in this Interim Order shall authorize the

disposition of any assets of the Debtors or the Bankruptcy Estates outside the ordinary course of

business or other proceeds resulting therefrom, except as permitted under the DIP Facility and the

DIP Financing Documents (subject to any required court approval).

9.     **Monitoring of Collateral.**  GE Capital shall be permitted to retain consultants and

financial advisors at the expense of the Debtors (subject to the rights of all parties in interest to

object to the amounts thereof as set forth in paragraph 21 herein), and GE Capital and its

consultants and advisors shall be given reasonable access to the Collateral and the DIP Collateral.

10.    **Financial Reporting.**  The Debtors shall provide Prepetition Lenders and GE Capital with all financial and other reporting in full compliance with the Prepetition Loan Documents and the DIP Financing Documents.

11.    **DIP and Adequate Protection Replacement Lien Perfection**.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Lien or to entitle the DIP Liens to the priorities granted herein.  Notwithstanding the foregoing, GE Capital may, in its sole discretion, file such financing statements, mortgages, security agreements, notices of liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code for the limited purpose of making such filings, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of this Interim Order.  The Debtors shall execute and deliver to GE Capital all such financing statements, mortgages, security agreements, notices and other documents as GE Capital may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens.  GE Capital, in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry or recorder of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.  To the extent that Prepetition Lender is the secured party under any account control agreements, listed as loss payee under any of the Debtors' insurance policies or is the secured party

under any of the Prepetition Loan Documents, GE Capital as DIP Lender shall also deemed to be

the secured party under such account control agreements, loss payee under the Debtors' insurance

policies and the secured party under each such document, shall have all rights and powers attendant

to that position (including, without limitation, rights of enforcement) and shall act in that capacity

and distribute any proceeds recovered or received in accordance with the terms of this Interim

Order and the other DIP Financing Documents.

12.     **Payment of Compensation**.  Nothing herein shall be construed as consent to the

allowance of any professional fees or expenses of any of the Debtors or any official committee

including, without limitation, the Committee, or shall affect the right of GE Capital to object to

the allowance and payment of such fees and expenses.

13.     **Waiver of Claims and Causes of Action.**  Without prejudice to the rights of a

Committee to object to and challenge, among other things, the amount, extent and validity of

Prepetition Lender's liens, claims and interests under the Prepetition Loan Documents or otherwise

and the rights set forth in paragraph 22 below, all claims and causes of action of the Debtors against

Prepetition Lender on account of the Prepetition Claims and Prepetition Loan Documents or

otherwise, including, but not limited to, any claims for preference, fraudulent conveyance or other

claims arising under the Bankruptcy Code, and any and all claims regarding the validity, priority,

perfection or avoidability of the Prepetition Claims or the Liens are hereby released, relinquished

and waived.

14.     **Waiver of Surcharge Rights.**  As a further condition of the DIP Facility and any

obligations of GE Capital to make credit extensions pursuant to the DIP Financing Documents,

upon entry of the Final DIP Order, the Debtors and the Bankruptcy Estates (and any successors

thereto or any representative thereof, including any trustees appointed in the Bankruptcy Cases)

shall be deemed to have waived any rights, benefits, or causes of action under section 506(c) of

the Bankruptcy Code as they may relate to or be asserted against GE Capital, or the GE Capital

Liens.  Nothing contained in this Interim Order or in the Final DIP Order shall be deemed a consent

by GE Capital to any charge, lien, assessment or claim against the DIP Collateral or the Collateral

under section 506(c) or otherwise.

48.    **No Additional Liens**.  Except for the Carve-Outs, from and after entry of

this Interim Order, unless GE Capital has provided its prior written consent or all DIP Obligations

have been indefeasibly paid in full in cash, there shall not be entered in these proceedings, or in

any Successor Case, any order which authorizes the obtaining of credit or the incurring of

indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or

any portion of the DIP Collateral and/or entitled to priority administrative status which is superior

to or *pari passu* with those granted pursuant to this Interim Order to GE Capital.

15.    **Proceeds of Subsequent Financing**.  Without limiting the provisions and

protections of any part of this Interim Order, if at any time prior to the indefeasible repayment in

full in cash of all DIP Obligations, the Bankruptcy Estates, any trustee, any examiner with enlarged

powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant

to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Financing

Documents, then all of the cash proceeds derived from such credit or debt and all cash collateral

shall immediately be turned over to GE Capital in reduction of the DIP Obligations in accordance

with the relative rights, claims, and priorities specified herein and in the DIP Financing

Documents.

16.    **Disposition of DIP Collateral.**  The Debtors shall not sell, transfer, lease,

encumber or otherwise dispose of any portion of the DIP Collateral without the prior written

consent (by email or otherwise) of GE Capital (which shall not be unreasonably withheld or delayed) required under the applicable DIP Financing Documents, except for sales of inventory in the ordinary course of business or except as otherwise provided for in the DIP Financing Documents and this Interim Order and approved by the Bankruptcy Court to the extent required under applicable bankruptcy law.

17. **No Marshaling/Applications of Proceeds**.  GE Capital and the GE Capital Liens shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the GE Capital Liens or any of the GE Capital Collateral.

18. **Events of Default.**  Subject to the provisions of the DIP Financing Documents and this Interim Order, unless and until all DIP Obligations are indefeasibly paid in full either in cash or by the issuance of the GE Note (as defined in the *Summary of Plan Terms*, dated January 6, 2015 and filed by the Debtors on the Petition Date) (or other arrangements for payment of such amounts satisfactory to GE Capital (in GE's sole discretion) have been made), the protections afforded GE Capital pursuant to this Interim Order and under the other DIP Financing Documents, and any actions taken pursuant thereto, shall survive the entry of any order confirming a chapter 11 plan or converting these Cases into a case under chapter 7, and the DIP Liens and the DIP Superpriority Claim shall continue in these proceedings and in any Successor Case, and such DIP Liens and DIP Superpriority Claim shall maintain their respective priority as provided by this Interim Order.

19. **Rights and Remedies Upon Occurrence of Event(s) of Default.**  Upon the occurrence of an Event of Default, and after giving any notice and/or opportunity to cure required by the DIP Agreement, GE Capital may settle an order (the "<u>Default Order</u>") on no less than seven (7) days' notice to the Debtors, the US Trustee, any Committee and any other party in interest

requesting notice that identifies the applicable Event of Default and provides, among other things, that: (a) the automatic stay under section 362(a) of the Bankruptcy Code shall be deemed lifted, vacated, modified and terminated with respect to GE Capital; and (b) GE Capital shall be entitled to exercise its rights and remedies in accordance with the DIP Financing Documents (unless within such five (5) day period the Bankruptcy Court determines that no default has occurred and is continuing), including, without limitation, (i) to terminate any obligations of GE Capital under the DIP Financing Documents and/or demand payment, and seek enforcement, of the DIP Obligations then outstanding, and (ii) to take any action, in its sole discretion, necessary to preserve and protect the GE Capital Collateral.  Notwithstanding the immediately preceding sentence, immediately following the giving of notice by GE Capital of the occurrence of an Event of Default:   (i) the Debtors shall continue to deliver and cause the delivery of the proceeds of GE Capital Collateral to GE Capital as provided in the DIP Financing Documents; (ii) GE Capital shall continue to apply such proceeds in accordance with the provisions of the DIP Financing Documents; and (iii) any obligation otherwise imposed on GE Capital to provide any loan or advance to the Debtors pursuant to the DIP Financing Documents shall immediately be suspended.  Notwithstanding anything contained in this Interim Order or the Final Order to the contrary, the Debtors shall have the right to continue to utilize Cash Collateral until and unless the Default Order has been entered, subject to all of the other terms and provisions contained in any order governing such use. Furthermore, subject to all of above provisions of this paragraph, upon the entry of the Default Order, GE Capital is authorized to exercise its remedies pursuant to the DIP Financing Documents and applicable law.  All proceeds realized in connection with the exercise of the rights and remedies of GE Capital shall be applied to the DIP Obligations and the Prepetition Claims under, and in accordance with the provisions of, the DIP Financing Documents.

20.     **Good Faith Under Section 364(e); No Modification or Stay of this Interim**

**Order.**  GE Capital is extending credit pursuant to the Order in "good-faith" within the meaning

of section 364(e) of the Bankruptcy Code, and the credit extended by GE Capital pursuant to this

Order, and in connection with the DIP Facility and the DIP Financing Documents shall be deemed

to be extended in good faith within the meaning of section 364(e) of the Bankruptcy Code and GE

Capital is entitled to the protections afforded by section 364(e) of the Bankruptcy Code and no

such appeal, modification, amendment or vacation shall affect the validity and enforceability of

any advances made hereunder or the liens, rights, claims, or priority authorized or created hereby.

Notwithstanding any such potential modification, amendment or vacation, any liens, rights, claims

or priorities granted to GE Capital hereunder arising prior to the effective date of such

modification, amendment or vacation of any DIP Liens and DIP Superpriority Claims granted to

GE Capital shall be governed in all respects by the original provisions of this Interim Order, and

GE Capital shall be entitled to all of the rights, liens, priorities remedies, privileges and benefits,

including the DIP Liens and DIP Superpriority Claims granted herein, with respect to any such

claim.  Since the loans made pursuant to the DIP Financing Documents are made in reliance on

this Interim Order, the obligations owed GE Capital prior to the effective date of any stay,

modification or vacation of this Interim Order shall not, as a result or any subsequent order in the

Bankruptcy Cases or in any Successor Cases, be subordinated, lose their lien priority or

superpriority administrative expense claim status, or be deprived of the benefit of the status of the

liens and claims granted to GE Capital under this Interim Order and/or the DIP Financing

Documents.

21.     **Expenses of Secured Creditor.**  As provided in the DIP Financing Documents,

the Debtors shall pay all reasonable and documented out-of-pocket expenses incurred by the DIP

Lender (including, without limitation, the reasonable and documented fees and disbursements of

counsel for the DIP Lender, any other local or foreign counsel that the DIP Lender shall retain

and any internal or third-party appraisers, consultants and auditors advising the DIP Lender),

including in connection with the preparation, execution, delivery and administration of the DIP

Financing Documents; provided, however, that the legal fees and expenses of counsel to the DIP

Lender (on a going forward basis commencing on the Petition Date) shall not exceed $75,000 in

the aggregate.  Payment of such fees shall not be subject to allowance by the Bankruptcy Court

and shall not be required to comply with the U.S. Trustee fee guidelines; provided, however, that

GE Capital shall submit copies of its legal counsel's invoices to the Debtor, the U.S. Trustee and

any Committee and such parties shall have twenty (20) days following their receipt of such

invoices to object to the reasonableness of the fees and expenses included in any invoice

submitted by GE Capital.  Any such objection must describe with particularity the items or

categories of fees and expenses that are the subject of the objection, and provide the specific

basis for the objection to each such item or category.  If any such objection is not resolved within

ten (10) days, a hearing with respect thereto shall be conducted at the next regularly scheduled

omnibus hearing in the Bankruptcy Cases.

   22. **Binding Effect.** The provisions of this Interim Order shall be binding upon and

shall inure to the benefit of GE Capital, the Debtors, the Bankruptcy Estates and their respective

successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal

representative of the Debtors or with respect to the property of the estates of the Debtors) whether

in the Bankruptcy Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or

chapter 7 Case.  Notwithstanding anything contained in this paragraph or this Order to the contrary,

the waivers and agreements contained in this Interim Order concerning, among other things, the

Prepetition Loan Documents, the Prepetition Claims, the Liens, and the Collateral shall not apply to a Committee if within: (i) ninety (90) days from the engagement of any counsel for the Committee, or (ii) if no counsel or no Committee is appointed, within one hundred twenty (120) days following the Petition Date, the Committee shall have commenced an adversary proceeding for the purpose of challenging the validity, extent, priority, perfection or enforceability of the Prepetition Loan Documents, the Prepetition Claims, the Liens, or the Prepetition Collateral.  To the extent any such adversary proceeding is not timely commenced, than all such waivers shall apply to all interested parties in the Bankruptcy Cases and all interested parties shall be forever bound by all such waivers.  Further, to the extent that any waiver contained in this Interim Order is not expressly challenged in any such adversary proceeding, than all interested parties in these Bankruptcy Cases shall be forever bound by such waiver.

23.    **No Waiver.**  The failure of GE Capital to seek relief or otherwise exercise their rights and remedies under the DIP Financing Documents, the DIP Facility, this Interim Order or otherwise, as applicable, shall not constitute a waiver of any of GE Capital's rights hereunder, thereunder, or otherwise.  Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights or remedies of GE Capital under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of GE Capital upon an Event of Default (i) to request conversion of any or all of the Bankruptcy Cases to cases under chapter 7, dismissal of the Bankruptcy Cases, or the appointment of a trustee in the Bankruptcy Cases, or (ii) to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan, or (iii) to exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of GE Capital, including against any non-Debtor entity.  Neither the commencement of the Bankruptcy

Cases nor the entry of this Interim Order shall limit or otherwise modify the rights and remedies of Prepetition Lender upon an Event of Default with respect to non-Debtor entities or third parties or their respective assets, whether such rights and remedies arise under the Prepetition Loan Documents, applicable law or equity.

24. **No Third Party Rights.** Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

25. **Section 552(b).** GE Capital shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the GE Capital Liens, the DIP Obligations and the Prepetition Claims and/or any proceeds, products, offspring or profits of any of the foregoing.

26. **Amendment.** Between the date hereof and the date of entry of the Final DIP Order, the DIP Financing Documents may not be modified in any material respect without further order of the Bankruptcy Court. Upon entry of the Final DIP Order, the Debtors and GE Capital may amend, modify, supplement or waive any provision of the DIP Financing Documents without further approval of the Bankruptcy Court but on prior written notice to counsel for a Committee, unless such amendment, modification, supplement or waiver (x) increases the interest rate (other than as a result of the imposition of the default rate), (y) increases the commitments of GE Capital under the DIP Financing Documents, or (z) changes the Maturity Date (as defined in the DIP Financing Documents). Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by, or on behalf of, all the Debtors and GE Capital and approved by the Bankruptcy Court.

27.     **Survival of Interim Order.**  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any chapter 11 plan in the Bankruptcy Cases, (ii) converting any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing any of the Bankruptcy Cases, (iv) withdrawing the reference of any of the Bankruptcy Cases from the Bankruptcy Court, or (v) providing for abstention from handling or retaining of jurisdiction of any of the Bankruptcy Cases in the Bankruptcy Court.  The terms and provisions of this Interim Order, including the DIP Liens and DIP Superpriority Claims granted pursuant to this Interim Order and the DIP Financing Documents and any protections granted GE Capital, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Liens and DIP Superpriority Claims and protections for GE Capital shall maintain their priority as provided by this Interim Order until all the DIP Obligations and the Prepetition Claims have been indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).  The DIP Obligations shall not be discharged by the entry of an order confirming a chapter 11 plan the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

28.     **Inconsistency.**  In the event of any inconsistency between the terms and conditions of the DIP Financing Documents and of this Interim Order, the provisions of the DIP Financing Documents shall govern and control.

29.     **Enforceability.**   This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon execution hereof

30.     **No Waivers or Modification of this Interim Order.**   The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of GE Capital and no such consent shall be implied by any other action, inaction or acquiescence of GE Capital.

31.     **Waiver of any Applicable Stay, including Bankruptcy Rule 6004(h).**   Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

32.     **Final Hearing.**   The final hearing to consider entry of the Final DIP Order is scheduled for _____, 2015, at _____ at the Bankruptcy Court (the "Final DIP Hearing").

33.     On or before _____, 2015, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final DIP Hearing (the "Final DIP Hearing Notice"), together with copies of this Interim Order and the Motion, on the Notice Parties and to any other party that has filed a request for notices with this Court prior thereto and to Committee counsel.  The Final DIP Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than _____, 2015 at _____, which objections shall be served so that the same are received on or before such date by:  (a) counsel for the Debtors; (b) counsel for GE Capital; (c) counsel for the Committee; and (d) the US Trustee.

34.     **Retention of Jurisdiction**.  The Bankruptcy Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated:  January ___, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit A to Interim Order**

See Attached.

US_ACTIVE-120503530.2-AEPILLE 1/6/15 8:33 PM