**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) <br> )    Chapter 11 <br> ) <br> )    Case No. 15-22017 (RDD) <br> ) <br> )    (Joint Administration Requested) <br> ) |
| J&B PARTNERS MANAGEMENT, LLC, *et al.*,[1] | |
| Debtors. | |

**DECLARATION OF DAWN PETITE, CHIEF OPERATING OFFICER OF
THE DEBTORS IN SUPPORT OF DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Dawn Petite, hereby declare under penalty of perjury:

1.  I am the Chief Operating Officer of J & B Partners Management LLC, J & B Restaurant Partners of NYDMA LLC, J & B Restaurant Partners of NJ, LLC, J & B Restaurant Partners of Long Island Holding Co., LLC, J & B Restaurant Partners of Long Island, LLC, J & B Restaurant Partners of Long Island II, LLC, J & B Real Estate Partners of Long Island, LLC, J & B Real Estate Partners of Long Island II, LLC, J & B Restaurant Partners of Massapequa Park, LLC, J & B Restaurant Partners of Middle Island, LLC, J & B Restaurant Partners of Shirley, LLC, limited liability companies organized under the laws of Delaware and the above-captioned debtors

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  J & B Partners Management LLC (1366); J & B Restaurant Partners of Long Island Holding Co., LLC (8712); J & B Restaurant Partners of NYDMA, LLC (7161); J & B Restaurant Partners of Massapequa Park, LLC (5849); J & B Restaurant Partners of Middle Island, LLC (4746); J & B Restaurant Partners of Shirley, LLC (3799); J & B Restaurant Partners of Long Island, LLC (8717); J & B Restaurant Partners of Long Island II, LLC (9901); J & B Real Estate Partners of Long Island, LLC (4550); J & B Real Estate Partners of Long Island II, LLC (9904); J & B Restaurant Partners of NJ, LLC (4102).  The location of the Debtors' corporate headquarters and the Debtors' service address is:  4000 Veterans Memorial Hwy, 2nd Floor, Bohemia, New York, 11716.

and debtors in possession (collectively, the "Debtors").  In this capacity, I am familiar with the

Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.    On the date hereof (the "Petition Date"), the Debtors each filed voluntary petitions

for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The

Debtors continue to operate their businesses and manage their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   Concurrently herewith, the

Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule

1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.    I submit this declaration (this "First Day Declaration") to provide an overview

of the Debtors and these chapter 11 cases and to support the Debtors' chapter 11 petitions and "first

day" motions (each, a "First Day Motion," and collectively, the "First Day Motions").[2]  Except as

otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my

personal knowledge of the Debtors' operations and finances, information learned from my review

of relevant documents, information supplied to me by other members of the Debtors' management

and the Debtors' advisors, or my opinion based on my experience, knowledge, and information

concerning the Debtors' operations and financial condition.  I am authorized to submit this First

Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify

competently to the facts set forth herein.

## I.    General Background.

### A.    Debtors' Business and Overview.

4.    The Debtors operate as franchisees of Friendly's, a leading full-service, family-

oriented restaurant chain.    Recently, the Debtors operated 36 restaurants in three states.

---

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant First
Day Motion.

Immediately prior to the Petition Date, the Debtors closed 12 stores such that on the Petition Date, they operated 24 stores in two states.  The Debtors are headquartered in Bohemia, NY.

5.       The Debtors pride themselves for having a strong reputation for offering customers a family-oriented casual dining experience at value prices that emphasize comfort food and dessert items made from Friendly's own signature premium ice cream.  Meal offerings include handhelds (sandwiches, burgers, and melts), plated entrees, baskets, entree salads, and appetizers; however, the main focus of the menu is centered on premium ice cream products.

6.       As discussed in further detail below, in the years leading up to the Petition Date, the significant U.S. economic downturn hit the restaurant industry hard, including the Debtors' business.  As unemployment levels skyrocketed, discretionary spending by historically-loyal customers and other consumers dropped, leading to depressed restaurant sales and reduced consumer traffic.  As the economy has recovered, consumers are continuing to seek out less expensive dining options.

7.       The Debtors have engaged in significant cost-cutting and overhead reduction programs to mitigate the effects of decreased revenue on their business.  However, with the continued effects of the poor economy and general softness in the midscale restaurant market, overall profitability and liquidity suffered significantly.  In the first three quarters of 2014, the Debtors generated approximately $46.189 million in revenue and negative EBITDA of approximately $1.583 million.

8.       The Debtors' liquidity has suffered and the Debtors have struggled to meet their debt service, franchise and unsecured obligations.  In consultation with their professionals and after careful examination by the Debtors' management team, the Debtors determined that

chapter 11 provides the necessary tools to preserve asset value and accomplish a meaningful operational restructuring on an expedited basis.

**B.      The Debtors' Prepetition Organizational Structure.**

9.      The chart attached hereto as **Exhibit A** depicts the Debtors' prepetition organizational structure.

**C.      The Debtors' Prepetition Capital Structure.**

10.      As of the Petition Date, the Debtors have outstanding secured debt obligations in the aggregate principal amount of approximately $14.6 million, consisting of four loans with General Electric Capital Corporation or its affiliate(s) ("GE").

**1.      The September 28, 2008 Loans**

11.      On or about September 28, 2008, J & B Restaurant Partners of Long Island Holding Co., LLC, one of the Debtors, and GE entered into that certain Loan Agreement (together with the Note, Security Agreement, and other ancillary documents, the "First GE Loan Documents") in the approximate amount of $9.016 million (the "First GE Loan") in connection with the refinance of certain existing debt.  The First GE loan was guaranteed by, amongst others, J & B Restaurant Partners of Long Island, LLC, J & B Restaurant Partners of Long Island II, LLC, J & B Real Estate Partners of Long Island, LLC, J & B Real Estate Partners of Long Island II, LLC, J & B Restaurant Partners of Massapequa Park, LLC, and J & B Restaurant Partners of Middle Island, LLC.

12.      On or about September 28, 2008, J & B Restaurant Partners of Long Island Holding Co., LLC, one of the Debtors, and General Electric Capital Corporation entered into that certain Loan and Security Agreement (together with the Note, Security Agreement, and other ancillary documents, the "Second GE Loan Documents") in the approximate amount of $7.76 million (the "Second GE Loan") in connection with the refinance of certain existing debt.  The Second GE loan was, similar to the First GE Loan, guaranteed by, amongst others, J & B Restaurant Partners of

4

Long Island, LLC, J & B Restaurant Partners of Long Island II, LLC, J & B Real Estate Partners

of Long Island, LLC, J & B Real Estate Partners of Long Island II, LLC, J & B Restaurant Partners

of Massapequa Park, LLC, and J & B Restaurant Partners of Middle Island, LLC.

13.     On or about December 23, 2009, J & B Restaurant Partners of Shirley, LLC

("Shirley") and GE entered into that certain Development Line of Credit Loan Agreement (together

with the Note, Security Agreement, and other ancillary documents, the "Third GE Loan

Documents") in the approximate amount of $1.2 million (the "Third GE Loan") in connection with

the development of Shirley's restaurant location.  The Third GE loan was, similar to the First and

Second GE Loan, guaranteed by, amongst others, J & B Restaurant Partners of Long Island

Holding Co., LLC, J & B Restaurant Partners of Long Island, LLC, J & B Restaurant Partners of

Long Island II, LLC, J & B Real Estate Partners of Long Island, LLC, J & B Real Estate Partners

of Long Island II, LLC, J & B Restaurant Partners of Massapequa Park, LLC, and J & B Restaurant

Partners of Middle Island, LLC, in addition to J & B Restaurant Partners Management LLC.

14.     On or about September 30, 2011, J & B Restaurant Partners of NYDMA LLC and

J & B Restaurant Partners of NJ, LLC, along with other non-filing affiliates, and GE Capital

Financial Inc. entered into that certain Development Line of Credit Loan Agreement (together with

the Note, Security Agreement, and other ancillary documents, the "Fourth GE Loan Documents")

in the approximate amount of $1.2 million (individually, the "Fourth GE Loan" and collectively,

with the First GE Loan, Second GE Loan, and Third GE Loan, the "GE Prepetition Loans") in

connection with the development of multiple restaurant locations.  The Third GE loan was, similar

to the First, Second and Third GE Loan, guaranteed by, amongst others, J & B Restaurant Partners

of Long Island Holding Co., LLC, J & B Restaurant Partners of Long Island, LLC, J & B

Restaurant Partners of Long Island II, LLC, J & B Real Estate Partners of Long Island, LLC, J &

B Real Estate Partners of Long Island II, LLC, J & B Restaurant Partners of Massapequa Park, LLC, J & B Restaurant Partners of Middle Island, LLC, and J & B Restaurant Partners Management LLC, in addition to J & B Restaurant Partners of Shirley, LLC, however the guarantees are coupled with a pledge of assets.

15.     The Security Agreements associated with the GE Prepetition Loans grant a security interest in and liens upon all or substantially all of the assets of the Debtors.  Prior to the Petition Date, GE and its affiliates are Debtors' first lien secured creditor.

## 2.     The Owner Loans.

16.     In the fall of 2013, non-Debtor affiliate entities of the Debtors disposed of certain assets.  In connection with this disposition, the net proceeds of approximately $2.15 million from the sales were to be distributed to the holders of the equity of J & B Partners Holding Co., LLC (the non-debtor ultimate parent company to the Debtors).   The equity holders ultimately determined to lend these net proceeds to entities operated by the direct and indirect subsidiaries of the ultimate parent company, including certain Debtors.  As of the Petition Date, there has been no repayment of these funds to the ultimate parent company and/or its equity holders.

## D.     The Debtors' Prepetition Franchise/License Agreements

17.     The Debtors have operated multiple Friendly's restaurants since 2001 pursuant to individualized franchise agreements with Friendly's Franchising, LLC or its predecessors ("Friendly's").   On or about August 4, 2014, Debtors and Friendly's entered into that certain License Agreement (as amended, modified or extended from time to time, the "License Agreement").  A true and correct copy of the License Agreement, together with all amendments, is attached hereto as **Exhibit B**  The term of the License Agreement was one week and could be extended in writing by Friendly's Franchising for additional one week periods. Friendly's

Franchise has timely extended the License Agreement on a weekly basis through the Petition Date.

The current License Agreement terminates, if not extended, on January 8, 2015.

## II.    Events Leading to these Chapter 11 Cases.

18.    Over the course of the last few years, a series of factors have contributed to the

Debtors' need to file these chapter 11 cases, including, most notably, declining restaurant sales.

These events placed significant strain on the Debtors' business and  liquidity, and ultimately led to

the filing of these chapter 11 cases.

### A.    Declining Restaurant Sales.

19.    In the years leading up to the Petition Date, the significant U.S. economic downturn

hit the restaurant industry hard, including the Debtors' business.  As unemployment levels

skyrocketed, discretionary spending by historically-loyal customers and other consumers dropped,

leading to depressed restaurant sales and reduced consumer traffic.  As the economy has recovered,

consumers are continuing to seek out less expensive dining options.

20.    In the first nine months of 2014, the Debtors reported a 13.4% decline in same store

sales, following same store sales declines of 6.8% percent in 2013.  These decreases were driven

by a decline in guest traffic.

### B.    The 2011 Location Expansion

21.    As referenced above, the Debtors were also impacted negatively by an expansion

of their operations in 2011.  Prior to the expansion, the Debtors operated 32 stores in Nassau and

Suffolk Counties on Long Island, New York.   In mid-2011, certain of the Debtors purchased

approximately 30 restaurants for the aggregate purchase price of $2.365 million, doubling the

number of stores and expanding the geographic footprint into upstate New York, Connecticut and

New Jersey.  The negative impact of the economic downturn was thus magnified with the increased

number of stores.  As locations were determined not to be economically viable, the Debtors sold or closed locations strategically.

### C.    Rise in Cost of Goods Sold.

22.    The Debtors are required to purchase virtually all of their food from the franchisor. Prices are set by the franchisor and are, in practice, adjusted monthly to reflect market conditions.

23.    The increase in the cost of certain items or components of items the Debtors sell, principally milk, cream, and meats, had an adverse impact on the Debtors' operating results for several years.  In the two years preceding the Petition Date, the price of butter (which drives the price of cream) increased by 50% percent, while the price of milk increased by 30% percent.

24.    In addition, to stimulate sales, the Debtors have implemented strategies to drive traffic to the stores including discounting and coupons.

25.    The combination of higher costs and discounted prices to the consumer have resulted in increases in the percentage of Cost of Goods Sold, from 26.2% in 2012 to 27.1% in 2014.

### D.    Debtors' Restructuring Efforts

26.    The Debtors have engaged in significant cost-cutting and overhead reduction programs to mitigate the effects of decreased revenue on their business.  However, with the continued effects of the poor economy and general softness in the midscale restaurant market, overall profitability and liquidity continues to suffer.  In the first three quarters of 2014, the Debtors generated approximately $46.189 million in revenue and negative EBITDA of approximately negative $1.583 million.

27.    Throughout the economic recession and leading to the Petition Date, the Debtors' management has focused on introducing new and strategic initiatives to combat the fall in

consumer spending and improve guest traffic. Such initiatives include, amongst others, local marketing campaigns and new bundling strategies.

### E.    The Debtors' Prepetition Restructuring Negotiations.

28.    The events leading up to the bankruptcy made it increasingly difficult for the Debtors' to service their debt obligations. Ultimately, the Debtors' management determined that they could not meet their liquidity needs going forward. Faced with severe liquidity shortfalls, the Debtors consulted with their advisors to determine the best strategy to preserve value for the benefit of the Debtors' creditor constituencies.

29.    To that end, after careful review, the Debtors, in consultation with their advisors, determined that a chapter 11 filing, combined with an expedited operational restructuring, was the best and most efficient way to maximize a return for the Debtors, their estates, and all parties-in-interest. Over the past year, the Debtors and their advisors have explored alternatives, including restructure and complete liquidation. The restructure efforts have been fruitful, and the Debtors have entered into a plan term sheet with key creditor constituencies, namely GE and Friendly's. A copy of the Summary of Plan Term (the "Plan Term Sheet") is attached hereto as Exhibit __. As a part of the Plan Term Sheet, Debtors have secured debtor-in- possession financing to fund the chapter 11 cases and the restructure and also a short term postpetition license agreement, coupled with an agreement for a longer term post-Effective Date franchise or license agreement with Friendly's. The Plan Term Sheet provides a return to unsecured creditors, a result not obtainable in any other alternative to the filing of these Chapter 11 cases.

### F.    Affiliate Bankruptcy Filing.

30.    On or about October 1, 2014, an affiliate of the Debtors, J & B Restaurant Partners of NY, LLC ("J & B NY"), filed a voluntary chapter 7 petition in this Court. J & B NY is a wholly

9

owned subsidiary of J & B Restaurant Partners NYDMA LLC and all of the Debtor entities share

common upstream, direct or indirect ownership with each other.  See Exhibit __.

### III.    Evidentiary Support for First Day Motions.[3]

31.    Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a

number of First Day Motions seeking relief that the Debtors believe is necessary to enable them

to operate with minimal disruption and loss of productivity.  The Debtors request that the relief

requested in each of the First Day Motions be granted as critical elements in ensuring a smooth

transition into, and stabilizing and facilitating the Debtors' operations during the pendency of these

chapter 11 cases.  I have reviewed each of the First Day Motions discussed below and the facts set

forth in each First Day Motion are true and correct to the best of my knowledge and belief with

appropriate reliance on corporate officers and advisors.

### A.    Debtors' Motion for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases (the "Joint Administration Motion").

32.    The Debtors request entry of an order directing joint administration of these

chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  Specifically,

the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases

under the case of J & B Partners Management LLC and also request that an entry be made on the

docket of each of the Debtors' chapter 11 cases, other than J & B Partners Management LLC, to

reflect the joint administration of these chapter 11 cases.

33.    Given the integrated nature of the Debtors' operations, joint administration of these

chapter 11 cases will provide significant administrative convenience without harming the

substantive rights of any party in interest.  Many of the motions, hearings, and orders that will arise

---

[3] Capitalized terms used in this section and not otherwise defined shall have the meanings ascribed to them in the applicable motion.

in these chapter 11 cases will jointly affect J & B Partners Management LLC and each of its affiliates that also have filed chapter 11 cases.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

34.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.**    **Debtors' Motion to Authorize Maintenance of Certain Prepetition Bank Accounts and Cash Management System (the "Cash Management Motion").**

35.    The Debtors request the authority to:  (a) continue to use, with the same account numbers, all of the Bank Accounts in their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) open new debtor-in-possession accounts, if needed; (d) use, in their present form, all correspondence and business forms (including check stock, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession; and (e) continue performing Intercompany Transactions in the ordinary course of business.

36.    In addition, the Debtors further request that the Court authorize the Banks to: (a) continue to maintain, service, and administer the Bank Accounts; and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashier's checks prior to the Petition

Date; (ii) checks or other items deposited in the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

37.     In the ordinary course of business, the Debtors utilize an integrated Cash Management System to collect, transfer, and disburse funds generated by their operations and maintain current and accurate accounting records of all daily cash transactions.  If the Debtors were required to comply with the U.S. Trustee Guidelines, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend, would disrupt the Debtors' business at this critical time.  The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

38.     In addition, in the ordinary course of business, the Debtors maintain a large and complex system of Intercompany Transactions for, among other reasons, facilitating intercompany sales, centralizing accounting and purchasing departments, and moving cash between entities.  If the Intercompany Transactions are discontinued, a number of services provided by and to the Debtors would be disrupted and could affect the Debtors' ability to pay wages and benefits to their employees and make timely payments to vendors.

39.     The relief requested in the Cash Management Motion is vital to ensuring the

Debtors' seamless transition into bankruptcy.  Authorizing the Debtors to maintain their Cash

Management System will avoid many of the possible disruptions and distractions that could divert

their attention from more critical matters during the initial days of these chapter 11 cases.

40.     I believe that the relief requested in the Cash Management Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the

Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**C.     Debtors' Motion for Entry of an Order Authorizing the Payment of Prepetition (A) Wages, Salaries, and Other Compensation; (B) Reimbursable Employee Expenses, and (C) Employee Medical and Similar Benefits (the "<u>Wages and Benefits Motion</u>").**

41.     The Debtors request the authority, in their sole discretion, to pay prepetition claims,

honor obligations, and to continue programs, in the ordinary course of business and consistent with

past practices, relating to the Employee Wages and Benefits.

42.     As of the Petition Date, the Debtors employ approximately 1,400 employees, of

which approximately 1,350, or about 96.4% percent, are paid on an hourly basis and approximately

50, or about 3.6%, are paid on a salaried basis.  Although the Debtors have paid their wage, salary,

and other obligations in accordance with their ordinary compensation schedule prior to the Petition

Date, as of the date hereof, certain prepetition obligations for Employees may nevertheless be due

and owing.

43.     The majority of the Debtors' Employees rely exclusively on their compensation,

benefits, and reimbursement of expenses to satisfy their daily living expenses.  Consequently, these

Employees will be exposed to significant financial difficulties if the Debtors are not permitted to

honor obligations for unpaid compensation, benefits, and reimbursable expenses.  Moreover, if the

13

Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical to the Debtors.  In the absence of such payments, the Debtors believe their Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors, thereby hindering the Debtors' ability to meet their customer obligations and likely diminishing creditors' confidence in the Debtors.  Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtors should be focusing on stabilizing their operations.

44.    I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be approved.

**D.    Debtors' Motion for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees (the "Taxes and Fees Motion").**

45.    The Debtors request authority to pay any Taxes and Fees that, in the ordinary course of business, accrued or arose before the Petition Date.  In the ordinary course of business, the Debtors incur or collect certain Taxes and Fees and remit such Taxes and Fees to various authorities.  The Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during these chapter 11 cases.  Specifically, the Debtors' failure to pay the Taxes and Fees could affect adversely the Debtors' business operations because the authorities could suspend the Debtors' operations, file liens, or seek to lift the automatic stay.  In addition, certain authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes that undoubtedly would distract those individuals from their duties related to the Debtors' restructuring.

14

46.     The Debtors have attached a comprehensive list of the Taxes to the Taxes and Fees Motion.  At this time, the Debtors are not able to attach a comprehensive list of the Fees or the amounts outstanding on account of the Fees as of the Petition Date.  The Debtors will endeavor to update the Court with this information as soon as is practical.

47.     I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be approved.

**E.     Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utilities Motion").**

48.     The Debtors request the entry of interim and final orders:  (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order; (d) establishing procedures for the Utility Providers to object to the Debtors' proposed adequate assurance procedures; and (e) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this Motion, pending entry of the Final Order; and (f) setting a final hearing (the "Final Hearing") within 30 days of the Petition Date.

49.     In the ordinary course of business, the Debtors incur expenses for gas, water, sewer, electric, telecommunications, and other similar utility services provided by approximately 30 utility providers.  Uninterrupted utility services are essential to the Debtors' ongoing operations

and, therefore, to the success of their reorganization.  Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.

50.    I believe and am advised that the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance are necessary in these chapter 11 cases, because if such procedures were not approved, the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of these chapter 11 cases.  Moreover, a Utility Provider could blindside the Debtors by unilaterally deciding—on or after the 30th day following the Petition Date—that it is not adequately assured of future performance and discontinuing service or making an exorbitant demand for payment to continue service.  Discontinuation of utility service could shut down operations, and any significant disruption of operations could jeopardize a successful reorganization in these chapter 11 cases.

51.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

F.    **Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims (A) Arising Under the Perishable Agricultural Commodities Act and (B) Arising Under Section 503(b)(9) of the Bankruptcy Code and (II) Granting Certain Related Relief (the "PACA Motion").**

52.    The Debtors request the authority to (a) pay prepetition claims arising, or of the type, under the Perishable Agricultural Commodities Act of 1930 ("PACA") and (b) satisfy claims subject to section 503(b)(9) of the Bankruptcy Code.

53.    The Debtors rely on one key seller – Friendly's Ice Cream, LLC -- who supplies the Debtors with fruits and vegetables protected by PACA and who may be eligible to assert PACA Claims against the Debtors in priority ahead of all other secured and unsecured creditors in the Debtors' chapter 11 cases.  In addition, the Debtors have received goods delivered within the twenty-day period prior to the Petition Date that may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

54.    The Debtors receive their non-PACA Claims food and non-perishable goods, such as branded items utilized in the operation of the restaurants and paper goods, exclusively from Friendly's.  Because Friendly's supplies the Debtors with virtually all of their goods, Friendly's continued supply is a necessary to the Debtors' continued operation.  Without the ability to pay these claims in the ordinary course of Debtor's business, Friendly's may cease delivery of goods and providing services to the Debtors, which would have devastating consequences for the Debtors' efforts in continuing with these chapter 11 cases.

55.    Without the relief granted in the PACA Motion, certain vendors may refuse to supply essential food, product, and supplies.  Failure to receive these services could cause serious disruptions to the continuous and timely flow of food, product, and supplies essential to the Debtors' business.  Paying the prepetition obligations owed to the PACA Vendor and holders of claims subject to section 503(b)(9) of the Bankruptcy Code in the ordinary course of business will

17

thus benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.

56.    I believe that the relief requested in the PACA Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the PACA Motion should be approved.

**G.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Parties, and (IV) Granting Liens and Superpriority Claims (the "DIP Motion").**

57.    The Debtors request the authority to (a) obtain postpetition financing on a senior secured, superiority basis, (b) use Cash Collateral, and (c) grant adequate protection to certain prepetition secured parties relating to the potential diminution in value of the Prepetition Collateral and the Debtors' use of the Cash Collateral.  The Debtors need financing to fund the administration of these chapter 11 cases.

58.    Without access to the DIP Facility, the Debtors could experience a liquidity shortfall and would be deprived of the capital necessary to operate their businesses.  The DIP Facility will provide the funding necessary to allow the Debtors to, among other things, maintain their businesses in the ordinary course, thereby preserving value for the benefit of all creditor constituencies.  The DIP Facility also will enhance the Debtors' ability to minimize disruption to their businesses and instill confidence in their various creditor constituencies, including customers, employees, vendors, and service providers.  In sum, approval of the DIP Facility is necessary to avoid erosion of value and to accomplish a seamless transition into chapter 11 and, ultimately, to new ownership through a public sale process.

59.    I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion should be approved.

**H.    Debtors' Motion for Entry of an Order Authorizing and Approving Expedited Procedures for (A) Rejection of Executory Contracts and Unexpired Leases and (B) Abandonment of Personal Property (the "Rejection Procedures Motion").**

60.    By the Rejection Procedures Motion, the Debtors request the entry of an order authorizing the implementation of expedited procedures to reject executory contracts and unexpired leases.  Additionally, the Debtors request authority to remove any property from the premises that is the subject of any rejected Contract prior to the effective date of any proposed rejection, consistent with the Debtors' ownership rights or other property interests therein.

61.    I am advised that absent the relief requested in the Rejection Procedures Motion, filing motions for each rejection would result in substantial increased costs and administrative burdens on the Debtors' estates.  As such, expedited procedures for Contract rejection are appropriate and necessary to minimize the costs and administrative burden on the Debtors' estates. Accordingly, on behalf of the Debtors, I respectfully submit that the Rejection Procedures Motion should be approved.

**I.    Debtors' Motion for Authority to Enter Into and Approving Postpetition License Agreement with Friendly's Franchising, LLC and for Related Relief (the "Postpetition License Agreement Approval Motion").**

62.    By the Postpetition License Agreement Approval Motion, the Debtors request the entry of an order authorizing the Debtors to enter into and approving the postpetition license agreement with Friendly's Franchising, LLC.  The use of the Friendly's brands, marks, proprietary systems and confidential information is critical to the Debtors' continued survival and operation.

Because the Debtors' no longer need the locations covered by the Leases, rejection of the Leases is a sound exercise of the Debtors' business judgment and will benefit the Debtors' estates and stakeholders.

63.    I am advised that absent the relief requested in the Postpetition License Agreement Approval Motion, Debtors would cease to have authority to use Friendly's brands, marks, proprietary systems and confidential information and would result in substantial increased costs and administrative burdens on the Debtors' estates and perhaps impact the value of the Debtor's assets.  As such, approval of the Postpetition License Agreement is appropriate and necessary to minimize the costs and administrative burden on and risk to the Debtors' estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Postpetition License Agreement Approval Motion should be approved.

**J.    J & B Restaurant Partners of Long Island II, LLC's Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtor to Enter Into and Perform Under the Summary of Plan Terms with General Electric Capital Corporation, GE Capital Commercial of Utah, LLC, GE Capital Bank, Friendly's Franchising, LLC and Certain Consenting Parties (the "Plan Term Sheet Motion").**

64.    J & B Restaurant Partners of Long Island II, LLC ("Long Island II") requests the authority, to enter into and perform under a Summary of Plan Terms among (a) the Debtors (b) General Electric Capital Corporation, GE Capital Commercial of Utah LLC, and GE Capital Bank (collectively, "GE"); (c) Friendly's Franchising, LLC ("Franchisor" or "Friendly's"); (d) holders of existing equity interest in J & B Partners Holding Co., LLC (the "Owners," collectively with the Debtors, GE, and Friendly's, the "Supporting Parties")

65.    Prior to commencing these Chapter 11 Cases, the Debtors  entered into negotiations with GE, Friendly's and the other Supporting Parties, which included an agreement by the Supporting Parties to support an agreed upon plan as well as the provision of post-petition debtor in possession financing to the Debtors by GE.  Prior to the execution of the Plan Term Sheet, Long

Island II commenced its Chapter 11 Case.  The Plan Term Sheet provides significant benefits for Long Island II's Case.  Not only does it set forth the path for an expedient exit from chapter 11, with the support of its largest secured and unsecured creditors, but it also provides Long Island II with the license agreement necessary to operate during the chapter 11 process and secures debtor in possession financing.

66.    I believe that absent the Plan Term Sheet, Long Island II would be required to litigate costly issues with its major creditors.  For these reasons, Long Island II seeks the relief requested by the Plan Term Sheet Motion to ensure that it will obtain the benefits provided by the Plan Term Sheet.

[Remainder of Page Intentionally Left Blank]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  January 6, 2015
          Bohemia, New York

Dawn Petite
Chief Operating Officer, J & B Partners
Management LLC and Each of the other Debtors

Exhibit A

Organizational Chart



| | | |
|---|---|---|
| SA 1 | = | J & B Restaurant Partners of Copiague, LLC |
| SA 2 | = | J & B Restaurant Partners of Hampton Bays, LLC |
| SA 3 | = | J & B Restaurant Partners of Hicksville, LLC |
| SA 4 | = | J & B Restaurant Partners of Massapequa Park, LLC |
| SA 5 | = | J & B Restaurant Partners of Middle Island, LLC |
| SA 6 | = | J & B Restaurant Partners of Shirley, LLC |
| Rest I | = | J & B Restaurant Partners of Long Island, LLC |
| Rest II | = | J & B Restaurant Partners of Long Island II, LLC |
| RE I | = | J & B Real Estate Partners of Long Island, LLC |
| RE II | = | J & B Real Estate Partners of Long Island II, LLC |
| NY | = | J & B Restaurant Partners of NY, LLC |
| NJ | = | J & B Restaurant Partners of NJ, LLC |
| CT | = | J & B Restaurant Partners of CT, LLC |

# SCHEDULE C

Exhibit B

License Agreement

EXECUTION VERSION

## LICENSE AGREEMENT

This LICENSE AGREEMENT, effective as of August 4, 2014 (this "Agreement"), is entered into by and among Friendly's Franchising, LLC (as successor in interest to Friendly' Restaurants Franchise, LLC), a Delaware limited liability company (the "Company"), J&B Partners Holding Co., LLC, a New York limited liability company ("J&B Partners Holding"), J&B Restaurant Partners Family Dining, LLC, a New York limited liability company ("J&B Restaurant Partners"), and each of its subsidiaries listed on the signature page of this Agreement (each, a "J&B Entity" and together with J&B Partners Holding and J&B Restaurant Partners, the "J&B Parties").

## W I T N E S S E T H :

WHEREAS, the Company and each J&B Entity is a party to certain Franchise Agreements (as amended from time to time, collectively, the "Franchise Agreements") entered into on the dates set forth on **Schedule A** attached hereto for the "Friendly's" restaurants (the "Restaurants") numbered and located as set forth on **Schedule A**;

WHEREAS, the Company has delivered to each J&B Entity certain notices of defaults under the Franchise Agreements on each of November 14, 2013, July 1, 2014 and July 25, 2014 for the failure of each such J&B Entity to pay past due amounts pursuant to the terms of their respective Franchise Agreements (the "Specified Defaults");

WHEREAS, on the date hereof, the Company has terminated the Franchise Agreements in accordance with their terms;

WHEREAS, the J&B Parties have requested a limited, non-exclusive, license to operate each Restaurant and to use the System and the Marks in operating the Restaurants from the Company effective upon the effectiveness of the termination of the Franchise Agreements (the "License"); and

WHEREAS, subject to the terms and conditions hereof, the Company has agreed to grant the J&B Entities the License in accordance with the terms set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties hereto, the parties hereto hereby agree as follows:

1.    _Defined Terms_.  Each capitalized term used herein and not otherwise defined herein shall have the meaning attributed to such term in that certain Franchise Agreement, dated as of May 23, 2011, by and between J&B Restaurant Partners of NJ, LLC and the Company for Restaurant #211, 441 Hillsdale Avenue, Hillsdale, New Jersey

07642 (the "Standard Franchise Agreement").  Each of the following capitalized terms shall have the meaning set forth below:

(a)    "License Period" means the period beginning on the date hereof and ending on the License Termination Date.

(b)    "License Termination Date" means the earliest to occur of (i) 5:00 p.m. (New York time) on the seventh day following the date hereof, unless the Company agrees in writing, in the Company's sole and absolute discretion, to extend such seven day period for an additional seven day period prior to 5:00 p.m. on such date (or any successive date as a result of more than one extension agreed to by the Company), (ii) the date upon which any of the J&B Parties make an assignment for the benefit of creditors, any of the J&B Parties file a voluntary petition in bankruptcy or any pleading seeking any reorganization, liquidation, dissolution or composition or other settlement with creditors under any law, an allegations of any such pleadings is filed against any of the J&B Parties or any of the J&B Parties take any action to authorize any such filing, or (iii) the breach by any of the J&B Parties of any representation, warranty, covenant, or agreement contained herein.

2.    Representations, Warranties, Confirmations, and Agreements by the J&B Parties with respect to Specified Defaults and Outstanding Obligations.

(a)    The J&B Parties represent and warrant to the Company that the Specified Defaults have occurred and are continuing.  The execution, delivery and performance by the J&B Parties of this Agreement have been duly authorized by all necessary action required on their part, and this Agreement is the legal, valid and binding obligation of the J&B Parties enforceable against the J&B Parties in accordance with its terms.

(b)    The J&B Parties confirm, acknowledge and agree that the Franchise Agreements and all terms and conditions contained therein have been terminated by the Company effective on August 4, 2014 and shall have no further force and effect from and after such date; provided, however, (i) the termination of the Franchise Agreements set forth under the heading "NJ Restaurants" on **Schedule A** hereto for Restaurants situated in the State of New Jersey (the "NJ Franchise Agreements") shall not, in accordance with the provisions set forth in the New Jersey Franchise Practices Act, become effective until 60 days after the notice of termination of such Franchise Agreements is provided to the applicable J&B Entity (the "NJ Franchise Agreement Effective Termination Date"); and (ii) subject to Section 5 hereof, any provisions of the Franchise Agreement which by their terms would survive the termination or expiration of the Franchise Agreements shall survive in accordance with the terms of such Franchise Agreement.

(c)    Nothing in this Agreement shall be construed as a waiver of or acquiescence to the Specified Defaults, and the Specified Defaults shall continue in existence notwithstanding this Agreement.  Except as expressly provided herein, the

execution and delivery of this Agreement shall not: (i) constitute an extension, modification, or waiver of any right of the Company that survives the termination of the Franchise Agreements; (ii) extend the terms of the Franchise Agreements or the due date of any of the obligations that arose thereunder; (iii) give rise to any obligation on the part of the Company to extend, amend, waive or otherwise modify any term or condition of the Franchise Agreements or any ancillary document thereto; or (iv) give rise to any defenses or counterclaims to the right of the Company to compel payment of any obligations owed to the Company by the J&B Parties pursuant to the terms of the Franchise Agreements or any ancillary document thereto or to otherwise enforce its rights and remedies under the Franchise Agreements or any ancillary document thereto.  For the avoidance of doubt, each party hereto hereby expressly reserves any and all of its rights, defenses, counterclaims and/or remedies under the Franchise Agreements and under applicable law including, without limitation, to the Specified Defaults and otherwise.

3.      License.  On the date hereof, the Company hereby grants to each J&B Entity that is a party to a Franchise Agreement under the heading "Non-NJ Restaurants" set forth on **Schedule A** hereto, during the License Period, the License for the use in the operations of the Restaurants.  Each such J&B Entity hereby acknowledges and agrees that the License, and the operation of the Restaurants, shall be subject to the same terms and conditions as set forth in the Standard Franchise Agreement, which are incorporated herein and made part hereof, including, but not limited to, the (i) the use of the Marks, Systems, Operations Manual and the Confidential Information, (ii) payment of Royalty Fees, Marketing Fund Fees and all other amounts set forth in the Standard Franchise Agreement in accordance with the payment schedules set forth therein, (iii) the restaurant operating standards, (iv) record keeping and (v) inspection and audit rights.  Immediately following the NJ Franchise Agreement Effective Termination Date, to the extent that the License for each J&B Entity that is a party to a Franchise Agreement under the heading "Non-NJ Restaurants" set forth on **Schedule A** is still in effect, each J&B Entity that is a party to a NJ Franchise Agreement shall immediately be granted a License for the use in the operations of the Restaurants located in New Jersey without any further action required by the Company or the J&B Parties; provided, however, such License shall be subject to the terms and conditions set forth herein including as set forth in this Section 3.

4.      Conditions to Effectiveness.  The effectiveness of this Agreement is expressly conditioned upon the Company's satisfaction that this Agreement has been duly authorized, executed and delivered to the Company by the J&B Parties.

5.      Effect on the Franchise Agreements.  Except as expressly set forth herein, all of the terms, conditions and covenants that survive the termination of the Franchise Agreements (upon the effectiveness of such termination) shall remain unaltered and in full force and effect and shall be binding on the Company and the applicable J&B Entities that are a party to such Franchise Agreements in accordance with the terms of such Franchise Agreements and each such party thereto hereby ratifies and confirms their respective obligations under such Franchise Agreements.  The J&B Entities' post-termination obligations as set forth in the Franchise Agreements shall remain in abeyance with respect to each Restaurant, and solely with respect to such Restaurant, until the date

a J&B Entity discontinues operating such Restaurant; and the post-termination restrictions set forth in the Franchise Agreements, to the extent applicable and subject to those certain modifications as set forth in the First Amendment to the Settlement Agreement dated March 23, 2013, shall become effective as of the date such J&B Entity discontinues operating the last Restaurant operated by such J&B Entity.

6.     <u>Delivery of Product</u>.   During the License Period, the Company covenants and agrees to cause its affiliates to continue to supply the J&B Parties, in the ordinary course of business, with products that the Company and its affiliates have previously supplied to the J&B Parties in order for the J&B Parties to continue the operation of the Restaurants so long as the J&B Parties pay for such products in accordance with the following payment terms: (i) net-21 days or (ii) as and if terms may be extended by the Company, or any of its affiliate, in the Company or its affiliates, as the case may be, sole discretion.

7.     <u>Execution in Counterparts</u>.   This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed signature page to this Agreement by facsimile transmission or otherwise transmitted or communicated by email shall be as effective as delivery of a manually executed counterpart of this Agreement.

8.     <u>Governing Law</u>.   This Agreement shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Massachusetts, without giving effect to any of the conflicts of laws or choice of law principles thereof that would compel the application of the substantive law of any other jurisdiction.

9.     <u>Jurisdiction</u>.   Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in Boston, Massachusetts, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices previously provided to the other party and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.

10.     <u>Binding Effect</u>.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.  The J&B Parties may not assign this Agreement without the prior written consent of the Company.  No person other than the parties hereto, any secured lender to the Company or

its affiliates or the Released Parties shall have any rights hereunder or be entitled to rely on this Agreement, and all third-party beneficiary rights are hereby expressly disclaimed; provided, however, any secured lender to the Company or its affiliates and the Released Parties shall be third party beneficiaries of the Agreement.

11.    Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**[Signature Page Follows]**

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**J&B PARTIES:**

**J&B PARTNERS HOLDING CO., LLC**

By: _____
    Name: Joseph Vitrano
    Title: Pres.com | CEO

**J&B RESTAURANT PARTNERS**
**FAMILY DINING, LLC**

By: _____
    Name: Dawn Petite
    Title: Chief Operating Officer

**J&B RESTAURANT PARTNERS OF**
**COPIAGUE, LLC**

By: _____
    Name: Dawn Petite
    Title: Chief Operating Officer

**J&B RESTAURANT PARTNERS OF**
**HAMPTON BAYS, LLC**

By: _____
    Name: Dawn Petite
    Title: Chief Operating Officer

**J&B RESTAURANT PARTNERS OF
HICKSVILLE, LLC**

By: _____
Name: Dawn Petite
Title: Chief Operating Officer

**J&B RESTAURANT PARTNERS OF
MASSAPEQUA PARK, LLC**

By: _____
Name: Dawn Petite
Title: Chief Operating Officer

**J&B RESTAURANT PARTNERS OF
MIDDLE ISLAND, LLC**

By: _____
Name: Dawn Petite
Title: Chief Operating Officer

**J&B RESTAURANT PARTNERS OF
SHIRLEY, LLC**

By: _____
Name: Dawn Petite
Title: Chief Operating Officer

Signature Page to License Agreement

**J&B RESTAURANT PARTNERS OF
LONG ISLAND, LLC**

By: _____
   Name: Dawn Petite
   Title: Chief Operating Officer


**J&B RESTAURANT PARTNERS OF
LONG ISLAND II, LLC**

By: _____
   Name: Dawn Petite
   Title: Chief Operating Officer


**J&B RESTAURANT PARTNERS OF
NY, LLC**

By: _____
   Name: Dawn Petite
   Title: Chief Operating Officer


**J&B RESTAURANT PARTNERS OF
NJ, LLC**

By: _____
   Name: Dawn Petite
   Title: Chief Operating Officer


Signature Page to License Agreement

**J&B RESTAURANT PARTNERS OF
CT, LLC**

By:_____
   Name: Dawn Petite
   Title: Chief Operating Officer

**COMPANY:**

**FRIENDLY'S FRANCHISING, LLC**

By:_____
   Name: Robert K. Sawyer, Jr.
   Title:  Senior Vice President, General
          Counsel

Signature Page to License Agreement

**J&B RESTAURANT PARTNERS OF CT, LLC**

By:_____
    Name:
    Title:


**COMPANY:**

**FRIENDLY'S FRANCHISING, LLC**

By:_____
    Name: Robert K. Sawyer, Jr.
    Title:  Senior Vice President, General
        Counsel

## SCHEDULE A

## RESTAURANTS

*Non-NJ Restaurants*

| FRANCHISEE | Rest # | Restaurant Street Address | City | State | Zip | Agreement Date |
|---|---|---|---|---|---|---|
| J & B Restaurant Partners of Copiague, LLC | 7633 | 960 Montauk Highway | Copiague | NY | 11726 | 6/2/2003 |
| J & B Restaurant Partners of CT, LLC | 156 | 4545 North Main Street | Bridgeport | CT | 06606 | 5/23/2011 |
| J & B Restaurant Partners of CT, LLC | 470 | 275 Boston Post Road | Darien | CT | 06820 | 5/23/2011 |
| J & B Restaurant Partners of CT, LLC | 4225 | 81 Newtown Road | Danbury | CT | 06810 | 5/23/2011 |
| J & B Restaurant Partners of Hampton Bays, LLC | 7634 | 149 Montauk Highway | Hampton Bays | NY | 11946 | 4/1/2004 |
| J & B Restaurant Partners of Hicksville, LLC | 7639 | 285 S. Broadway  Delco Plaza | Hicksville | NY | 11801 | 5/25/2007 |
| J & B Restaurant Partners of Long Island II, LLC | 7604 | 361 Larkfield Road | East Northport | NY | 11731 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7605 | 555 Broadway Street | Massapequa | NY | 11758 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7606 | 522 East Main Street | Patchogue | NY | 11772 | 3/28/2001 |

| | | | | | | |
|---|---|---|---|---|---|---|
| J & B Restaurant Partners of Long Island II, LLC | 7607 | 230 Jericho Turnpike | Mineola | NY | 11501 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7609 | 298 Montauk Avenue | Bayshore | NY | 11706 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7615 | 552 Franklin Avenue | Franklin Square | NY | 11010 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7620 | 201 Hallock Road | Stony Brook | NY | 11790 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7622 | 2151 Jericho Turnpike | Commack | NY | 11725 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7625 | 1187 Wantagh Avenue | North Wantagh | NY | 11793 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7626 | 949 Old Country Road | Riverhead | NY | 11901 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7627 | 1194 Deer Park Avenue | North Babylon | NY | 11703 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7629 | 220 Mount Pleasant Road | Smithtown | NY | 11787 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7603 | 50 Montauk Highway | East Islip | NY | 11730 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7608 | 292 Little East Neck Road | West Babylon | NY | 11704 | 3/28/2001 |

| | | | | | | |
|---|---|---|---|---|---|---|
| J & B Restaurant Partners of Long Island, LLC | 7611 | 553 Hawkins Avenue | Lake Ronkonkoma | NY | 11779 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7614 | 330 Fulton Street | Farmingdale | NY | 11735 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7617 | 1826 Hempstead Turnpike | East Meadow | NY | 11554 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7618 | 945 Merrick Road | Baldwin | NY | 11510 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7619 | 210 Montauk Highway | Sayville | NY | 11782 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7621 | 150 Jericho Turnpike | Syosset | NY | 11791 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7624 | 3287 Hempstead Turnpike | Levittown | NY | 11756 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7628 | 275 Route 25A | Miller Place | NY | 11764 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7630 | 2220 - Route 112 | Coram | NY | 11727 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7631 | 700-80 Route 101 | Medford | NY | 11763 | 3/28/2001 |
| J & B Restaurant Partners of Massapequa Park, LLC | 7638 | 4812 Sunrise Highway | Massapequa Park | NY | 11762 | 4/1/2004 |

| | | | | | | |
|---|---|---|---|---|---|---|
| J & B Restaurant Partners of Middle Island, LLC | 7636 | 848 Middle Country Rd. | Middle Island | NY | 11953 | 6/2/2003 |
| J & B Restaurant Partners of NY, LLC | 126 | 361 Central Street | Hartsdale | NY | 10530 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 152 | 477 Tuckahoe Road | Yonkers | NY | 10710 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 231 | 445 East Main Street | Mount Kisco | NY | 10549 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 332 | 1053 Main Street | Fishkill | NY | 12524 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 439 | 1983 Commerce Street | Yorktown Heights | NY | 10598 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 822 | 1354 Ulster Avenue | Kingston | NY | 12401 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 863 | 364 Route 211 East | Middletown | NY | 10940 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 946 | 2 Stoneleigh Avenue | Carmel | NY | 10512 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 952 | 15 North Airmont Road | Suffern | NY | 10901 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 1006 | 31 Matthews Street | Goshen | NY | 10924 | 5/23/2011 |
| J & B Restaurant Partners of Shirley, LLC | 7640 | 940 Montauk Highway | Shirley | NY | 11967 | 8/4/2009 |

*NJ Restaurants*

| | FRANCHISEE | Rest # | Restaurant Street Address | City | State | Zip | Agreement Date |
|---|---|---|---|---|---|---|---|
| 1 | J & B Restaurant Partners of NJ, LLC | 211 | 441 Hillsdale Avenue | Hillsdale | NJ | 07642 | 5/23/2011 |
| 2 | J & B Restaurant Partners of NJ, LLC | 237 | 1243 Broad Street | Bloomfield | NJ | 07003 | 5/23/2011 |
| 3 | J & B Restaurant Partners of NJ, LLC | 286 | 192 Madison Avenue | Convent Station | NJ | 07961 | 5/23/2011 |
| 4 | J & B Restaurant Partners of NJ, LLC | 343 | 114 County Road | Tenafly | NJ | 07670 | 5/23/2011 |
| 5 | J & B Restaurant Partners of NJ, LLC | 359 | 575 Pompton Turnpike | Pompton Plains | NJ | 07444 | 5/23/2011 |
| 6 | J & B Restaurant Partners of NJ, LLC | 399 | 195 Godwin Avenue | Midland Park | NJ | 07432 | 5/23/2011 |
| 7 | J & B Restaurant Partners of NJ, LLC | 664 | 304 Mountain Avenue | Hackettstown | NJ | 07840 | 5/23/2011 |
| 8 | J & B Restaurant Partners of NJ, LLC | 720 | 301 Mount Hope Avenue, Suite 1040 | Rockaway | NJ | 07866 | 5/23/2011 |
| 9 | J & B Restaurant Partners of NJ, LLC | 771 | 1230 Highway 35 | Middletown | NJ | 07748 | 5/23/2011 |
| 10 | J & B Restaurant Partners of NJ, LLC | 789 | 1210 Hooper Avenue | Toms River | NJ | 08753 | 5/23/2011 |
| 11 | J & B Restaurant Partners of NJ, LLC | 1053 | 981 Route 37 West | Toms River | NJ | 08753 | 5/23/2011 |
| 12 | J & B Restaurant Partners of NJ, LLC | 1059 | 3201 State Hwy 35 | Hazlet | NJ | 07730 | 5/23/2011 |

EXECUTON VERSION

## FIRST AMENDMENT TO LICENSE AGREEMENT

This **FIRST AMENDMENT TO LICENSE AGREEMENT**, dated August 28, 2014 (this "Amendment"), is entered into by and among Friendly's Franchising, LLC (as successor in interest to Friendly' Restaurants Franchise, LLC), a Delaware limited liability company (the "Company"), J&B Partners Holding Co., LLC, a New York limited liability company ("J&B Partners Holding"), J&B Restaurant Partners Family Dining, LLC, a New York limited liability company ("J&B Restaurant Partners"), and each of its subsidiaries listed on the signature page of this Amendment (each, a "J&B Entity" and together with J&B Partners Holding and J&B Restaurant Partners, the "J&B Parties").

## RECITALS

**WHEREAS**, the Company and the J&B Parties entered into that certain License Agreement, effective as of August 4, 2014 (the "Agreement"), pursuant to which the Company granted each J&B Entity that is a party to a Franchise Agreement set forth on Schedule A thereto, during the License Period, a limited, non-exclusive, license to operate each Restaurant and to use the System and the Marks in operating the Restaurants effective upon the effectiveness of the termination of the Franchise Agreements;

**WHEREAS**, the J&B Parties have provided notice to the Company that certain of the Restaurants have ceased operations and have or will be closing; and

**WHEREAS**, the Company and the J&B Parties desire to amend the Agreement as herein provided in order to appropriately reflect the Restaurants in which the License may be used.

**NOW THEREFORE,** in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Company and the J&B Parties hereby agree as follows:

**SECTION 1.  Defined Terms.**

Capitalized terms used but not otherwise defined herein have the meanings assigned to them in the Agreement.

**SECTION 2.  Amendment.**

Effective as of the date hereof, Schedule A of the Agreement is hereby amended and restated in its entirety as set forth on **Exhibit A** attached hereto.

**SECTION 5.  Applicable Law and Jurisdiction.**

This Amendment shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Massachusetts, without giving effect to any of the conflicts of laws or choice of law principles thereof that would compel the application of

1

the substantive law of any other jurisdiction.  Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in Boston, Massachusetts, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices previously provided to the other party and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.

**SECTION 6. <u>Counterparts</u>.**

This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed signature page to this Amendment by facsimile transmission or otherwise transmitted or communicated by email shall be as effective as delivery of a manually executed counterpart of this Amendment.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be duly executed as of the date first above written.

<u>**J&B PARTIES:**</u>

**J&B PARTNERS HOLDING CO., LLC**

By:_____
   Name:
   Title:

**J&B RESTAURANT PARTNERS FAMILY DINING, LLC**

By:_____
   Name:
   Title:

**J&B RESTAURANT PARTNERS OF COPIAGUE, LLC**

By:_____
   Name:
   Title:

**J&B RESTAURANT PARTNERS OF HAMPTON BAYS, LLC**

By:_____
   Name:
   Title:

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date first above written.

<u>J&B PARTIES:</u>

**J&B PARTNERS HOLDING CO., LLC**

By:_____
   Name:
   Title:


**J&B RESTAURANT PARTNERS FAMILY DINING, LLC**

By:_____
   Name: Dawn Pettu
   Title: COO


**J&B RESTAURANT PARTNERS OF COPIAGUE, LLC**

By:_____
   Name: Dawn Pettu
   Title: COO


**J&B RESTAURANT PARTNERS OF HAMPTON BAYS, LLC**

By:_____
   Name: Dawn Pettu
   Title: COO

**J&B RESTAURANT PARTNERS**
**OF HICKSVILLE, LLC**

By: _____
    Name: Dawn Pettit
    Title: CEO

**J&B RESTAURANT PARTNERS**
**OF MASSAPEQUA PARK, LLC**

By: _____
    Name: Dawn Pettit
    Title: CEO

**J&B RESTAURANT PARTNERS**
**OF MIDDLE ISLAND, LLC**

By: _____
    Name: Dawn Pettit
    Title: CEO

**J&B RESTAURANT PARTNERS**
**OF SHIRLEY, LLC**

By: _____
    Name: Dawn Pettit
    Title: CEO

Signature Page to License Agreement Amendment

**J&B RESTAURANT PARTNERS
OF LONG ISLAND, LLC**

By: _____
   Name: Dawn Pettit
   Title: COO

**J&B RESTAURANT PARTNERS
OF LONG ISLAND II, LLC**

By: _____
   Name: Dawn Pettit
   Title: COO

**J&B RESTAURANT PARTNERS
OF NY, LLC**

By: _____
   Name: Dawn Pettit
   Title: COO

**J&B RESTAURANT PARTNERS
OF NJ, LLC**

By: _____
   Name: Dawn Pettit
   Title: COO

Signature Page to License Agreement Amendment

**J&B RESTAURANT PARTNERS
OF CT, LLC**

By:_____
    Name:
    Title:

**COMPANY:**

**FRIENDLY'S FRANCHISING, LLC**

By:_____
    Name: Robert K. Sawyer, Jr.
    Title:   Senior Vice President, General Counsel

Signature Page to License Agreement Amendment

**J&B RESTAURANT PARTNERS
OF CT, LLC**

By:_____
    Name:
    Title:

**COMPANY:**

**FRIENDLY'S FRANCHISING, LLC**

By:_____
Name: Robert K. Sawyer, Jr.
Title:   Senior Vice President, General Counsel

Signature Page to License Agreement Amendment

**EXHIBIT A**

**SCHEDULE A**

**RESTAURANTS**

*Non-NJ Restaurants*

| FRANCHISEE | Rest # | Restaurant Street Address | City | State | Zip | Agreement Date |
|---|---|---|---|---|---|---|
| J & B Restaurant Partners of CT, LLC | 156 | 4545 North Main Street | Bridgeport | CT | 06606 | 5/23/2011 |
| J & B Restaurant Partners of CT, LLC | 470 | 275 Boston Post Road | Darien | CT | 06820 | 5/23/2011 |
| J & B Restaurant Partners of CT, LLC | 4225 | 81 Newtown Road | Danbury | CT | 06810 | 5/23/2011 |
| J & B Restaurant Partners of Hampton Bays, LLC | 7634 | 149 Montauk Highway | Hampton Bays | NY | 11946 | 4/1/2004 |
| J & B Restaurant Partners of Long Island II, LLC | 7604 | 361 Larkfield Road | East Northport | NY | 11731 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7605 | 555 Broadway Street | Massapequa | NY | 11758 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7606 | 522 East Main Street | Patchogue | NY | 11772 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7607 | 230 Jericho Turnpike | Mineola | NY | 11501 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7609 | 298 Montauk Avenue | Bayshore | NY | 11706 | 3/28/2001 |

| J & B Restaurant Partners of Long Island II, LLC | 7615 | 552 Franklin Avenue | Franklin Square | NY | 11010 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7620 | 201 Hallock Road | Stony Brook | NY | 11790 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7622 | 2151 Jericho Turnpike | Commack | NY | 11725 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7625 | 1187 Wantagh Avenue | North Wantagh | NY | 11793 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7626 | 949 Old Country Road | Riverhead | NY | 11901 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7627 | 1194 Deer Park Avenue | North Babylon | NY | 11703 | 3/28/2001 |
| J & B Restaurant Partners of Long Island II, LLC | 7629 | 220 Mount Pleasant Road | Smithtown | NY | 11787 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7603 | 50 Montauk Highway | East Islip | NY | 11730 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7608 | 292 Little East Neck Road | West Babylon | NY | 11704 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7611 | 553 Hawkins Avenue | Lake Ronkonkoma | NY | 11779 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7614 | 330 Fulton Street | Farmingdale | NY | 11735 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7617 | 1826 Hempstead Turnpike | East Meadow | NY | 11554 | 3/28/2001 |

DB1 / 80399493.1

| | | | | | | |
|---|---|---|---|---|---|---|
| J & B Restaurant Partners of Long Island, LLC | 7618 | 945 Merrick Road | Baldwin | NY | 11510 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7619 | 210 Montauk Highway | Sayville | NY | 11782 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7621 | 150 Jericho Turnpike | Syosset | NY | 11791 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7624 | 3287 Hempstead Turnpike | Levittown | NY | 11756 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7628 | 275 Route 25A | Miller Place | NY | 11764 | 3/28/2001 |
| J & B Restaurant Partners of Long Island, LLC | 7630 | 2220 - Route 112 | Coram | NY | 11727 | 3/28/2001 |
| J & B Restaurant Partners of Massapequa Park, LLC | 7638 | 4812 Sunrise Highway | Massapequa Park | NY | 11762 | 4/1/2004 |
| J & B Restaurant Partners of Middle Island, LLC | 7636 | 848 Middle Country Rd. | Middle Island | NY | 11953 | 6/2/2003 |
| J & B Restaurant Partners of NY, LLC | 126 | 361 Central Street | Hartsdale | NY | 10530 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 152 | 477 Tuckahoe Road | Yonkers | NY | 10710 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 231 | 445 East Main Street | Mount Kisco | NY | 10549 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 332 | 1053 Main Street | Fishkill | NY | 12524 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 439 | 1983 Commerce Street | Yorktown Heights | NY | 10598 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 822 | 1354 Ulster Avenue | Kingston | NY | 12401 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 863 | 364 Route 211 East | Middletown | NY | 10940 | 5/23/2011 |

| J & B Restaurant Partners of NY, LLC | 946 | 2 Stoneleigh Avenue | Carmel | NY | 10512 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 952 | 15 North Airmont Road | Suffern | NY | 10901 | 5/23/2011 |
| J & B Restaurant Partners of NY, LLC | 1006 | 31 Matthews Street | Goshen | NY | 10924 | 5/23/2011 |
| J & B Restaurant Partners of Shirley, LLC | 7640 | 940 Montauk Highway | Shirley | NY | 11967 | 8/4/2009 |

*NJ Restaurants*

| | FRANCHISEE | Rest # | Restaurant Street Address | City | State | Zip | Agreement Date |
|---|---|---|---|---|---|---|---|
| 1 | J & B Restaurant Partners of NJ, LLC | 211 | 441 Hillsdale Avenue | Hillsdale | NJ | 07642 | 5/23/2011 |
| 2 | J & B Restaurant Partners of NJ, LLC | 237 | 1243 Broad Street | Bloomfield | NJ | 07003 | 5/23/2011 |
| 3 | J & B Restaurant Partners of NJ, LLC | 286 | 192 Madison Avenue | Convent Station | NJ | 07961 | 5/23/2011 |
| 4 | J & B Restaurant Partners of NJ, LLC | 359 | 575 Pompton Turnpike | Pompton Plains | NJ | 07444 | 5/23/2011 |
| 5 | J & B Restaurant Partners of NJ, LLC | 399 | 195 Godwin Avenue | Midland Park | NJ | 07432 | 5/23/2011 |
| 6 | J & B Restaurant Partners of NJ, LLC | 664 | 304 Mountain Avenue | Hackettstown | NJ | 07840 | 5/23/2011 |
| 7 | J & B Restaurant Partners of NJ, LLC | 720 | 301 Mount Hope Avenue, Suite 1040 | Rockaway | NJ | 07866 | 5/23/2011 |
| 8 | J & B Restaurant Partners of NJ, LLC | 771 | 1230 Highway 35 | Middletown | NJ | 07748 | 5/23/2011 |
| 9 | J & B Restaurant Partners of NJ, LLC | 789 | 1210 Hooper Avenue | Toms River | NJ | 08753 | 5/23/2011 |
| 10 | J & B Restaurant Partners of NJ, LLC | 1053 | 981 Route 37 West | Toms River | NJ | 08753 | 5/23/2011 |
| 11 | J & B Restaurant Partners of NJ, LLC | 1059 | 3201 State Hwy 35 | Hazlet | NJ | 07730 | 5/23/2011 |

Exhibit C

Plan Term Sheet

**Summary of Plan Terms**
**January 6, 2015**

The following is a summary (this "***Term Sheet***") of certain material terms of a plan (the "***Plan***") for the reorganization of certain affiliates and wholly-owned direct and indirect subsidiaries of J&B Partners Holding Co., LLC identified on Exhibit A-1 hereto (each, a "***Debtor***" and collectively, the "***Debtors***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").  This Term Sheet does not contain all of the terms and provisions of the Plan; however, the Plan shall comply in all material respects with the terms of this Term Sheet and any material deviations or modifications to such terms and provisions set forth herein shall require the prior written consent of each Party hereto in its sole and absolute discretion.[1] Nothing in this Term Sheet is intended to be, and nothing in this Term Sheet shall be deemed to be, a solicitation of votes for any plan of reorganization or a sale or a solicitation of an offer to purchase any security of the Debtors.

Unless otherwise noted, section (§) references herein are to the Bankruptcy Code.

| | |
|---|---|
| **Parties** | •    the Debtors |
| | •    General Electric Capital Corporation, GE Capital Commercial of Utah LLC, and GE Capital Bank (collectively, "***GE***") |
| | •    Friendly's Franchising, LLC ("***Franchisor***" or "***Friendly's***") |
| | •    Holders of existing equity interest in J&B Partners Holding Co., LLC ("***Owners***" and collectively with the Debtors, GE and Friendly's, the "***Parties***") |
| **Overview of Restructuring** | The Debtors will pursue, and the other Parties shall support a restructuring which shall provide for, among other things: |
| | •    the assumption, pursuant to the Plan, of the real property leases and other attendant executory contracts related to locations set forth on Exhibit B (the "***Assumed Leases***"); |
| | •    the sale of those certain dark locations set forth on the |

---

[1] This Term Sheet shall only be binding with respect to J & B Restaurant Partners of Long Island II, LLC ("***JB II***") upon the Court's approving JB II entering into the Term Sheet with Friendly's and GE.  The Debtors will file a motion, to be heard at the first day hearing, asking the Court to approve the entry by JB II into the Term Sheet (the "***JB II Motion***").  A Termination Event (with respect to all Debtors) shall exist (without any further action taken by the Parties) if the Court has not approved the JB II Motion within 5 business days of the Petition Date.

1

attached Exhibit C, which locations are owned by the Debtors in fee simple, either during the Chapter 11 Cases (as defined below) or pursuant to the Plan (the "*Dark Store Sales*");

• the entry by the Debtors into sale-leaseback agreements for the locations set forth on Exhibit D either during the Chapter 11 Cases or pursuant to the Plan (the "*Sale-Leaseback Transactions*" and, together with the Assumed Leases, the "*Retained Stores*"), which sale-leaseback agreements shall, at a minimum, establish rent caps equal to 8.0% of Net Sales with rent increases not to exceed 10.0% over a five (5) year period; and

• the immediate closing of the Debtors' current locations set forth on the attached Exhibit E on or about the Petition Date (as defined below) and, to the extent applicable, the rejection of the attendant Lease (the "*Closed Stores*").

The Debtors and the reorganized Debtors acknowledge and agree that each of the Retained Stores shall remain open and in operations for a period beginning on the date hereof through no less than three (3) years following the Effective Date (as defined below), unless otherwise agreed to by Friendly's and the reorganized Debtors.

**Implementation**

The restructuring shall be implemented through a pre-negotiated Chapter 11 bankruptcy case of the Debtors (the "*Chapter 11 Cases*").

In addition, on or about the Petition Date, certain affiliates and wholly-owned direct and indirect subsidiaries of J&B Partners Holding Co., LLC identified on Exhibit A-2 (the "*Chapter 7 Affiliates*") will file voluntary petitions for relief under chapter 7 of the Bankruptcy Code. None of the Chapter 7 Affiliates or any of their downstream wholly-owned subsidiaries operated any Retained Store as of the Petition Date.

## Treatment of Claims

**Administrative Expenses**

Allowed Administrative Expenses, including professional fee claims, shall be paid in full in cash within 10 days after the later to occur of (i) the effective date of the Plan (the "*Effective Date*"), (ii) the date such claim was due and payable, and (iii) the date such claim becomes an allowed claim.

Administrative Expenses arising in the ordinary course of the

2

|  | Debtor's business which are neither (i) due and payable on or before the Effective Date nor (ii) cure amounts, shall be paid in the ordinary course of business when due. |
|---|---|
| **Priority Claims** | Allowed Priority Claims shall be paid in full in cash either (A) on the later of (i) the Effective Date, (ii) the date such claim was due and payable, (iii) within 30 days following the entry of an order allowing such claim, and (iv) such other date as may be agreed to by the holder of such claim, or (B) with respect to Priority Tax Claims, and at the sole discretion of the Debtors, the date or dates specified in § 1129(a)(9)(C). |
| **DIP Claim** | The post-petition claims (the "***DIP Claims***") of GE under the DIP Facility shall be treated as an allowed secured claim.  GE shall receive the GE Note (defined below) in full and complete satisfaction of the DIP Claims. |
| **Class 1:  GE Claim** | The pre-petition claims (the "*GE Claim*") of GE shall be treated as an allowed secured claim in the amount of $15,716,924 (the "***Allowed GE Claim***").  GE shall receive the GE Note in full and complete satisfaction of the GE Claims.   GE shall have no unsecured deficiency claim under the Plan on account of the GE Claim.

This class is impaired and entitled to vote on the Plan. |
| **Class 2: Unsecured Claims** | This class shall consist of all unsecured claims ("***Unsecured Claims***") other than administrative and priority claims, the Friendly's Claim, and the Owner Claims.  In full and complete satisfaction of allowed Unsecured Claims, each holder of an Unsecured Claim shall be paid an amount in cash equal to 10% of the allowed amount of such claim, in four equal installments, on the six month, twelve month, eighteen month, and twenty-four month anniversary of the Effective Date.

This class impaired and entitled to vote on the Plan. |
| **Class 3:  Friendly's Claim** | The pre-petition claims (the "*Friendly's Claim*") of Friendly's related to unpaid pre-petition royalty and advertising funds and all such other non-food/non-supply amounts alleged to be owed pursuant to any pre-petition franchise and/or license agreements between Friendly's and the Debtors, shall be treated as an allowed unsecured claim.   Friendly's shall receive no distribution under the Plan on account of the Friendly's Claim. For the avoidance of doubt, the Friendly's Claim shall not include any amounts owed for the sale of food or supplies to the Debtors, which amounts shall be paid pursuant to normal 21-day |

3

terms upon entry of an interim or final order authorizing the payment of such claims. The Debtors shall file one or more motions on the date the Chapter 11 Cases are commenced (the "***Petition Date***") requesting the foregoing authority to pay amounts owing to Friendly's for unpaid food as § 503(b)(9) claims or claims arising under the Perishable Agricultural Commodities Act of 1930.

This class is impaired and entitled to vote on the Plan.

|  |  |
|---|---|
| **Class 4:  Owner Claims** | The claims (the "***Owner Claims***") of the Owners (the "***Owner Creditors***") related to the general unsecured loan of approximately $2,150,000 to the Debtors, through their individual holding companies, shall be treated as an allowed unsecured claim. In full and complete satisfaction of allowed Owner Claims, on the Effective Date the holders of the Owner Claims shall receive 100% of the equity in the Debtors' reorganized parent company(ies) (the "***Reorganized Parent***").

This class is impaired and entitled to vote on the Plan. |
| **Class 5:  Old Equity** | On the Effective Date, existing equity interests shall be cancelled and the holders of such equity shall receive no distribution on account of their equity interests; provided, however, that existing equity interests in the other Debtors shall be retained by the corresponding holder solely for the purpose of maintaining the existing corporate structure.

This class is impaired and presumed to reject the Plan. |

### General Plan Implementation

|  |  |
|---|---|
| **DIP Financing**[2] | GE shall provide post-petition financing in the amount of $1,500,000 to the Debtors on the terms set forth in the accompanying DIP Term Sheet annexed hereto as Appendix 1. |
| **Plan Funding** | All Plan payments shall be funded from available cash on hand or the DIP Financing. |
| **GE Note**[3] | The DIP Claim and the GE Claim shall be satisfied through the |

---

[2] Material terms of the DIP Financing not set forth herein, and any changes to material terms of the DIP Financing set forth herein, shall be subject to approval by the Debtors, GE, and Friendly's.

4

issuance to GE of a new note (the "**GE Note**") on the Effective Date.  The GE Note shall be secured by fully perfected, first priority liens on and security interests in substantially all assets of the Debtors, and shall contain the following terms:

Principal Amount:  Amount equal to: (i) (a) the DIP Claim plus (b) the Allowed GE Claim less (ii) net proceeds generated during the Chapter 11 Cases from any (x) Dark Store Sales plus (y) Sale-Leaseback Transactions.

Amortization:  the GE Note shall have a 12-year amortization period.

Interest: 8% per annum.

Payments:  Principal and interest shall be payable monthly in cash.   Additional  principal  payments  shall  be  made  in accordance with the Net Excess Cash Flow section set forth herein.

Balloon Payment:  All amounts owing under the GE Note shall be due and payable on the third anniversary of the Effective Date.

All other terms of the GE Note will be on terms and conditions mutually acceptable to GE and the Debtors.

|                |                                                                 |
|----------------|-----------------------------------------------------------------|
| **Management** | The Debtors shall retain a chief restructuring officer ("**CRO**"). The CRO will oversee both the reorganization process through the Effective Date of the Plan and shall oversee the Debtors' and the reorganized Debtors' operations until the earlier of: |

- The date upon which the Parties mutually agree to remove the CRO; and

- The date on which the reorganized Debtors have, for a rolling four-quarter basis for the Retained Stores (as adjusted on a pro rata basis to the extent there are fewer than 24 Retained Stores), (i) achieved 95% of Sales and Corporate EBITDA (each as they are each defined in that certain Business Plan, dated January 6, 2015, agreed to by the Debtors, GE and Friendly's, and attached hereto as

---

[3] Material terms of the GE Note not set forth herein, and any changes to material terms of the GE Note set forth herein,  shall be subject to approval by the Debtors, GE, and Friendly's.

5

Appendix 2 (the "***Business Plan***")); (ii) made all principal and interest payments due and owing under the GE Note; (iii) made all capital expenditures as scheduled in the Business Plan; and (iv) timely made all fee and product payments to Friendly's as applicable. With respect to the foregoing provision, the first rolling four-quarter basis shall be measured on December 31, 2015.

The initial CRO shall be selected by the Debtors from a list of not less than four (4) candidates to be provided by GE, and may be removed only in accordance with the terms set forth in the DIP Term Sheet attached hereto as Appendix 1. Any replacement CRO to be appointed upon the removal of the initial CRO shall be selected pursuant to the following procedures (the "***CRO Replacement Procedures***"):

1. A principal from each of the Debtors (collectively), GE, and Friendly's shall meet-and-confer to determine if a replacement CRO can be identified consensually.

2. If a replacement cannot be identified consensually, then the Debtors, GE, and Friendly's shall each submit two (2) candidates to the Bankruptcy Court for approval, and the Bankruptcy Court shall select a replacement CRO from among the candidates.

To the extent the CRO is no longer engaged by the reorganized Debtors, the reorganized Debtors shall identify, subject to approval by Friendly's solely as to such person's qualifications, at least one executive-level employee of J & B Partners Holding Co., LLC—or one of its direct or indirect wholly-owned subsidiaries—who shall be responsible for, and devote substantially all of their professional time, attention, diligence, and effort to, the operation of the reorganized Debtors' business.

**Friendly's Franchise Agreement**

Subject to Bankruptcy Court approval, through the Effective Date, Friendly's shall continue to provide the Debtors' with a license (the "***Postpetition License***") pursuant to the terms of that certain License Agreement, dated as of August 4, 2014 (the "License Agreement"), to operate each Retained Store, except that, notwithstanding anything set forth in the License Agreement to the contrary:

- The license shall immediately terminate (without any action taken by Friendly's) upon the earlier of (i) 150 days from the filing of the Chapter 11 Cases, and (ii) a

6

Termination Event (as defined below).

- A one-time royalty payment equal to $45,000.00, payable no later than 4 business days after the Petition Date.

- Advertisement funds shall be equal to 0.0% of Net Sales.

- Local store marketing spend shall be equal to 0.5% of Net Sales.

- For the avoidance of doubt, during the Chapter 11 Cases, ordinary course of business transactions between Friendly's and the Debtors, including, but not limited to, the payment of goods received by Debtors from Friendly's, vendor rebates and any return of funds related to gift cards, shall continue in the ordinary course of business.

As used in this Term Sheet, a "***Termination Event***" shall occur (without any action taken by Friendly's other than the provision of such notice as may be required below) on such date that any of the following is true:

(i)    The Debtors fail to meet any of the following milestones (the "***Exit Milestones***"), which Exit Milestones may be amended if agreed to in writing by Friendly's:

　　a.    No later than 4 business days after the Petition Date, the Debtors shall have obtained orders (the "***Payment Orders***"), in form and substance reasonably acceptable to Friendly's, permitting the Debtors to pay to Friendly's all food- and supplies-related payments (either past due or that will become due during the Chapter 11 Cases).

　　b.    No later than 5 business days after the Petition Date, the Debtors shall have obtained an interim order (the "***Interim DIP Order***") approving the DIP Financing on terms consistent in all material respects with those set forth in the DIP Term Sheet.

　　c.    No later than 60 days after the date the Interim DIP Order is entered, the Debtors shall have obtained a final order approving the DIP Financing on terms consistent in all material respects with those set forth in the DIP Term Sheet.

7

d.  The Debtors shall have filed a Plan within 30 days after the Petition Date that complies in all material respects with the terms of this agreement.

e.  The Bankruptcy Court shall have entered an order approving the disclosure statement (the "***Disclosure Statement***") within 60 days after the filing of the Plan.

f.  The Bankruptcy Court shall have commenced the confirmation hearing with respect to the Plan within 60 days of the approval by the Bankruptcy Court of the Disclosure Statement.

g.  Bankruptcy Court shall have entered an order confirming the Plan within 30 days after the commencement of the confirmation hearing.

h.  No later than 4 business days after the Petition Date, the Debtors shall have obtained an interim order (the "***Interim License Order***"), in form and substance reasonably acceptable to Friendly's, approving the terms of the Postpetition License and Friendly's termination rights during the Chapter 11 Cases.

i.  No later than 60 days after the entry of the Interim License Order, the Debtors shall have obtained a final order, in form and substance reasonably acceptable to Friendly's, approving the terms of the Postpetition License and Friendly's termination rights during the Chapter 11 Cases.

The parties expressly acknowledge and agree that the foregoing Exit Milestones are subject to Bankruptcy Court availability, and that no Termination Event shall occur where the Debtors' failure to satisfy one of the foregoing Exit Milestones was solely the result of the unavailability of necessary time on the Bankruptcy Court's calendar and such Exit Milestone is nevertheless satisfied not more than 7 days after the deadline set forth above.

(ii)  The Debtors fail to comply with the terms of, or otherwise breach, (x) the Term Sheet, including the payment of all amounts contemplated to be paid pursuant to (A) the Postpetition License and (B) the Term Sheet for food- and supplies-related amounts due to Friendly's at any time prior to or during the Chapter 11 Cases, (y)

8

206157342

the Postpetition License, or (z) the Payment Orders.

(iii)    An event of default shall have occurred under the DIP Financing.

(iv)    The DIP Financing is terminated or withdrawn.

(v)    Any (i) provision of the DIP Financing related to payment, spending limitations, maturity, interest rate, fees, the chief restructuring officer, insurance, negative covenants, and financial covenants, or (ii) any event of default under the DIP Financing relating to any of the foregoing, is amended, modified, or waived (or a forbearance is entered into with respect thereto) without the prior written consent of Friendly's.

(vi)    The Bankruptcy Court enters an order dismissing any of the Chapter 11 Cases or converting any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

(vii)    The Bankruptcy Court enters an order appointing a trustee in any Chapter 11 Case or an examiner with enlarged powers (beyond those set forth under §§ 1106(a)(3) and (4)).

(viii)    A change of control occurs (as such term is contemplated in the DIP Financing documents).

(ix)    Any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final order making illegal or otherwise materially restricting, preventing or prohibiting the restructuring (as contemplated by this Term Sheet) in a way that cannot be reasonably remedied by the Parties within 5 days.

(x)    The Debtors file or otherwise seek, or the Bankruptcy Court approves any plan, disclosure statement or any documents relating to the foregoing inconsistent with the provisions of this Term Sheet.

Notwithstanding the foregoing, a Termination Event shall not occur with respect to the defaults enumerated in paragraphs (ii), (iii), (v), or (x) unless such default exists and is continuing after the expiration of five (5) business days after notice of such default has been received by the Debtors. The mere delivery of any such notice by Friendly's to the Debtors or any similar action taken by Friendly's in an effort to terminate the Postpetition License in connection with its termination rights

9

thereunder shall not constitute a violation of the automatic stay under § 362.

Commencing on the Effective Date, Friendly's shall provide the reorganized Debtors with a three-year franchise agreement on Friendly's then-current form of franchise agreement (subject to those modifications set forth herein) (the "**Franchise Agreement**") for each Retained Store, with an option to renew for an additional ten-year period at the option of the reorganized Debtors. The Franchise Agreements shall include, and will only include, the following modifications to the then-current form of franchise agreement (and, except to the extent otherwise set forth herein, such modifications shall be removed and/or shall be of no further force or effect upon the transfer or assignment of a Franchise Agreement to a third party other than a transfer or assignment between any two wholly-owned direct or indirect subsidiaries of J & B Partners Holding Co., LLC):

- Royalty payments equal to 1.0% of Net Sales (as to be defined in the Franchise Agreement) for the first three years of the Franchise Agreement and if the term is thereafter extended pursuant to this section, the royalty payments shall be equal to 3.0% of Net Sales for the first year after such extension, 3.5% of Net Sales for the second year after such extension, and 4.0% of Net Sales for the remainder of the term of Franchise Agreement.

- Marketing Fund payments equal to three percent (3.0%) of Net Sales and an additional one-half of one percent (0.5%) of Net Sales to be spent by Debtors on local advertising (collectively, the "*Ad Spend*"), which aggregate amount shall escalate in accordance with the terms set forth in the Net Excess Cash Flow section herein, to an amount not to exceed 4.0% of Net Sales. Of the foregoing Ad Spend contributions by the reorganized Debtors, (i) a portion of Ad Spend equal to 0.75% of Net Sales may be spent by Friendly's in accordance with Item 11.IV of Friendly's then-current FDD; (ii) a portion of Ad Spend equal to 0.5% of Net Sales will be used by the Debtors for local advertising; and (iii) any remaining portion of Ad Spend will be spent such that Ad Spend for Retained Stores located in New Jersey shall be spent in the State of New Jersey and Ad Spend for the Retained Stores located in New York shall be spent in Nassau County and Suffolk County, in each case pursuant to a marketing plan created by Friendly's in consultation with the reorganized Debtors as set forth below (the foregoing, collectively, the "*Ad*

10

*Spend Allocation*").   Prior to finalizing each marketing plan, Friendly's shall meaningfully consult (*i.e.*, each of the Debtors and Friendly's having an opportunity for dialogue and input regarding such marketing plan and media buy) with the reorganized Debtors solely as to the content of the marketing plan and media to be purchased thereunder.   On a quarterly basis, Friendly's shall also review with the reorganized Debtors, on a summary basis, the Ad Fund dollars actually spent and results achieved under the marketing plan in the prior quarter and consult with the reorganized Debtors on any changes to be made in the marketing plan on the basis of such results.   For the avoidance of doubt, the parties acknowledge and agree that, following such meaningful consultations as set forth above, all decisions relating to content of the marketing plan and media placement of all advertising and promotions thereunder shall be made by Friendly's in Friendly's sole and absolute discretion. Upon the assignment or transfer of a Franchise Agreement to a third party (other between any two wholly-owned direct or indirect subsidiaries of J&B Partners Holding Co., LLC), the modifications relating to Ad Spend as set forth herein, including, but not limited to, the Ad Spend Allocation and consultation rights, shall immediately terminate and be of no further force or effect.

- Except as otherwise set forth or modified herein, subject to the standard transfer provisions of the Franchise Agreements, each Franchise Agreement shall be freely assignable to any third party designated by the applicable reorganized Debtor during the initial 3-year term and/or any renewal term; provided, however, that (i) upon the assignment of a Franchise Agreement in the first three (3) years of the term, royalty payments shall immediately increase to three percent (3%) of Net Sales and shall thereafter escalate by 0.5% of Net Sales on the first and second anniversaries of such assignment up to a total of 4% of Net Sales as a royalty payment for the remainder of the term of the Franchise Agreement and (ii) if the term of a Franchise Agreement has been extended, and such Franchise Agreement is thereafter assigned, the royalty payments will be the amount that was being paid by the reorganized Debtor at the time of such assignment; provided, that if such royalty payment is less than 4% of Net Sales, then it will thereafter escalate by 0.5% of Net Sales on the anniversaries of such date that the Franchise Agreement had been extended up to a total of 4% of Net

11

Sales for the remainder of the term of the Franchise Agreement in accordance with the first bullet point of this section. For the avoidance of doubt, an assignment between any two wholly-owned direct or indirect subsidiaries of J&B Partners Holding Co., LLC will not be deemed to be an assignment that triggers the royalty escalation described herein.

- Each Franchise Agreement shall provide for a minimum of a three (3) mile radius surrounding the Retained Store (the "**Protected Area**") such that during the initial three (3) year period of the franchise term, Friendly's will not own or operate, or grant anyone else the right to operate, a Friendly's restaurant within the Protected Area for each such Retained Store; provided, however, that the Debtors shall have a right of first refusal and a right of first offer as to any Friendly's restaurant proposed to be built between three and file miles from a Retained Store during the initial three (3) year period of the franchise term. Upon exercise of the ten-year renewal option, the Debtors shall no longer have the right of first refusal and right of first offer described in the foregoing sentence, and the Protected Area shall be reduced to the greater of (i) a 2-mile radius around each Retained Store and (ii) the then standard protections in Friendly's standard franchise agreement. Upon the transfer or assignment of the Franchise Agreement, other than a transfer of an assignment between two wholly-owned direct or indirect subsidiaries of J&B Partners Holding Co., LLC, the foregoing radius protections and any right of first refusal and right of first offer described in the first sentence of this bullet point shall no longer have any force or effect and the Protected Area shall revert to the greater of (i) a 1-mile radius around each Retained Store and (ii) the then standard protections in Friendly's standard franchise agreement.

- For the avoidance of doubt, no Franchise Agreement shall include a personal guarantee; provided, however, that Friendly's shall retain the right to require a personal guarantee from any non-reorganized Debtor assignee of the Franchise Agreement other than an assignment between any two wholly-owned subsidiaries of J&B Partners Holding Co., LLC. Upon the assignment or transfer of a Franchise Agreement, no reorganized Debtor, nor any member thereof, shall be required to provide a personal guaranty of the assignee's liability under any

12

franchise agreement.

- The non-compete restrictive covenants of each Franchise Agreement will be modified to reflect the language as negotiated by the Debtors and Friendly's and set forth in that certain Settlement Agreement, dated April 18, 2011, as amended by the First Amendment to Settlement Agreement, dated March 23, 2013.

**Net Excess Cash Flow**    For each lagging twelve-month ("*LTM*") period after the Effective Date, "*Net Cash Flow*" shall be equal to SL EBITDA (as calculated in the Business Plan), less disbursements for G&A, royalties, ad fund, and capital expenditures. The term "*Net Excess Cash Flow*" shall be equal to cash, if any, that exceeds 105% of Net Cash Flow in the corresponding LTM period; provided, that the allocation of Net Excess Cash Flow as set forth herein shall not cause the Debtors' aggregate cash balance for the Retained Stores to be less than $500,000 (as adjusted on a pro rata basis to the extent there are fewer than 24 Retained Stores). Net Excess Cash Flow shall be allocated as follows:

*First*, on a combination of the following, as agreed to by the reorganized Debtors and Friendly's:

- to increase the Ad Spend until total Ad Spend equals four percent (4.0%) of Net Sales; provided, however, that Ad Spend shall (a) occur, as agreed upon by Friendly's and the reorganized Debtors, either (i) pursuant to the marketing plan developed by Friendly's (in accordance with the terms and conditions set forth above) or (ii) as directed by the reorganized Debtors for local advertising and marketing, (b) be spent in the trade area in which the Retained Stores are located consistent with the Ad Spend Allocation, and (c) at no time be an amount that is greater than the percentage of Net Sales that Friendly's other full-service franchisees in the NYDMA are currently contributing to the Marketing Fund. Notwithstanding the foregoing, Friendly's and the reorganized Debtors may redirect Ad Spend towards remodeling Retained Stores as mutually agreed to among the Parties and in accordance with below and, if Friendly's and the reorganized Debtors are unable to determine how the Ad Spend should be directed as set forth in subsection (a) of the preceding sentence within 15 business days of the determination of the Excess Net Cash Flow, the Ad Spend shall automatically be redirected towards

13

remodeling Retained Stores; and

- to fund maintenance, renovations and updates to Retained Stores pursuant to a schedule to be agreed to among the reorganized Debtors and Friendly's;

provided, however, that the aggregate amount of such spending shall not exceed $500,000 in any rolling 12-month period.

*Second*, to the extent of any additional Net Excess Cash Flow, to pay down outstanding principal on the GE Note.

**Store Disposition**

From and after the Effective Date, the reorganized Debtors will be permitted subject to the terms of the GE Note and the Friendly's Franchise Agreement, to sell individual stores.

**Releases and Related Matters**

To the fullest extent permitted by law, the Plan shall provide for customary releases and exculpations (including mutual releases among the releasing parties and by third parties) for the benefit of the Parties and each of such entities' predecessors, successor and assigns, subsidiaries, funds, portfolio companies, affiliates, respective attorneys, and each of their respective officers, directors, employees, managers, financial advisors or other professionals or representatives. For the avoidance of doubt, such releases shall include, without limitation, the release of any personal guaranty claims asserted by Friendly's pursuant to any pre-petition franchise and/or license agreement by and between Friendly's and one or more of the Debtors and/or individual members of the Debtors. Notwithstanding the foregoing, Friendly's and its affiliates shall not release J & B Restaurant Partners of Hampton Bays, LLC and each of its officers, directors, employees, managers, financial advisors or other professionals or representatives from any claims or liabilities including, without limitation, the release of any personal guaranty claims asserted by Friendly's pursuant to any pre-petition franchise and/or license agreement by and between Friendly's and J & B Restaurant Partners of Hampton Bays, LLC and any and all such claims shall survive the Plan.

Any indemnification provisions in place at the commencement of the Chapter 11 Cases, whether in the Debtors' operating agreement, other formation documents, board resolutions, or contracts for the current and former directors, officers, equity holders, managers, employees, attorneys, other professionals, and agents of the Debtors and such persons' respective affiliates, shall be assumed and irrevocable and will survive the

14

206157342

effectiveness of the Plan.

The Debtors' governance documents after effectiveness of the Plan will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the reorganized Debtors' current and former directors, equity holders, officers, employees, or agents, and such persons' respective affiliates, to the fullest extent permitted by law and at least to the same extent as the organizational documents of the Debtors as of the commencement of the Chapter 11 Cases.

**Termination**                    This Term Sheet shall immediately terminate and be of no further force and effect upon the earlier of (i) 150 days from the filing of the Chapter 11 Cases, and (ii) the occurrence of a Termination Event.

15

IN WITNESS WHEREOF, the parties have caused to be executed this Term Sheet by their duly authorized officers, as of the date first written above.

**J&B PARTNERS MANAGEMENT LLC**, for itself and for each of the other Debtors identified on Exhibit A-1

By: _____

    Name: _____

    Title: _____

**GENERAL ELECTRIC CAPITAL CORPORATION**
**GE CAPITAL COMMERCIAL OF UTAH LLC**
**GE CAPITAL BANK**

By: _____

    Name: _____David A Burger_____

    Title: _____Senior Vice President_____

**FRIENDLY'S FRANCHISING, LLC**

By: _____

    Name: _____

    Title: _____

_____
**JOSEPH VITRANO**

_____
**WILLIAM MURPHY**

_____
**JAMCO INTERESTS LLC**

_____
**JAMES NOTARNICOLA**

_____
**WILLIAM MONACO**

_____
**GERALD SNEARLY**

_____
**GREGORY KALOUSTIAN**

*Signature Page for*
*Summary of Plan Terms*

IN WITNESS WHEREOF, the parties have caused to be executed this Term Sheet by their duly authorized officers, as of the date first written above.

**J&B PARTNERS MANAGEMENT LLC**, for itself and for each of the other Debtors identified on Exhibit A

By: _____

     Name:_____

     Title: _____

**GENERAL ELECTRIC CAPITAL CORPORATION**
**GE CAPITAL COMMERCIAL OF UTAH LLC**
**GE CAPITAL BANK**

By: _____

     Name:_____

     Title: _____

**FRIENDLY'S FRANCHISING, LLC**

By: _____*Robert K Sawyer*_____

     Name: _*Robert K. Sawyer, Jr.*_

     Title: _*Senior Vice President*_

_____
**JOSEPH VITRANO**

_____
**WILLIAM MURPHY**

_____
**JAMCO INTERESTS LLC**

_____
**JAMES NOTARNICOLA**

_____
**WILLIAM MONACO**

_____
**GERALD SNEARLY**

_____
**GREGORY KALOUSTIAN**

*Signature Page for*
*Summary of Plan Terms*

IN WITNESS WHEREOF, the parties have caused to be executed this Term Sheet by their duly authorized officers, as of the date first written above.

**J&B PARTNERS MANAGEMENT LLC**, for itself and for each of the other Debtors identified on Exhibit A

By: _____

Name: _Joseph Vitrano_____

Title: _Operating Manager Member._____

**GENERAL ELECTRIC CAPITAL CORPORATION**
**GE CAPITAL COMMERCIAL OF UTAH LLC**
**GE CAPITAL BANK**

By: _____

Name: _____

Title: _____

**FRIENDLY'S FRANCHISING, LLC**

By: _____

Name: _____

Title: _____

_____    _____
**JOSEPH VITRANO**                          **WILLIAM MURPHY**

_____    _____
**JAMCO INTERESTS LLC**                     **JAMES NOTARNICOLA**

_____    _____
**WILLIAM MONACO**                          **GERALD SNEARLY**

_____
**GREGORY KALOUSTIAN**

IN WITNESS WHEREOF, the parties have caused to be executed this Term Sheet by their duly authorized officers, as of the date first written above.

**J&B PARTNERS MANAGEMENT LLC**, for itself and for each of the other Debtors identified on Exhibit A

By: _____

Name: _Joseph Vitrano_____

Title: _Operating Manager Member_____

**GENERAL ELECTRIC CAPITAL CORPORATION**
**GE CAPITAL COMMERCIAL OF UTAH LLC**
**GE CAPITAL BANK**

By: _____

Name: _____

Title: _____

**FRIENDLY'S FRANCHISING, LLC**

By: _____

Name: _____

Title: _____

_____          _____
JOSEPH VITRANO                                        WILLIAM MURPHY

_____          _____
JAMCO INTERESTS LLC                                JAMES NOTARNICOLA

_____          _____
WILLIAM MONACO                                       GERALD SNEARLY

_____
GREGORY KALOUSTIAN

*Signature Page for*
*Summary of Plan Terms*

IN WITNESS WHEREOF, the parties have caused to be executed this Term Sheet by their duly authorized officers, as of the date first written above.

**J&B PARTNERS MANAGEMENT LLC,** for itself and for each of the other Debtors identified on Exhibit A

By: _____

Name: _Joseph Vitrano_____

Title: _Operating Manager Member_____

**GENERAL ELECTRIC CAPITAL CORPORATION**
**GE CAPITAL COMMERCIAL OF UTAH LLC**
**GE CAPITAL BANK**

By: _____

Name: _____

Title: _____

**FRIENDLY'S FRANCHISING, LLC**

By: _____

Name: _____

Title: _____

**JOSEPH VITRANO** _____   **WILLIAM MURPHY** _____

**JAMCO INTERESTS LLC** _____   **JAMES NOTARNICOLA** _____

**WILLIAM MONACO** _____   **GERALD SNEARLY** _____

**GREGORY KALOUSTIAN** _____

*Signature Page for*
*Summary of Plan Terms*

IN WITNESS WHEREOF, the parties have caused to be executed this Term Sheet by their duly authorized officers, as of the date first written above.

**J&B PARTNERS MANAGEMENT LLC**, for itself and for each of the other Debtors identified on Exhibit A

By: _____

Name: _____

Title: _____

**GENERAL ELECTRIC CAPITAL CORPORATION**
**GE CAPITAL COMMERCIAL OF UTAH LLC**
**GE CAPITAL BANK**

By: _____

Name: _____

Title: _____

**FRIENDLY'S FRANCHISING, LLC**

By: _____

Name: _____

Title: _____

_____          _____
JOSEPH VELRANO                            WILLIAM MURPHY


_____          _____
JAMCO INTERESTS LLC                       JAMES NOTARNICOLA

_____          _____
WILLIAM MONACO                            GERALD SNEARLY

_____
GREGORY KALOUSTIAN

*Signature Page for*
*Summary of Final Terms*

## EXHIBIT A-1

### SCHEDULE OF DEBTORS

J&B Partners Management LLC

J&B Restaurant Partners of Long Island Holding Co., LLC

J&B Restaurant Partners of NYDMA LLC

J&B Restaurant Partners of Massapequa Park, LLC

J&B Restaurant Partners of Middle Island, LLC

J&B Restaurant Partners of Shirley, LLC

J&B Restaurant Partners of Long Island, LLC

J&B Restaurant Partners of Long Island II, LLC

J&B Real Estate Partners of Long Island, LLC

J&B Real Estate Partners of Long Island II, LLC

J&B Restaurant Partners of NJ, LLC

## EXHIBIT A-2

### SCHEDULE OF AFFILIATES FILING CHAPTER 7

J&B Restaurant Partners of Upstate NY, LLC

J&B Restaurant Partners of Copiague, LLC

J&B Restaurant Partners of Hicksville, LLC

J&B Restaurant Partners of CT, LLC

**EXHIBIT B**

**SCHEDULE OF ASSUMED LEASES**

1.  211    Hillsdale - Hillsdale, NJ
    J&B Restaurant Partners of NJ, LLC

2.  237    Bloomfield - Bloomfield, NJ
    J&B Restaurant Partners of NJ, LLC

3.  286    Convent Station - Convent Station, NJ
    J&B Restaurant Partners of NJ, LLC

4.  664    Hackettstown - Hackettstown, NJ
    J&B Restaurant Partners of NJ, LLC

5.  789    Toms River (HOOP) - Tom's River, NJ
    J&B Restaurant Partners of NJ, LLC

6.  1053   Toms River (R37) - Tom's River, NJ
    J&B Restaurant Partners of NJ, LLC

7.  617    East Meadow -East Meadow, NJ
    J&B Restaurant Partners of Long Island, LLC

8.  621    Syosset - Syosset, NY
    J&B Restaurant Partners of Long Island, LLC

9.  628    Miller Place - Miller Place, NY
    J&B Restaurant Partners of Long Island, LLC

10. 630    Coram - Coram, NY
    J&B Restaurant Partners of Long Island, LLC

11. 607    Mineola - Mineola, NY
    J&B Restaurant Partners of Long Island II, LLC

12. 615    Franklin SQ - Franklin Square, NY
    J&B Restaurant Partners of Long Island II, LLC

13. 620    StonyBrook - Stony Brook, NY
    J&B Restaurant Partners of Long Island II, LLC

14. 622    Commack - Commack, NY
    J&B Restaurant Partners of Long Island II, LLC

15. 624      Levittown - Levittown, NY
J&B Restaurant Partners of Long Island, LLC

16. 626      Riverhead - Riverhead, NY
J&B Restaurant Partners of Long Island II, LLC

17. 629      Smithtown - Smithtown, NY
J&B Restaurant Partners of Long Island II, LLC

18. 636      Mid Island - Middle Island, NY
J&B Restaurant Partners of Middle Island, LLC

19. 638      Mass Park - Massapequa Park, NY
J&B Restaurant Partners of Massapequa Park, LLC

20. 640      Shirley -Shirley, NY
J&B Restaurant Partners of Shirley, LLC

**EXHIBIT C**

**SCHEDULED OF DARK STORE SALES**

1. 608    West Babylon - West Babylon
   J&B Restaurant Partners of Long Island, LLC

2. 609  Bayshore
   J&B Restaurant Partners of Long Island II, LLC

3. 614 Farmingdale
   J&B Restaurant Partners of Long Island, LLC

4. 616 Selden
   J&B Restaurant Partners of Long Island, LLC

## EXHIBIT C

## SCHEDULE OF SALE-LEASEBACK TRANSACTIONS

1. 603  East Islip – EastIslip
   J&B Restaurant Partners of Long Island, LLC

2. 611    Lake Ronkonkoma – LakeRonk
   J&B Restaurant Partners of Long Island, LLC

3. 618      Baldwin – Baldwin
   J&B Restaurant Partners of Long Island, LLC

4. 619      Sayville – Sayville
   J&B Restaurant Partners of Long Island, LLC

**EXHIBIT D**

**SCHEDULE OF CLOSED STORES**

1.  359    Pompton Plains - Pompton Plains, NJ
    J&B Restaurant Partners of NJ, LLC

2.  720    Rockaway - Rockaway, NJ
    J&B Restaurant Partners of NJ, LLC

3.  771    Middletown NJ - Middletown, NJ
    J&B Restaurant Partners of NJ, LLC

4.  1059  Hazlet - Hazlet, NJ
    J&B Restaurant Partners of NJ, LLC

5.  604    E Northport - East Northport, NY
    J&B Restaurant Partners of Long Island II, LLC

6.  606    Patchogue - Patchogue, NY
    J&B Restaurant Partners of Long Island II, LLC

7.  625    N. Wantagh - N. Wantagh, NY
    J&B Restaurant Partners of Long Island II, LLC

8.  627    N Babylon - N. Babylon, NY
    J&B Restaurant Partners of Long Island II, LLC

9.  156    Bridgeport - Bridgeport, CT
    J&B Restaurant Partners of CT, LLC

**APPENDIX 1**

**DIP TERM SHEET**

**Summary of Terms and Conditions for**
**Debtor-in-Possession Credit Facility and Use of Cash Collateral**
**January 6, 2015**

The following is a summary (this "**Term Sheet**") of certain material terms of a proposed agreement to extend DIP Loans (defined below) to, and permit the use of cash collateral by, the Debtors (as defined below) in connection with cases proposed to be commenced in the United States Bankruptcy Court for the Southern District of New York, White Plains Division under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). This Term Sheet does not contain all of the terms and provisions of the DIP Loans. Nothing in this Term Sheet is intended to be, and nothing in this Term Sheet shall be deemed to be, a solicitation of votes for any plan of reorganization or a sale or a solicitation of an offer to purchase any security of the Debtors.

Unless otherwise noted, section (§) references herein are to the Bankruptcy Code.

## I.    Parties

|   |   |
|---|---|
| Debtors: | J&B Partners Management LLC and those affiliates identified on Exhibit A to the *Summary of Plan Terms* (the "**Plan Term Sheet**"), as debtors and debtors-in-possession (each, excluding any such entity that instead files a petition for relief under chapter 7 of the Bankruptcy Code, a "**Debtor**" and collectively, the "**Debtors**") in jointly administered cases (the "**Cases**") to be filed on the date (the "**Petition Date**") approved by the Debtors, the Existing Lender (defined below) and Friendly's Franchising, LLC (the "**Franchisor**") under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "**Bankruptcy Court**"). |
| Existing Lender: | General Electric Capital Corporation, GE Capital Commercial of Utah LLC, and GE Capital Bank (collectively, the "**Existing Lender**"). |
| DIP Lender: | General Electric Capital Corporation (the "**DIP Lender**"). |

## II.    DIP Facility

|   |   |
|---|---|
| Type/Amount: | A revolving loan facility (the "**DIP Facility**") in an aggregate principal amount not to exceed $1,500,000 (the loan thereunder, the "**DIP Loan**"). The DIP Facility shall be secured by the DIP Collateral (defined below). |
| Availability/Purpose: | Commencing on the Closing Date (defined below) and ending on the DIP Facility Termination Date (defined |

below), and subject to the satisfaction of the conditions set forth in Section VI, the DIP Loan shall be made available to the Debtors from time to time in accordance with the DIP Documentation (defined below) for use in accordance with the Budget (defined below) to effectuate the restructuring described in the Debtors' Plan Term Sheet.

Maturity:

The earliest to occur of (i) the date that is thirty (30) days after the date on which an order confirming a plan of reorganization is entered by the Bankruptcy Court; (ii) the Effective Date (as defined in the Plan Term Sheet) of a plan of reorganization for the Debtors; (iii) any sale or transfer of a substantial portion of the DIP Collateral except as otherwise contemplated in the Plan Term Sheet; and (iv) the Commitment Termination Date (defined below) (such earliest date, the "**DIP Facility Termination Date**").

Available Cash:

The Debtors will use all cash available to them (the "**Available Cash**") to fund any Budget (as defined hereinafter) items before drawing on the DIP Loan unless, after giving effect to such funding with Available Cash, the amount of such Available Cash would be less than $200,000 (the "**Minimum Amount**").

## III.    Budget; Certain Agreed Budget Items

All of the Debtors' operating and capital expenditures and cash flow shall be set forth in budgets prepared on a 13-week basis (each, a "**Budget**"), as may be modified from time to time with the consent of the DIP Lender.  The initial Budget is included as part of the Business Plan attached to the Plan Term Sheet as Appendix 2.  The Budget shall set forth expected receipts and all of the operating and capital expenditures to be made during each calendar week and in the aggregate for the period of time covered by the Budget.  By no later than 3:00 p.m. prevailing Eastern Time of Wednesday of each calendar week, the Debtors shall provide to the DIP Lender:  (i) an update and extension to the Budget satisfactory to the DIP Lender, and (ii) a variance report/reconciliation relating to the Budget and the amount of Available Cash for the preceding week and cumulative 13-week period or, if shorter, the preceding week(s) since the Petition Date (the "**Weekly Cash Flow Variance Report**"), in each case in the form attached hereto as Exhibit 1.

2

During any cumulative 13-week Budget period, or, if shorter, commencing with the fourth full week after the commencement of the Cases, absent express prior written consent of the DIP Lender, the Debtors (i) shall not permit any expenditure made during such period to exceed the projected amount of such category items ("category item" being defined as the following categories: disbursements, operating outflows, maintenance cap-ex, and total disbursements) contained in the Budget by 10% of such category item's projected percentage of revenue amount tested on a rolling 4-week basis; (ii) shall not permit aggregate expenditures to be greater than 105% of total projected percentage of revenue contained in the Budget; and (iii) shall have achieved on a rolling four-week basis for the Retained Stores (as adjusted on a pro rata basis to the extent there are fewer than 24 Retained Stores), 90% of Sales and Corporate EBITDA (as each such term is defined in the Business Term Plan attached to the Plan Term Sheet as Appendix 2).  For purposes of determining compliance with this variance provision, Debtor Professional Fees (as defined below) shall not be included in the calculation.

Without limiting the DIP Lenders' general right to approve the Budget, the Budget shall provide, *inter alia*, for:

- payment of aggregate postposition legal fees for Debtors' legal counsel of $250,000.  The foregoing shall be in addition to amounts paid to Debtors' legal counsel for (i) legal services rendered prior to the Petition Date and (ii) and a retainer not to exceed $50,000.

- payment to the CRO (as such term is defined in section 6(h) below) of fees in the aggregate amount of not more than $23,000/week and expenses in the aggregate amount of not more than $2,500/week for the five (5) weeks immediately following the Petition Date, followed by payment of fees in the aggregate amount of not more than $13,000/week and expenses in the aggregate amount of not more than $500 for each week thereafter until confirmation of the Plan;

- payment to an investment banking firm to be selected by the Debtors in an amount equal to actual fees (and expenses) charged at the investment banking firm's prevailing hourly rates, which fees shall be subject to a $10,000 monthly cap; provided, however, that any unused portion of the monthly cap shall roll forward and be

3

available for use in other months. For the avoidance of doubt, no compensated services shall be rendered by such investment banker except on the request of, and with the approval of, the CRO. Notwithstanding the foregoing, the investment banking firm shall not be required to provide services if the provision of such services would exceed $10,000 per week (subject to the roll-forward provision in subpart (i) above) based on the investment banking firm's prevailing rates as outlined on an engagement letter.

• in addition to the retainer and monthly fee described above, payment to such investment banking firm of a success fee in an amount not to exceed $200,000 payable as follows: (i) $100,000 on the Effective Date of the Plan and (ii) either (a) an additional $100,000 on the closing and funding of real estate sales transactions by the Debtors as contemplated by the Plan Term Sheet, which yield Gross proceeds of at least $9,000,000; or (b) an additional $50,000 if the real estate sales transactions contemplated by the Plan Term Sheet yield Gross Proceeds yield less than $9,000,000.

## IV.    **Certain Payment Provisions**

Interest Rate:    The DIP Loan shall accrue interest at a rate per annum equal to ten percent (10%) which shall be payable monthly.

At any time when the Debtors are in default in the payment of any obligations due under the DIP Facility, such unpaid amount shall bear interest at a rate equal to eighteen percent 18% per annum and shall be payable upon demand.

All per annum rates shall be calculated on the basis of a year of 365 days, for actual days elapsed.

Commitment Fee:    1.0% of the aggregate DIP Facility commitment.

Unused Facility Fee:    1.0% per annum during the term of the DIP Facility.

Exit Fee:    1.0% of the original aggregate amount of the DIP Facility commitments.

Commitment Reductions:    Commitments may be reduced by the Debtors in minimum amounts to be agreed upon and shall, to the extent the Debtors are permitted to retain such net proceeds for use in accordance with the Budget, be permanently reduced in an

4

amount equal to the net proceeds of any asset sales that occur outside the ordinary course of the Debtors' business.

## V.    Collateral

Priority and Collateral:

Pursuant to Bankruptcy Code § 364(c)(1), the DIP Lender will be granted a superpriority administrative claim over any and all administrative claims of the kind specified in Bankruptcy Code § 503(b) and § 507(b).  As collateral for the DIP Loan (the "**DIP Collateral**"), the DIP Lender will be granted: (i) pursuant to Bankruptcy Code § 364(c)(2), a perfected first priority lien on all assets of the Debtors that are unencumbered as of the commencement of the Cases and the proceeds therefrom; and (ii) pursuant to Bankruptcy Code § 364(c)(3) of the Bankruptcy Code, a perfected junior lien on all assets of the Debtors that are encumbered by valid, perfected and non-avoidable liens as of the commencement of the Cases and the proceeds therefrom.

Carve-Out Expenses:

The "**Carve-Out Expenses**" shall be included in the Budget and shall be defined to mean: (i) all  unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); plus (ii) an amount equal to the allowed fees and expenses of retained professionals of the Debtors ("**Debtor Professional Fees**") incurred before the delivery of a Carve-Out Trigger Notice (as defined below) that are ultimately allowed by final order of the Court (whether allowed before or after the delivery of such notice), but solely to the extent the same are incurred in accordance with the Budget on a cumulative basis with respect to each professional; plus (iii) all allowed Debtor Professional Fees that are incurred from and after the delivery of a Carve-Out Trigger Notice in an aggregate amount of not more than $50,000.  The "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Lender to counsel for the Debtors following the occurrence of an Event of Default expressly stating that the Carve-Out Expenses have been triggered (the "**Carve-Out Trigger Notice**").

The DIP Documentation shall provide that, upon delivery of a Carve-Out Trigger Notice, the DIP Lender shall fund an amount equal to the unpaid portion of the Carve-Out Expenses, including accrued and unpaid Debtor Professional Fees through the date of delivery of the Carve-Out Trigger Notice; provided, however, that nothing contained herein shall require the DIP Lender to advance an amount in excess of the aggregate DIP Facility commitments or to pay the

5

Debtors Professional Fees in excess of the limits set forth in the Budget. Any amount funded pursuant to the foregoing that is not utilized for the payment of fees and expenses of the professionals of the Debtors shall be returned to the DIP Lender within 180 days after delivery of the Carve-Out Trigger Notice.

Nothing herein shall constitute a waiver by the DIP Lender of it right to object to the fees and expenses of any professional retained by the Debtors, all such rights being specifically reserved.

No Budget shall include any fees or expenses incurred by any party, including the Debtors, or its or their professionals, in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings, contested matter, objection, other litigation, or discovery against the Existing Lender and the DIP Lender or their advisors, agents or subagents, including, without limitation, challenging the amount, validity, perfection, priority or enforceability of, or asserting any defense, counterclaim or offset to, the obligations arising under the DIP Facility and the liens and claims thereunder in favor of the Existing Lender and the DIP Lender.

**Use of Available Cash and Cash Collateral:**

Except for the accrual and payment of the Carve-Out Expenses, the Debtors shall not spend any cash, including cash collateral and Available Cash and shall not incur any debt or liability, except as approved pursuant to the Budget or permitted under the DIP Documentation. The DIP Loan shall not be available for direct borrowings unless the Debtors shall at the time of drawing thereunder have first used all of the Available Cash in excess of the Minimum Amount. The use of Available Cash by the Debtors shall terminate from and after acceleration of the DIP Facility by the DIP Lender upon the occurrence of an Event of Default under the DIP Documentation.

**Adequate Protection:**

The Existing Lender will be granted adequate protection to the extent of any diminution in the value of their collateral as of the Petition Date (the "**Pre-Petition Collateral**", together with the DIP Collateral, the "**Collateral**"), including but not limited to any diminution in value resulting from (i) the use of the cash collateral pursuant to Bankruptcy Code § 363(a), (ii) the use, sale or lease of Pre-Petition Collateral (other than the cash collateral) pursuant

6

to Bankruptcy Code § 363(c), or (iii) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a), in the form of (a) the reimbursement of all reasonable and documented fees and expenses incurred by professionals for the Existing Lender including, without limitation, the reasonable disbursements of counsel and any financial consultant, advisor or expert advising the Existing Lender, (b) a lien immediately junior only to the lien granted to the DIP Lender on the DIP Collateral, (c) subject to payment of the Carve-Out Expenses, a superpriority claim pursuant to Bankruptcy Code § 507(b), (d) engagement by the Debtors of a CRO (defined below) with the powers and duties set forth herein, (e) inclusion of the Exit Milestones (defined below) and (f) inclusion of credit bidding rights in favor of the Existing Lender in connection with the sale of any of the Debtors' assets, whether conducted pursuant to Bankruptcy Code §§ 363 and 1129(b)(2)(A), or otherwise.

## VI.    Certain Conditions

Initial Conditions:

The initial availability of the DIP Facility shall be conditioned upon satisfaction or waiver of the following conditions precedent (the date upon which all such conditions precedent shall be satisfied or waived, the "**Closing Date**"):

(a)    The Debtors shall have executed and delivered definitive financing documentation with respect to the DIP Facility that is satisfactory to the DIP Lender in all respects (the "**DIP Documentation**");

(b)    The Debtors shall have delivered the initial Budget that is satisfactory to the Existing Lender and to the DIP Lender in all respects;

(c)    Pursuant to the DIP Facility, the Debtors shall have released the Existing Lender, its former and current affiliates and its respective officers, directors, employees, advisors and agents, in a form of release that is satisfactory to the Existing Lender in all respects;

(d)    The Existing Lender and the DIP Lender shall have received all fees required to be paid, and all expenses for which invoices have been presented on or before the Closing Date;

7

(e)     The Bankruptcy Court shall have entered, upon motion in form and substance reasonably satisfactory to the Existing Lender and the DIP Lender, on such prior notice to such parties as may be satisfactory to the Existing Lender and the DIP Lender, an order of the Bankruptcy Court (the "**Interim Order**"), no later than five (5) business days after the date on which the Cases have been commenced, approving and authorizing the use of cash collateral and the DIP Facility and related transactions, all provisions thereof and the priorities and liens granted under Bankruptcy Code §§ 364(c), 364(d) and 503(b), as applicable, in form and substance satisfactory to the Existing Lender and the DIP Lender, and including without limitation, provisions (i) modifying the automatic stay to permit the creation and perfection of the liens of the DIP Lender and the Existing Lender on the DIP Collateral, without any further action, filing or recordation being required by the Debtors, the DIP Lender or the Existing Lender; (ii) after the occurrence and during the continuation of an Event of Default, providing for the automatic vacation of such stay to permit the enforcement of the DIP Lender's remedies under the DIP Facility, including without limitation, the enforcement, upon five (5) business days' prior written notice, of such remedies against the DIP Collateral, subject to the right of the Debtors to seek continuation of the automatic stay during such five (5) business days period, provided that any continuation of the automatic stay after such an Event of Default shall have no effect on the termination of the Debtors' use of Available Cash (including cash collateral) as a result of such Event of Default; (iii) prohibiting following entry of the Final Order (defined below) approving the DIP Facility, the assertion of claims arising under Bankruptcy Code § 506(c) against the Existing Lender or the DIP Lender; (iv) prohibiting the incurrence of debt secured by liens with priority equal or senior to, the liens granted for the benefit of the DIP Lender against the DIP Collateral or the adequate protection liens granted to the Existing Lender; (v) prohibiting any granting or imposition of liens other than liens acceptable to the Existing Lender and to the DIP Lender and other than liens permitted to be granted or imposed pursuant to court order; (vi) subject to the limitations that are usual

8

and customary for financings of this type (including a challenge period available to creditors), determining the validity, enforceability, and priority of the liens granted by the Debtors in favor of the Existing Lender pursuant to the agreements and other documents evidencing, *inter alia*, the Debtors' obligations to the Existing Lender (the "**Existing Indebtedness**") and the Debtors' grant of liens in and to the "**Pre-Petition Collateral** (the "**Existing Loan Documents**"); and (vii) authorizing and approving the DIP Facility and the transactions contemplated hereby, including without limitation the granting of the super-priority claims, the first-priority and priming security interests and liens upon the DIP Collateral and the payment of all fees and expenses due to the DIP Lender;

(f)     The Interim Order shall not have been reversed, modified or amended without the prior written consent of the Existing Lender and the DIP Lender or stayed, vacated or subject to any pending appeal;

(g)     The Debtors shall be in compliance with the Interim Order;

(h)     All of the "first day orders," and all related pleadings to be entered at the time of commencement of the Cases or shortly thereafter, shall be in form and substance satisfactory to the Existing Lender and the DIP Lender, including, but not limited to, a motion and proposed order of the Debtors authorizing the engagement by the Debtors of a Chief Restructuring Officer ("**CRO**") as the person responsible for managing the Debtors during the pendency of the Cases and maximizing the long-term value of the Debtors for the benefit of all stakeholders. The CRO shall have substantially all the powers vested in the Board of Managers of each of the Debtors and the following additional duties and responsibilities:

1.     Evaluate the Debtors' liquidity situation and assist Debtors' management with the preparation of the Budget;

2.     Assist the Debtors in preparing rolling 13 week cashflow projections and other

9

reporting required pursuant to the DIP Documentation;

3.     Manage the Debtors' operations within the parameters of the Budget and the Business Plan attached to the Plan Term Sheet as Appendix 2;

4.     Work with the Debtors' management, and other professionals and stakeholders to manage any sale of the Debtors' assets as contemplated by the Plan Term Sheet;

5.     Assist the Debtors and direct legal counsel as necessary throughout the Cases including, without limitation, assisting the Debtors in the post-petition process and fulfilling their duties under the Bankruptcy Code, Court Orders and the DIP Documentation;

6.     Participate in the development of a marketing plan and remodeling plan in consultation with existing senior management; and

7.     Assist with the preparation of the Debtors' monthly operating reports and other periodic reporting required to be performed by the Debtors to comply with the applicable provisions of the Bankruptcy Code.

Nothing contained herein shall limit the Debtors' or the reorganized Debtors', as applicable, right to seek an order from the Bankruptcy Court to remove and replace the CRO, and the Plan shall provide that the Bankruptcy Court shall retain, for a period of not less than thirty-six (36) months following the Effective Date of the Plan, the authority to remove and replace the CRO; provided, however, that any such removal of the CRO by the Bankruptcy Court may, in accordance with the applicable loan documents, constitute an Event of Default under the DIP Facility and the GE Note, unless a replacement CRO is appointed in accordance with the CRO Replacement Procedures (as defined in the Plan Term Sheet).

(i)     Except as otherwise agreed by the DIP Lender, the Debtors shall have paid all taxes then due and payable that are liens against all or a portion of the Collateral, and no action shall have been taken against any portion of the Collateral with regard to eminent domain.

Termination:    If the Final Order is not entered within 60 days after the date of entry of Interim Order, all such extensions of credit together with accrued interest shall be due in full at that time.

On-Going Conditions:    The making of each extension of credit shall be conditioned upon (a) the accuracy of all representations and warranties in the DIP Documentation (including, without limitation, the material adverse change and litigation representations), (b) there being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit, and (c) receipt by the DIP Lender of a certificate (a "**Borrowing Request**") executed by the CRO to the effect that (i) the proposed extension of credit and its intended use are consistent in all material respects with the terms of the DIP Documentation and the Budget and are necessary, after utilization and application of Available Cash, to satisfy their obligations, (ii) the Debtors have observed or performed all of their covenants and other agreements and have satisfied in all material respects every condition contained in the DIP Documentation and the Interim Order or the Final Order (as applicable) to be observed, performed or satisfied by the Debtors, and (iii) such officer has no knowledge of any Event of Default or event, but for the passing of time or notice, that will result in an Event of Default under the DIP Documentation.  As used herein and in the DIP Documentation a "material adverse change" shall mean any event, development or circumstance, including a significant weather event, that has had or could reasonably be expected to have a material adverse effect on (a) the business, assets, property or financial condition of the Debtors, or (b) the validity or enforceability of any of the DIP Documentation or the rights or remedies of the DIP Lender thereunder; provided, however, that no events related to the commencement and continuation of the Cases shall be deemed to constitute a material adverse change, and the existence of the automatic stay pursuant to Bankruptcy Code § 362 shall be considered in determining materiality.

11

The making of each extension of credit after sixty (60) days following the date on which the Bankruptcy Court enters the Interim Order, shall be subject to the further condition that a final order approving the DIP Facility shall have been entered by the Bankruptcy Court (the "**Final Order**"). The Final Order shall be in form and substance satisfactory to the Existing Lender and the DIP Lender, and shall approve and authorize on a final basis the matters and containing the provisions described in <u>clause (f)</u> of "Initial Conditions," above, prohibit the assertion of claims arising under Bankruptcy Code § 506(c) against the Existing Lender or the DIP Lender by the Debtors or any person claiming through the Debtors including, without limitation, the Debtors' legal counsel, advisors, investment bankers, and principals, and the Final Order shall not have been reversed, modified or amended without the prior written consent of the DIP Lender, stayed, vacated or subject to any pending appeal.

## VII.    <u>Certain Documentation Matters</u>

The DIP Documentation shall contain representations, warranties, covenants and events of default as set forth below:

Representations and
Warranties:

Financial reporting required under the DIP Documentation and the Existing Loan Documents; absence of undisclosed liabilities; no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of DIP Documentation; no conflict with law or contractual obligations; no undisclosed litigation; no default; ownership of property; liens (excluding liens permitted under the DIP Documentation); intellectual property; environmental matters; governmental approvals; quality of title; taxes; properties; agreements and liens (excluding liens permitted under the DIP Documentation); accuracy of disclosure; in each case, subject to materiality thresholds and exceptions as set forth in the DIP Documentation.

The Debtors shall recognize that the funds made available by the Existing Lender pursuant to the Existing Loan Documents are secured by valid, perfected, enforceable first-priority liens and security interests in the Pre-Petition Collateral granted by the Debtors to the Existing Lender, which liens and security interests are not subject to

12

challenge, subordination, defense, disallowance or otherwise avoidable. Any objection or challenge by any statutory committee appointed in the Cases, creditor, or party in interest in the Cases to Existing Lender's liens and security interests in the Pre-Petition Collateral must be made within ninety (90) days from the engagement of counsel for any official committee of unsecured creditors, or, if no counsel or no official committee of unsecured creditors is appointed, within one hundred twenty (120) days of the Petition Date. If any statutory committee appointed in the Cases, creditor, or party in interest in the Cases fails to challenge or object to the Existing Lender's liens and security interests in the Pre-Petition Collateral within such time period, such failure shall be deemed an acceptance of such liens and security interests and will waive such party's rights to challenge such liens and security interests.

**Affirmative Covenants:** Delivery of monthly financial statements, reports and officers' certificates as required by the DIP Documentation and the Existing Loan Documents; timely payment of other material post-petition obligations; periodic reporting packages and other information reasonably requested by the Existing Lender and the DIP Lender including delivery of weekly updates and extensions to the Budget and delivery of the Weekly Cash Flow Variance Report and explanation (in each case in a form that is acceptable to the Existing Lender and the DIP Lender) as set forth in Section III above; continuation of business and maintenance of existence and material rights and privileges (including all permits and licenses); compliance with laws and material contractual obligations; maintenance of property and insurance; maintenance of books and records; right of the Existing Lender and the DIP Lender periodically to inspect property and books and records; notices of defaults, litigation and other material events; taxes; use of proceeds; collateral and security interests; perfection of security interests; separate corporate existence; and compliance with environmental laws, in the case of each of the foregoing, subject to materiality thresholds and exceptions set forth in the DIP Documentation.

In addition, the Debtors shall satisfy the following milestones (the milestones set forth in clauses (i) through (iv) below, the "**Exit Milestones**"):

(i) The Debtors shall file a plan of reorganization (the "**Plan**") within thirty (30) days of the Petition Date;

13

(ii)   The Bankruptcy Court shall have entered an order approving the disclosure statement (the "**Disclosure Statement**") within sixty (60) days of the filing of the Plan;

(iii) The Bankruptcy Court shall have commenced the confirmation hearing with respect to the Plan within sixty (60) days of the approval by the Bankruptcy Court of the Disclosure Statement; and

(iv) The Bankruptcy Court shall have entered an order confirming the Plan within thirty (30) days of the commencement of the confirmation hearing.

The parties expressly acknowledge and agree that the foregoing Exit Milestones are subject to Bankruptcy Court availability, and that no Termination Event shall occur where the Debtors' failure to satisfy one of the foregoing Exit Milestones was solely the result of the unavailability of necessary time on the Bankruptcy Court's calendar and such Exit Milestone is nevertheless satisfied not more than 7 days after the deadline set forth above.

| | |
|---|---|
| Negative Covenants: | Limitations on: indebtedness; liens (except as permitted under the DIP Documentation); guarantee obligations; mergers, consolidations, liquidations and dissolutions; sales of assets; leases; dividends and other payments in respect of capital stock; capital expenditures; investments, loans and advances; optional payments and modifications of other indebtedness and obligations; transactions with affiliates; sale and leasebacks; changes in fiscal year; negative pledge clauses; changes in lines of business; payment of pre-petition claims except as authorized by order of the Bankruptcy Court; and existence of any claims other than those of the Existing Lender and the DIP Lender entitled to superpriority under the Bankruptcy Code, in each case, subject to materiality thresholds and exceptions as mutually agreed by the Existing Lender and the DIP Lender and the Debtors. |

The Debtors shall not spend any Available Cash or proceeds from the DIP Loan or incur debts or liabilities, except as set forth in the DIP Documentation and the Budget.

| | |
|---|---|
| Events of Default: | Events of Default under the DIP Documentation shall include the following: nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed upon; material inaccuracy of |

representations and warranties; violation of covenants; failure to comply with the Budget provisions set forth in <u>Section III</u> above; failure to satisfy the Exit Milestones set forth in <u>Section VII</u> above; material judgments (after taking into account insurance); filing of an objection or challenge by any party in interest in the Cases to the Existing Lender's liens and security interests in the Pre-Petition Collateral that is not dismissed or otherwise resolved in favor of the Existing Lender within 30 days; actual invalidity of any post-petition lien or security document; the entry of an order dismissing any Chapter 11 Case or converting any such case to a Chapter 7 case; the entry of an order appointing a trustee in any Chapter 11 Case; except for the Carve-Out Expenses, the entry of an order granting any other superpriority claim or lien equal or superior in priority to those granted for the benefit of the DIP Lender and the Existing Lender; the entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any material asset or assets of the Debtors; the entry of an order staying, reversing, vacating or otherwise modifying (except with the prior written consent of the DIP Lender) the DIP Documentation, the Interim Order or the Final Order; the entry of an order appointing an examiner having enlarged powers (beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4)); the entry of an order under Bankruptcy Code § 506(c) surcharging the DIP Collateral or the Pre-Petition Collateral; the issuance of any order by any governmental authority having or asserting jurisdiction over the Debtors or its business which adversely affects in any material respect the Debtors' business as currently operated; the filing of any pleading by the Debtors seeking, or otherwise consenting to, certain of the matters set forth above; failure of the Bankruptcy Court to enter an order authorizing the engagement of a CRO with the powers, duties and responsibilities set forth herein; failure of the Bankruptcy Court to enter the Final Order within 60 days after the date of entry of the Interim Order; failure by the Debtors to fulfill their obligations under the Interim Order and the Final Order; change of control; payment of prepetition claims without Bankruptcy Court order; proposal of any sale of the Debtors' assets outside the ordinary course that is not contemplated by the Plan Term Sheet, absent consent by the Existing Lender and the DIP Lender; and proposal of any sale of the Debtors' assets that does not preserve the Existing Lender's right to credit bid its pre-petition claim.

15

| | |
|---|---|
| Termination and Remedies: | Upon the occurrence of an Event of Default, the DIP Lender may, upon written notice to the Debtors, terminate the DIP Facility (the date of any such termination, the "**Commitment Termination Date**"), declare the DIP Loan to be immediately due and payable and exercise all rights and remedies under the DIP Documentation and the Interim Order or the Final Order, as applicable. The DIP Lender shall have customary remedies, including, without limitation, the right (after providing five (5) business days' prior notice to the Debtors and any statutory committee of the occurrence of the Commitment Termination Date) to realize on all Collateral without the necessity of obtaining any further relief or order from the Bankruptcy Court. The Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the DIP Documentation, the Existing Loan Documents, the Interim Order, the Final Order and with respect to the Pre-Petition Collateral and the DIP Collateral. |
| Cash Management: | Subject to the Budget, the Debtors shall maintain a cash management system substantially identical to the cash management system that they maintained immediately prior to the Petition Date, including but not limited to, the maintenance of the accounts established in connection with the Existing Loan Documents and the related agreements. In connection with the foregoing, the Debtors shall seek the entry of appropriate first day orders, satisfactory to the Existing Lender and the DIP Lender in their discretion, providing for the continuation of the cash management system. |
| Hampton Bays: | With respect to J&B Restaurant Partners of Hampton Bays, LLC ("**Hampton Bays LLC**") and the Friendly's store that is operated by such entity (the "**Hampton Bays Store**"), the Parties agree to the following: |
| | (a) Hampton Bays LLC is a non-debtor affiliate of the Debtors, and will not commence a Chapter 11 Case for itself on the Petition Date. |
| | (b) No proceeds of the DIP Loans will be allocated and/or used to pay any liabilities of Hampton Bays LLC or the Hampton Bays Store. |
| | (c) Neither DIP Lender's nor Existing Lender's cash collateral, as such term is defined in the Bankruptcy Code, will be utilized in connection with the |

16

|  | operation of, or to pay any liabilities of, Hampton Bays LLC or the Hampton Bays Store. |
|---|---|
| Expenses and Indemnification: | The Debtors shall pay immediately upon written demand from the DIP Lender and without application to the Bankruptcy Court all reasonable and documented out-of-pocket expenses of the DIP Lender (including the reasonable and documented fees, disbursements and other charges of advisors or of counsel) in connection with the enforcement of the DIP Documentation; provided, however, that the legal fees and expenses of counsel to the DIP Lender (on a going forward basis commencing on the Petition Date) shall not exceed $75,000 in the aggregate. |
|  | The DIP Lender (and its affiliates and its respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, bad faith or willful misconduct of the indemnified party). |
| Governing Law: | State of New York |

17

IN WITNESS WHEREOF, the parties have caused to be executed this Term Sheet by their duly authorized officers, as of the date first written above.

**J&B PARTNERS MANAGEMENT LLC**, for itself and for each of the other Debtors identified on Exhibit A to the Summary of Plan Terms

By:_____

    Name: Joseph Vitrano

    Title: Operating Manager Member

**GENERAL ELECTRIC CAPITAL CORPORATION, GE CAPITAL COMMERCIAL OF UTAH LLC**, and **GE CAPITAL BANK**, as Existing Lender

By:_____

    Name:_____

    Title: _____

**GENERAL ELECTRIC CAPITAL CORPORATION**, as DIP Lender

By:_____

    Name:_____

    Title: _____

*Signature Page to*
*Summary of Terms and Conditions for*
*Debtor-in-Possession Credit Facility and Use of Cash Collateral*

IN WITNESS WHEREOF, the parties have caused to be executed this Term Sheet by their duly authorized officers, as of the date first written above.

**J&B PARTNERS MANAGEMENT LLC**, for itself and for each of the other Debtors identified on Exhibit A to the Summary of Plan Terms

By:_____

    Name:_____

    Title: _____

**GENERAL ELECTRIC CAPITAL CORPORATION, GE CAPITAL COMMERCIAL OF UTAH LLC**, and **GE CAPITAL BANK**, as Existing Lender

By:_____

    Name:____DAVID A. BURGER_____

    Title: ____Senior Vice President____

**GENERAL ELECTRIC CAPITAL CORPORATION,** as DIP Lender

By:_____

    Name:____DAVID A. BURGER_____

    Title: ____Senior Vice President____

*Signature Page to*
*Summary of Terms and Conditions for*
*Debtor-in-Possession Credit Facility and Use of Cash Collateral*

**EXHIBIT 1**

**FORM OF**
**WEEKLY CASH FLOW VARIANCE REPORT**

## Four-Week Rolling Variance Analysis
*Subject to change - for illustrative purposes only*

| | 1/5/2015 2015-2 Forecast | 1/12/2015 2015-3 Forecast | 1/19/2015 2015-4 Forecast | 1/26/2015 2015-5 Forecast | Total 4 Week Forecast | 1/5/2015 2015-2 Actual | 1/12/2015 2015-3 Actual | 1/19/2015 2015-4 Actual | 1/26/2015 2015-5 Actual | Total 4 Week Actual | Total Variance Forecast vs. Actual $ | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Beginning of week --->* | | | | | | | | | | | | |
| Weekly Cash Flow Forecast | | | | | | | | | | | | |
| **Beginning Balance (Book)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| **Receipts** | | | | | | | | | | | | |
| Cash Receipts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Credit Card | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Sales Tax Collection | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Rebates | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| FF&E recovery | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Selden real estate, net proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| **Total Receipts** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0.0%** |
| **Disbursements** | | | | | | | | | | | | |
| Food costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Supplies | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Sales Tax payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Ad fund | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Royalty | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| CC Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Bank fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| LSM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Utilities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Labor | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| R&M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Property Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| FUTA / SUTA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Field G&A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Corp. G&A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| **Operating Outflows** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0.0%** |
| **Operating Cashflow ("OCF")** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | |
| Maint. Capex | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| Debt | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| **Total Debt, Interest and Capex** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0.0%** |
| Total Filing, Legal, FA and Associated Fees | | | | | | | | | | 0 | 0 | |
| **Total Disbursements** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0.0%** |
| Adjustments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | *NM* |
| **Change in Cash** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0.0%** |
| **Ending Balance (Book)** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0.0%** |

# APPENDIX 2

# BUSINESS PLAN

**JB Friendly's - P&L build by store by month, including remodels**

24 Store model. Excludes Hampton Bays
Note: Margins are impacted by incremental revenue from remodels, as associated incremental expenses are taking out in a single line item

| | Full year 2015 | P5 - P12 2015 | Full year 2016 | Full year 2017 | Full year 2018 | 36 Months Out of Bk TTM P4 2019 | 01/31/15 P1 2015 | 02/28/15 P2 2015 | 03/31/15 P3 2015 | 04/30/15 P4 2015 | 05/31/15 P5 2015 | 06/30/15 P6 2015 | 07/31/15 P7 2015 | 08/31/15 P8 2015 | 09/30/15 P9 2015 | 10/31/15 P10 2015 | 11/30/15 P11 2015 | 12/31/15 P12 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 34,171,831 | 23,596,311 | 35,196,996 | 36,252,995 | 37,340,482 | 36,599,482 | 2,201,648 | 2,436,070 | 3,231,589 | 2,706,213 | 2,757,829 | 3,862,979 | 3,055,011 | 3,006,570 | 3,304,570 | 2,517,467 | 2,349,646 | 2,742,440 |
| % growth, period over period | 4.37% | | 3.00% | 3.00% | 3.00% | | | | | | | | | | | | | |
| Incremental revenue from remodels | 74,287 | 74,287 | 692,372 | 1,307,092 | 1,701,199 | 1,318,954 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 37,143 | 37,143 |
| Total Revenues | 34,246,117 | 23,670,597 | 35,889,557 | 37,559,987 | 39,041,681 | 38,108,436 | 2,201,648 | 2,436,070 | 3,231,589 | 2,706,213 | 2,757,829 | 3,862,979 | 3,055,011 | 3,006,570 | 3,304,570 | 2,517,467 | 2,386,789 | 2,779,583 |
| % growth, period over period | 4.59% | | 4.80% | 4.65% | 3.94% | | | | | | | | | | | | | |
| Cost of sales | 9,259,905 | 6,417,018 | 9,537,703 | 9,823,934 | 10,118,549 | 9,914,314 | 591,771 | 651,145 | 870,164 | 729,808 | 743,175 | 1,055,555 | 829,860 | 818,734 | 900,708 | 684,763 | 638,517 | 745,905 |
| % of revenue | 27.10% | 27.20% | 27.10% | 27.10% | 27.10% | | 26.88% | 26.73% | 26.93% | 27.12% | 27.16% | 27.32% | 27.16% | 27.23% | 27.26% | 27.20% | 27.18% | 27.20% |
| Gross profit | 24,986,212 | 17,253,579 | 26,351,655 | 27,736,155 | 28,923,132 | 28,194,122 | 1,609,876 | 1,784,925 | 2,361,426 | 1,976,405 | 2,014,654 | 2,807,624 | 2,225,151 | 2,187,635 | 2,403,861 | 1,832,704 | 1,748,272 | 2,033,678 |
| % margin | 73.12% | 72.80% | 74.87% | 76.51% | 77.46% | 77.06% | 73.12% | 73.27% | 73.07% | 73.03% | 73.05% | 72.68% | 72.84% | 72.77% | 72.74% | 72.80% | 74.41% | 74.16% |
| Labor and related costs | 11,454,567 | 7,813,991 | 11,798,225 | 12,152,172 | 12,516,737 | 12,268,041 | 807,308 | 843,593 | 1,082,243 | 907,652 | 931,586 | 1,231,375 | 993,027 | 973,548 | 1,094,436 | 843,546 | 804,014 | 942,459 |
| % of revenue | 33.52% | 33.22% | 33.52% | 33.52% | 33.52% | | 36.67% | 34.62% | 33.49% | 33.54% | 33.78% | 31.88% | 32.50% | 32.38% | 33.12% | 33.51% | 34.22% | 34.37% |
| Supplies, including paper costs | 1,099,378 | 754,100 | 1,132,559 | 1,166,330 | 1,201,320 | 1,177,319 | 76,346 | 74,784 | 108,400 | 85,749 | 94,455 | 119,345 | 94,512 | 91,802 | 109,868 | 80,552 | 75,460 | 88,129 |
| % of revenue | 3.22% | 3.20% | 3.22% | 3.22% | 3.22% | | 3.47% | 3.07% | 3.35% | 3.17% | 3.42% | 3.09% | 3.09% | 3.05% | 3.32% | 3.20% | 3.21% | 3.21% |
| Repairs & maintenance | 642,231 | 422,489 | 661,498 | 681,343 | 701,783 | 688,337 | 64,627 | 61,267 | 48,202 | 45,646 | 44,025 | 59,203 | 61,435 | 47,178 | 71,530 | 51,866 | 41,160 | 46,092 |
| % of revenue | 1.88% | 1.79% | 1.88% | 1.88% | 1.88% | | 2.94% | 2.51% | 1.49% | 1.69% | 1.60% | 1.53% | 2.01% | 1.57% | 2.16% | 2.06% | 1.75% | 1.68% |
| Other controllable expenses | 720,390 | 483,721 | 742,002 | 764,262 | 787,190 | 771,794 | 53,220 | 61,409 | 64,634 | 57,406 | 53,755 | 66,888 | 60,931 | 61,336 | 66,516 | 55,042 | 57,515 | 61,738 |
| % of revenue | 2.11% | 2.05% | 2.11% | 2.11% | 2.11% | | 2.42% | 2.52% | 2.00% | 2.12% | 1.95% | 1.73% | 1.99% | 2.04% | 2.01% | 2.19% | 2.45% | 2.25% |
| Property tax, CAM & insurance | 1,482,388 | 1,086,901 | 1,526,860 | 1,572,666 | 1,619,846 | 1,585,253 | 143,514 | 110,767 | 85,713 | 55,495 | 37,756 | 73,327 | 130,535 | 118,802 | 56,689 | 46,732 | 226,570 | 56,689 |
| % of revenue | 4.34% | 4.61% | 4.34% | 4.34% | 4.34% | | 6.52% | 4.55% | 2.65% | 2.05% | 1.37% | 1.90% | 4.27% | 3.95% | 1.72% | 1.86% | 9.64% | 2.07% |
| Utilities & telephone | 1,609,959 | 1,093,143 | 1,658,257 | 1,707,984 | 1,799,224 | 1,724,432 | 121,557 | 117,902 | 134,138 | 123,119 | 120,967 | 144,484 | 144,032 | 151,765 | 167,100 | 130,067 | 113,395 | 121,533 |
| % of revenue | 4.71% | 4.63% | 4.71% | 4.71% | 4.71% | | 5.52% | 5.66% | 4.15% | 4.55% | 4.39% | 3.74% | 4.71% | 5.05% | 5.06% | 5.17% | 4.82% | 4.43% |
| Advertising, local | 161,500 | 111,089 | 166,345 | 171,355 | 176,475 | 172,939 | 10,657 | 11,791 | 15,218 | 12,744 | 12,982 | 18,174 | 14,380 | 14,146 | 15,561 | 11,858 | 11,067 | 12,921 |
| % of revenue | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | | 0.48% | 0.48% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% |
| Incremental remodel revenue expenses | 44,572 | 44,572 | 415,423 | 784,255 | 1,020,719 | 911,372 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22,286 | 22,286 |
| % of revenue | 0.13% | 0.19% | 1.18% | 2.16% | 2.73% | 2.49% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.95% | 0.81% |
| % of incremental revenue | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 60.00% | 60.00% |
| Pre royalty/ad-fund SL EBITDAR | 7,771,227 | 5,443,573 | 8,250,706 | 8,735,807 | 9,139,859 | 8,894,634 | 332,648 | 483,532 | 822,878 | 688,596 | 579,128 | 1,094,829 | 726,499 | 729,059 | 822,161 | 613,061 | 397,206 | 681,831 |
| % margin | 22.74% | 23.07% | 23.44% | 24.10% | 24.48% | 24.31% | 15.11% | 19.85% | 25.46% | 25.44% | 13.75% | 28.34% | 23.78% | 24.25% | 24.88% | 24.35% | 16.90% | 24.86% |
| Cash rent, stores only | 1,902,770 | 1,262,710 | 2,350,283 | 2,416,887 | 2,485,411 | 2,439,915 | 160,788 | 159,721 | 159,309 | 160,240 | 160,220 | 159,562 | 160,136 | 160,794 | 159,831 | 159,831 | 161,584 | 160,749 |
| % of revenue | 5.57% | 5.55% | 6.68% | 6.67% | 6.66% | 6.67% | 7.30% | 6.56% | 4.93% | 5.92% | 5.81% | 4.13% | 5.24% | 5.35% | 4.84% | 6.35% | 6.88% | 5.13% |
| Pre royalty/ad-fund SL EBITDA | 5,868,457 | 4,180,863 | 5,900,424 | 6,318,920 | 6,654,428 | 6,454,721 | 171,859 | 323,811 | 663,569 | 528,355 | 218,908 | 935,265 | 566,363 | 568,265 | 662,330 | 453,229 | 235,422 | 541,082 |
| % margin | 17.17% | 17.72% | 16.76% | 17.43% | 17.82% | 17.64% | 7.81% | 13.29% | 20.53% | 19.52% | 7.94% | 24.21% | 18.54% | 18.90% | 20.04% | 18.00% | 10.02% | 19.73% |
| G&A, corporate | 1,054,255 | 702,837 | 1,085,883 | 1,118,459 | 1,152,013 | 1,129,644 | 87,855 | 87,855 | 87,855 | 87,855 | 87,855 | 87,855 | 87,855 | 87,855 | 87,855 | 87,855 | 87,855 | 87,855 |
| % of revenue | 3.09% | 2.98% | 3.09% | 3.09% | 3.09% | 3.09% | 3.99% | 3.61% | 2.72% | 3.25% | 3.19% | 2.27% | 2.88% | 2.92% | 2.66% | 3.49% | 3.74% | 3.20% |
| G&A, field | 106,695 | 94,259 | 109,996 | 113,193 | 116,589 | 113,589 | 3,093 | -2,907 | 10,507 | 1,743 | 3,611 | 7,677 | 8,202 | 5,362 | 1,174 | 5,367 | 19,218 | 43,648 |
| % of revenue | 0.31% | 0.40% | 0.31% | 0.31% | 0.31% | 0.31% | 0.14% | -0.12% | 0.33% | 0.06% | 0.13% | 0.20% | 0.27% | 0.18% | 0.04% | 0.21% | 0.82% | 1.59% |
| Hampton Bays mgmt (income) | -28,775 | -20,462 | -29,638 | -30,528 | -31,443 | -30,792 | -1,824 | -1,847 | -2,536 | -2,106 | -2,239 | -3,203 | -2,909 | -2,894 | -3,047 | -2,026 | -1,889 | -2,256 |
| % of revenue | -0.08% | -0.09% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.10% | -0.10% | -0.09% | -0.08% | -0.08% | -0.08% |
| Pre royalty/ad-fund Corporate EBITDA | 4,736,282 | 3,404,229 | 4,734,284 | 5,117,796 | 5,417,270 | 5,242,281 | 82,736 | 240,710 | 567,743 | 440,863 | 129,079 | 842,956 | 473,215 | 477,942 | 576,348 | 362,034 | 130,238 | 411,835 |
| % margin | 13.86% | 14.43% | 13.45% | 14.12% | 14.51% | 14.33% | 3.76% | 9.88% | 17.57% | 16.29% | 4.70% | 21.82% | 15.49% | 15.90% | 17.44% | 14.38% | 5.54% | 15.02% |
| Royalty | 342,461 | 236,706 | 358,894 | 375,600 | 928,919 | 381,084 | 22,016 | 24,361 | 32,316 | 27,062 | 27,578 | 38,630 | 30,550 | 30,064 | 33,046 | 25,175 | 23,868 | 27,796 |
| % of revenue | 1.00% | 1.00% | 1.02% | 1.04% | 2.49% | 1.04% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% |
| Ad fund | 1,027,384 | 710,118 | 1,076,681 | 1,126,800 | 1,305,876 | 1,143,253 | 66,049 | 73,082 | 96,948 | 81,186 | 82,735 | 115,889 | 91,650 | 90,191 | 99,137 | 75,524 | 71,604 | 83,387 |
| % of revenue | 3.01% | 3.01% | 3.06% | 3.11% | 3.50% | 3.12% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| Corporate EBITDA before restructuring expenses | 3,366,438 | 2,457,406 | 3,298,709 | 3,615,397 | 3,182,475 | 3,717,944 | -5,330 | 143,267 | 438,480 | 332,615 | 19,366 | 688,417 | 351,015 | 357,688 | 444,166 | 261,336 | 34,767 | 300,652 |
| % margin | 9.85% | 10.41% | 9.37% | 9.97% | 8.52% | 10.16% | -0.24% | 5.88% | 13.57% | 12.29% | 0.70% | 17.82% | 11.49% | 11.90% | 13.44% | 10.38% | 1.48% | 10.96% |

**JB Friendly's - P&L build by store by month, including remodels**

24 Store model. Excludes Hampton Bays
Note: Margins are impacted by incremental revenue from remodels, as associated incremental expenses are taking out in a single line item

| | Full year 2015 | P5 - P12 2015 | Full year 2016 | Full year 2017 | Full year 2018 | 36 Months Out of R6 / TTM P4 2018 | 01/31/16 P1 2016 | 02/29/16 P2 2016 | 03/31/16 P3 2016 | 04/30/16 P4 2016 | 05/31/16 P5 2016 | 06/30/16 P6 2016 | 07/31/16 P7 2016 | 08/31/16 P8 2016 | 09/30/16 P9 2016 | 10/31/16 P10 2016 | 11/30/16 P11 2016 | 12/31/16 P12 2016 | 01/31/17 P1 2017 | 02/28/17 P2 2017 | 03/31/17 P3 2017 | 04/30/17 P4 2017 | 05/31/17 P5 2017 | 06/30/17 P6 2017 | 07/31/17 P7 2017 | 08/31/17 P8 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 34,171,831 | 23,596,311 | 35,196,986 | 36,252,895 | 37,540,482 | 36,589,482 | 2,567,697 | 2,509,152 | 3,328,537 | 2,787,399 | 2,840,564 | 3,978,868 | 3,146,661 | 3,096,561 | 3,403,707 | 2,992,991 | 2,420,135 | 2,924,721 | 2,335,726 | 2,584,427 | 3,428,393 | 2,871,021 | 2,925,781 | 4,098,235 | 3,241,061 | 3,189,458 |
| % growth, period over period | 4.37% | | 3.00% | 3.00% | 3.00% | | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| Incremental revenue from remodels | 74,287 | 74,287 | 692,372 | 1,307,092 | 1,701,199 | 1,518,954 | 37,143 | 37,143 | 37,143 | 37,143 | 37,143 | 37,143 | 86,028 | 86,028 | 86,028 | 87,142 | 87,142 | 87,142 | 87,142 | 87,142 | 87,142 | 87,142 | 87,142 | 87,142 | 87,142 | 198,960 |
| **Total Revenues** | 34,246,117 | 23,670,597 | 35,889,357 | 37,559,987 | 39,041,681 | 38,108,434 | 2,304,840 | 2,546,296 | 3,365,680 | 2,824,542 | 2,877,707 | 4,016,012 | 3,183,804 | 3,182,589 | 3,489,735 | 2,679,019 | 2,507,278 | 2,911,850 | 2,422,870 | 2,671,569 | 3,515,536 | 2,958,163 | 3,012,923 | 4,185,377 | 3,328,203 | 3,326,418 |
| % growth, period over period | 4.59% | | 4.80% | 4.65% | 3.94% | | 4.69% | 4.52% | 4.15% | 4.37% | 4.35% | 3.96% | 4.22% | 5.86% | 5.60% | 5.05% | 5.12% | 4.92% | 4.45% | 4.73% | 4.70% | 4.22% | 4.54% | 4.58% | | |
| Cost of sales | 9,259,905 | 6,417,018 | 9,537,705 | 9,823,834 | 10,118,549 | 9,914,314 | 609,524 | 670,679 | 896,269 | 751,702 | 765,470 | 1,087,016 | 854,756 | 843,296 | 927,730 | 705,306 | 657,673 | 768,282 | 627,810 | 690,799 | 923,157 | 774,253 | 788,434 | 1,119,626 | 880,398 | 868,595 |
| % of revenue | 27.20% | 27.20% | 27.20% | 27.10% | 27.10% | 27.10% | 26.88% | 26.73% | 26.93% | 26.97% | 26.95% | 27.32% | 27.16% | 27.23% | 27.26% | 27.20% | 27.20% | 26.88% | 26.73% | 26.93% | 26.97% | 26.95% | 27.32% | 27.16% | 27.23% | 27.25% |
| **Gross profit** | 24,986,212 | 17,253,579 | 26,351,653 | 27,736,153 | 28,923,132 | 28,194,122 | 1,695,316 | 1,875,617 | 2,469,412 | 2,072,840 | 2,112,237 | 2,928,996 | 2,329,048 | 2,339,292 | 2,562,005 | 1,973,713 | 1,849,605 | 2,143,527 | 1,795,060 | 1,980,770 | 2,592,379 | 2,183,910 | 2,224,489 | 3,065,751 | 2,447,805 | 2,459,822 |
| % margin | 73.12% | 73.12% | 74.87% | 76.51% | 77.46% | 77.06% | 74.76% | 74.75% | 74.19% | 74.36% | 74.36% | 73.61% | 74.04% | 73.62% | 73.54% | 75.27% | 76.12% | 76.85% | 76.64% | 75.61% | 76.07% | 76.03% | 74.81% | 75.52% | 77.12% | |
| Labor and related costs | 11,454,587 | 7,813,991 | 11,798,225 | 12,152,172 | 12,516,737 | 12,268,041 | 831,527 | 868,695 | 1,114,711 | 934,882 | 959,534 | 1,268,317 | 1,022,818 | 1,002,754 | 1,127,269 | 868,852 | 826,134 | 970,752 | 856,473 | 894,756 | 1,148,152 | 962,928 | 988,320 | 1,306,366 | 1,053,503 | 1,032,837 |
| % of revenue | 33.52% | 33.12% | 33.52% | 33.52% | 33.32% | 33.53% | 36.67% | 34.62% | 33.49% | 33.54% | 33.35% | 31.88% | 32.50% | 32.38% | 33.12% | 33.51% | 34.22% | 34.73% | 36.67% | 34.62% | 33.49% | 33.54% | 33.35% | 31.88% | 32.50% | 32.38% |
| Supplies, including paper costs | 1,099,378 | 754,100 | 1,132,359 | 1,166,330 | 1,201,320 | 1,177,319 | 78,636 | 77,027 | 111,652 | 88,321 | 97,288 | 122,925 | 97,347 | 94,556 | 113,164 | 82,948 | 77,723 | 90,772 | 80,995 | 79,338 | 115,001 | 90,971 | 100,207 | 126,613 | 100,267 | 97,392 |
| % of revenue | 3.22% | 3.20% | 3.22% | 3.22% | 3.22% | 3.22% | 3.47% | 3.07% | 3.35% | 3.17% | 3.42% | 3.09% | 3.09% | 3.05% | 3.32% | 3.20% | 3.21% | 3.47% | 3.47% | 3.07% | 3.35% | 3.17% | 3.42% | 3.09% | 3.09% | 3.05% |
| Repairs & maintenance | 642,231 | 422,489 | 661,498 | 681,343 | 701,783 | 688,337 | 66,566 | 63,105 | 49,648 | 47,015 | 45,346 | 60,979 | 63,278 | 48,593 | 73,676 | 53,422 | 42,395 | 47,475 | 68,563 | 64,998 | 51,138 | 48,426 | 46,706 | 62,808 | 65,176 | 50,051 |
| % of revenue | 1.88% | 1.79% | 1.88% | 1.88% | 1.88% | 1.88% | 2.94% | 2.51% | 1.49% | 1.69% | 1.60% | 1.53% | 2.01% | 1.57% | 2.16% | 2.06% | 1.75% | 1.68% | 2.94% | 2.51% | 1.49% | 1.69% | 1.60% | 1.53% | 2.01% | 1.57% |
| Other controllable expenses | 720,390 | 485,721 | 742,002 | 764,262 | 787,190 | 771,794 | 54,817 | 63,251 | 66,573 | 59,128 | 55,368 | 68,895 | 62,759 | 63,176 | 68,511 | 56,693 | 59,240 | 63,590 | 56,461 | 65,149 | 68,570 | 60,902 | 57,029 | 70,961 | 64,642 | 65,071 |
| % of revenue | 2.11% | 2.05% | 2.11% | 2.11% | 2.11% | 2.11% | 2.42% | 2.52% | 2.00% | 2.12% | 1.95% | 1.73% | 1.99% | 2.04% | 2.01% | 2.19% | 2.45% | 2.25% | 2.42% | 2.52% | 2.00% | 2.12% | 1.95% | 1.73% | 1.99% | 2.04% |
| Property tax, CAM & insurance | 1,482,388 | 1,086,901 | 1,526,860 | 1,572,666 | 1,619,846 | 1,585,251 | 147,819 | 114,090 | 88,284 | 57,158 | 389,089 | 73,527 | 134,245 | 122,366 | 58,390 | 48,134 | 233,367 | 58,360 | 152,254 | 117,313 | 90,932 | 58,873 | 400,761 | 77,793 | 138,273 | 126,037 |
| % of revenue | 4.34% | 4.41% | 4.34% | 4.34% | 4.34% | 4.35% | 6.52% | 4.55% | 2.65% | 2.05% | 13.70% | 1.90% | 4.27% | 3.95% | 1.72% | 1.86% | 9.44% | 2.07% | 6.52% | 4.55% | 2.65% | 2.05% | 13.70% | 1.90% | 4.27% | 3.95% |
| Utilities & telephone | 1,609,959 | 1,093,143 | 1,658,237 | 1,707,984 | 1,759,224 | 1,724,432 | 125,204 | 142,121 | 138,162 | 126,813 | 124,596 | 148,819 | 148,553 | 156,318 | 172,113 | 153,969 | 116,591 | 125,179 | 128,960 | 146,385 | 142,307 | 130,617 | 128,334 | 153,283 | 152,804 | 161,007 |
| % of revenue | 4.71% | 4.45% | 4.71% | 4.71% | 4.71% | 4.71% | 5.52% | 5.66% | 4.15% | 4.55% | 4.39% | 3.74% | 4.71% | 5.05% | 5.06% | 5.17% | 4.82% | 4.43% | 5.52% | 5.66% | 4.15% | 4.55% | 4.39% | 3.74% | 4.71% | 5.05% |
| Advertising, local | 161,500 | 111,089 | 166,345 | 171,335 | 176,475 | 172,930 | 10,977 | 12,145 | 15,675 | 13,126 | 13,372 | 18,719 | 14,811 | 14,570 | 16,028 | 12,214 | 11,399 | 13,508 | 11,307 | 12,510 | 16,145 | 13,520 | 13,773 | 19,281 | 15,255 | 15,007 |
| % of revenue | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.48% | 0.48% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.48% | 0.48% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% |
| Incremental remodel revenue expenses | 44,572 | 44,572 | 415,423 | 784,255 | 1,020,719 | 911,372 | 22,286 | 22,286 | 22,286 | 22,286 | 22,286 | 22,286 | 51,617 | 51,617 | 51,617 | 52,285 | 52,285 | 52,285 | 52,285 | 52,285 | 52,285 | 52,285 | 52,285 | 52,285 | 52,285 | 83,376 |
| % of revenue | 0.13% | 0.19% | 1.18% | 2.16% | 2.73% | 2.49% | 0.98% | 0.89% | 0.67% | 0.80% | 0.78% | 0.56% | 1.67% | 1.67% | 1.52% | 1.99% | 2.16% | 1.85% | 2.24% | 2.02% | 1.53% | 1.82% | 1.79% | 1.28% | 1.61% | 2.61% |
| % of incremental revenue | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% |
| **Pre royalty /ad-fund SL EBITDAR** | 7,771,227 | 5,443,573 | 8,250,706 | 8,735,807 | 9,139,839 | 8,894,654 | 357,485 | 512,895 | 842,422 | 724,111 | 405,359 | 1,142,530 | 763,151 | 785,342 | 881,237 | 665,864 | 428,470 | 721,840 | 387,763 | 547,656 | 907,848 | 765,588 | 437,074 | 1,196,360 | 805,600 | 929,043 |
| % margin | 22.74% | 23.07% | 23.45% | 24.10% | 24.48% | 24.31% | 15.76% | 20.44% | 25.91% | 25.98% | 14.27% | 28.71% | 24.25% | 25.36% | 25.89% | 25.68% | 17.70% | 25.55% | 16.21% | 26.48% | 26.46% | 14.94% | 29.19% | 24.86% | 25.99% | |
| Cash mgmt, stores only | 1,902,770 | 1,262,710 | 2,350,283 | 2,416,887 | 2,485,411 | 2,439,913 | 198,148 | 197,049 | 196,624 | 197,383 | 197,563 | 196,885 | 197,476 | 198,154 | 197,162 | 196,968 | 177,508 | 203,767 | 202,635 | 202,198 | 203,186 | 203,164 | 202,466 | 205,075 | 203,773 | |
| % of revenue | 5.57% | 5.55% | 6.68% | 6.67% | 6.47% | 6.47% | 7.85% | 7.85% | 5.91% | 7.09% | 6.96% | 4.95% | 6.26% | 6.40% | 5.79% | 7.60% | 8.22% | 6.28% | 7.84% | 5.90% | 7.08% | 6.94% | 4.94% | 6.27% | 6.39% | |
| **Pre royalty /ad-fund SL EBITDA** | 5,868,457 | 4,180,863 | 5,900,424 | 6,318,920 | 6,654,428 | 6,454,721 | 159,337 | 315,846 | 645,797 | 526,528 | 207,796 | 945,645 | 565,675 | 587,188 | 684,075 | 468,702 | 229,502 | 544,332 | 183,996 | 345,201 | 705,651 | 562,203 | 233,909 | 993,893 | 602,524 | 625,269 |
| % margin | 17.17% | 17.72% | 16.76% | 17.43% | 17.82% | 17.64% | 7.03% | 12.59% | 20.00% | 18.89% | 7.32% | 25.77% | 17.98% | 18.96% | 20.10% | 18.08% | 9.48% | 19.27% | 7.88% | 13.36% | 20.58% | 19.58% | 7.99% | 24.25% | 18.59% | 19.60% |
| G&A, corporate | 1,054,255 | 702,837 | 1,085,883 | 1,118,459 | 1,152,013 | 1,129,644 | 90,440 | 90,490 | 90,490 | 90,490 | 90,490 | 90,490 | 90,490 | 90,490 | 90,490 | 90,490 | 90,490 | 90,490 | 93,205 | 93,205 | 93,205 | 93,205 | 93,205 | 93,205 | 93,205 | 93,205 |
| % of revenue | 3.09% | 2.98% | 3.03% | 3.00% | 2.95% | 2.97% | 3.93% | 3.61% | 2.72% | 3.25% | 3.19% | 2.27% | 2.88% | 2.92% | 2.66% | 3.49% | 3.74% | 3.20% | 3.85% | 3.61% | 2.72% | 3.25% | 3.19% | 2.27% | 2.88% | 2.92% |
| G&A, field | 106,695 | 94,259 | 109,896 | 113,193 | 116,589 | 113,589 | 3,186 | -2,994 | 10,822 | 1,795 | 3,719 | 7,907 | 8,448 | 5,523 | 1,209 | 5,528 | 19,795 | 44,957 | 3,281 | -3,084 | 11,147 | 1,849 | 3,831 | 8,145 | 8,702 | 5,689 |
| % of revenue | 0.31% | 0.40% | 0.31% | 0.31% | 0.31% | 0.31% | 0.14% | -0.12% | 0.35% | 0.06% | 0.13% | 0.20% | 0.27% | 0.18% | 0.04% | 0.21% | 0.92% | 1.59% | 0.14% | -0.12% | 0.35% | 0.06% | 0.13% | 0.20% | 0.27% | 0.18% |
| Hampton Bays mgmt (income) | -28,775 | -20,462 | -29,638 | -30,528 | -31,443 | -30,792 | -1,879 | -1,902 | -2,612 | -2,169 | -2,304 | -3,299 | -2,997 | -2,981 | -3,138 | -2,087 | -1,946 | -2,324 | -1,935 | -1,960 | -2,691 | -2,234 | -2,373 | -3,398 | -3,086 | -3,071 |
| % of revenue | -0.08% | -0.09% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.10% | -0.09% | -0.10% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.08% | -0.10% | -0.09% |
| **Pre royalty /ad-fund Corporate EBITDA** | 4,736,282 | 3,404,229 | 4,734,284 | 5,117,796 | 5,417,270 | 5,242,261 | 67,590 | 230,253 | 567,097 | 436,452 | 114,891 | 850,546 | 469,733 | 494,156 | 595,314 | 374,771 | 121,163 | 411,209 | 89,445 | 257,040 | 603,989 | 469,382 | 139,247 | 895,942 | 503,705 | 529,447 |
| % margin | 13.86% | 14.43% | 13.45% | 14.12% | 14.51% | 14.33% | 2.98% | 9.18% | 17.04% | 15.66% | 4.08% | 21.38% | 14.93% | 15.96% | 17.50% | 14.45% | 5.01% | 14.56% | 3.83% | 9.95% | 17.62% | 15.93% | 12.23% | 21.86% | 15.54% | 16.60% |
| Royalty | 542,461 | 356,706 | 558,894 | 575,660 | 928,919 | 381,084 | 23,048 | 25,463 | 33,657 | 28,243 | 28,777 | 40,160 | 31,838 | 31,826 | 34,897 | 26,790 | 25,073 | 29,119 | 24,229 | 26,716 | 35,155 | 29,582 | 30,129 | 41,854 | 33,292 | 33,284 |
| % of revenue | 1.00% | 1.00% | 1.00% | 1.04% | 2.49% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% |
| Ad fund | 1,027,384 | 710,118 | 1,076,681 | 1,126,840 | 1,305,876 | 1,143,253 | 69,145 | 76,389 | 100,970 | 84,736 | 86,331 | 120,480 | 95,514 | 95,479 | 104,692 | 80,371 | 75,218 | 87,354 | 72,686 | 80,147 | 105,466 | 88,745 | 90,388 | 125,561 | 99,846 | 99,853 |
| % of revenue | 3.01% | 3.01% | 3.01% | 3.06% | 3.11% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| **Corporate EBITDA before restructuring expenses** | 3,366,438 | 2,457,406 | 3,298,709 | 3,615,397 | 3,182,475 | 3,717,948 | -24,654 | 128,401 | 432,470 | 323,429 | -782 | 689,906 | 342,381 | 366,852 | 455,725 | 267,610 | 20,872 | 294,736 | -7,470 | 150,177 | 463,368 | 351,056 | 18,730 | 728,527 | 570,576 | 396,310 |
| % margin | 9.83% | 10.41% | 9.37% | 9.97% | 8.52% | 10.16% | -1.09% | 5.12% | 12.99% | 11.63% | -0.03% | 17.34% | 10.88% | 11.85% | 13.39% | 10.32% | 0.86% | 10.43% | -0.32% | 5.81% | 13.52% | 12.23% | 0.64% | 17.78% | 11.43% | 12.43% |

**JB Friendly's - P&L build by store by month, including remodels**

24 Store model.  Excludes Hampton Bays
Note: Margins are impacted by incremental revenue from remodels, as associated expenses are taking out in a single line item

| | | | | | | 09/30/17 | 10/31/17 | 11/30/17 | 12/31/17 (36 Months Out of Bk) | 01/31/18 | 02/28/18 | 03/31/18 | 04/30/18 | 05/31/18 | 06/30/18 | 07/31/18 | 08/31/18 | 09/30/18 | 10/31/18 | 11/30/18 | 12/31/18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Full year 2015 | P5 - P12 2015 | Full year 2016 | Full year 2017 | Full year 2018 | TTM P4 2018 | P9 2017 | P10 2017 | P11 2017 | P12 2017 | P1 2018 | P2 2018 | P3 2018 | P4 2018 | P5 2018 | P6 2018 | P7 2018 | P8 2018 | P9 2018 | P10 2018 | P11 2018 | P12 2018 |
| Revenue | 34,171,831 | 23,596,511 | 35,196,996 | 36,252,895 | 37,540,482 | 36,589,482 | 3,505,818 | 2,670,781 | 2,492,740 | 2,909,454 | 2,405,800 | 2,661,960 | 3,511,245 | 2,957,152 | 3,013,554 | 4,221,182 | 3,338,293 | 3,285,141 | 3,610,995 | 2,750,904 | 2,567,522 | 2,996,736 |
| % growth, period over period | 4.37% | | 3.00% | 3.00% | 3.00% | | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| Incremental revenue from remodels | 74,287 | 74,287 | 692,572 | 1,307,092 | 1,701,199 | 1,518,954 | 138,960 | 138,960 | 140,108 | 140,108 | 140,108 | 140,108 | 140,108 | 140,108 | 140,108 | 140,108 | 140,108 | 143,129 | 143,129 | 143,129 | 145,529 | 145,529 |
| Total Revenues | 34,246,117 | 23,670,597 | 35,889,557 | 37,559,987 | 39,041,681 | 38,108,436 | 3,644,778 | 2,809,741 | 2,632,847 | 3,049,562 | 2,545,908 | 2,802,067 | 3,671,353 | 3,097,259 | 3,153,662 | 4,361,289 | 3,478,400 | 3,428,270 | 3,754,121 | 2,894,033 | 2,713,050 | 3,142,266 |
| % growth, period over period | 4.59% | | 4.80% | 4.65% | 3.94% | | 4.44% | 4.88% | 5.01% | 4.73% | 5.08% | 4.88% | 4.43% | 4.70% | 4.67% | 4.51% | 3.00% | 3.00% | 3.00% | 3.00% | 3.05% | 3.04% |
| Cost of sales | 9,259,905 | 6,417,018 | 9,537,703 | 9,825,834 | 10,118,549 | 9,914,314 | 955,562 | 726,465 | 677,403 | 791,331 | 646,644 | 711,523 | 950,851 | 797,480 | 812,088 | 1,153,215 | 906,810 | 894,653 | 984,228 | 748,259 | 697,725 | 815,071 |
| % of sales | 27.10% | 27.10% | 27.10% | 27.10% | 27.10% | 27.10% | 27.20% | 27.20% | 27.20% | 27.20% | 26.88% | 26.73% | 26.93% | 26.97% | 26.95% | 27.32% | 27.16% | 27.23% | 27.26% | 27.20% | 27.18% | 27.20% |
| Gross profit | 24,986,212 | 17,253,579 | 26,351,655 | 27,736,153 | 28,923,132 | 28,194,122 | 2,689,217 | 2,083,276 | 1,955,445 | 2,258,231 | 1,899,263 | 2,090,544 | 2,720,502 | 2,299,779 | 2,341,574 | 3,208,074 | 2,571,590 | 2,533,617 | 2,769,893 | 2,145,774 | 2,015,326 | 2,327,196 |
| % margin | 73.12% | 73.12% | 74.87% | 76.51% | 77.66% | 76.71% | 76.08% | 78.45% | 77.62% | 77.62% | 78.95% | 78.53% | 77.04% | 77.73% | 77.70% | 76.00% | 77.03% | 77.22% | 76.71% | 78.00% | 78.49% | 77.66% |
| Labor and related costs | 11,454,587 | 7,813,991 | 11,798,225 | 12,152,172 | 12,516,737 | 12,268,041 | 1,161,087 | 894,918 | 852,978 | 999,854 | 882,167 | 921,598 | 1,182,596 | 991,816 | 1,017,969 | 1,345,557 | 1,085,108 | 1,063,822 | 1,195,920 | 921,766 | 878,567 | 1,029,850 |
| % of revenue | 33.52% | 33.12% | 33.52% | 33.52% | 33.52% | 33.53% | 33.12% | 33.51% | 34.22% | 34.37% | 36.67% | 34.62% | 33.49% | 33.54% | 33.78% | 31.88% | 32.50% | 32.38% | 33.12% | 33.51% | 34.22% | 34.37% |
| Supplies, including paper costs | 1,099,578 | 754,100 | 1,132,359 | 1,166,330 | 1,201,320 | 1,177,319 | 116,559 | 85,436 | 80,055 | 93,494 | 83,425 | 81,718 | 118,451 | 93,700 | 103,213 | 130,411 | 105,275 | 100,314 | 120,055 | 87,999 | 82,457 | 96,301 |
| % of revenue | 3.22% | 3.20% | 3.22% | 3.22% | 3.22% | 3.22% | 3.32% | 3.20% | 3.21% | 3.21% | 3.47% | 3.07% | 3.35% | 3.17% | 3.42% | 3.09% | 3.09% | 3.05% | 3.32% | 3.20% | 3.21% | 3.21% |
| Repairs & maintenance | 642,231 | 422,489 | 661,498 | 681,343 | 701,783 | 688,337 | 75,886 | 55,025 | 43,667 | 48,899 | 70,620 | 66,948 | 52,672 | 49,879 | 48,107 | 64,693 | 67,132 | 51,553 | 79,163 | 56,675 | 44,977 | 50,366 |
| % of revenue | 1.88% | 1.79% | 1.88% | 1.88% | 1.88% | 1.88% | 2.16% | 2.06% | 1.75% | 1.68% | 2.94% | 2.51% | 1.49% | 1.69% | 1.60% | 1.53% | 2.01% | 1.57% | 2.16% | 2.06% | 1.75% | 1.68% |
| Other controllable expenses | 720,390 | 483,721 | 742,002 | 764,262 | 787,190 | 771,794 | 70,567 | 56,394 | 61,018 | 65,498 | 58,155 | 67,103 | 70,627 | 62,729 | 58,740 | 73,090 | 66,581 | 67,024 | 72,684 | 60,146 | 62,848 | 67,463 |
| % of revenue | 2.11% | 2.05% | 2.11% | 2.11% | 2.11% | 2.11% | 2.01% | 2.16% | 2.45% | 2.25% | 2.42% | 2.52% | 2.00% | 2.12% | 1.95% | 1.73% | 1.99% | 2.04% | 2.01% | 2.19% | 2.45% | 2.25% |
| Property tax, CAM & insurance | 1,482,388 | 1,086,901 | 1,526,860 | 1,572,666 | 1,619,846 | 1,585,253 | 60,142 | 49,579 | 260,368 | 60,142 | 156,822 | 121,038 | 95,660 | 60,639 | 412,784 | 80,127 | 142,423 | 129,818 | 61,946 | 51,066 | 247,579 | 63,946 |
| % of revenue | 4.34% | 4.61% | 4.34% | 4.34% | 4.34% | 4.35% | 1.72% | 1.86% | 9.64% | 2.07% | 6.52% | 4.55% | 2.65% | 2.05% | 13.70% | 1.90% | 4.27% | 3.95% | 1.72% | 1.86% | 9.64% | 2.07% |
| Utilities & telephone | 1,609,959 | 1,093,143 | 1,658,237 | 1,707,984 | 1,759,224 | 1,724,432 | 177,276 | 137,988 | 120,089 | 128,914 | 132,829 | 150,777 | 146,576 | 134,535 | 132,164 | 157,882 | 157,388 | 165,838 | 182,595 | 142,129 | 123,691 | 132,802 |
| % of revenue | 4.71% | 4.65% | 4.71% | 4.71% | 4.71% | 4.71% | 5.06% | 5.17% | 4.82% | 4.45% | 5.52% | 5.66% | 4.15% | 4.55% | 4.39% | 3.74% | 4.71% | 5.05% | 5.06% | 5.17% | 4.92% | 4.43% |
| Advertising, local | 161,500 | 111,089 | 166,345 | 171,335 | 176,475 | 172,939 | 16,509 | 12,580 | 11,741 | 13,708 | 11,644 | 12,885 | 16,629 | 13,925 | 14,186 | 19,859 | 15,713 | 15,458 | 17,004 | 12,938 | 12,094 | 14,119 |
| % of revenue | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.48% | 0.48% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% |
| Incremental remodel revenue expenses | 44,572 | 44,572 | 415,423 | 784,255 | 1,020,719 | 911,372 | 83,376 | 83,376 | 84,065 | 84,065 | 84,065 | 84,065 | 84,065 | 84,065 | 84,065 | 84,065 | 85,877 | 85,877 | 85,877 | 87,317 | 87,317 | 87,317 |
| % of revenue | 0.13% | 0.19% | 1.18% | 2.16% | 2.73% | 2.49% | 2.36% | 3.12% | 3.37% | 2.89% | 3.49% | 3.16% | 2.38% | 2.84% | 2.79% | 1.99% | 2.52% | 2.61% | 2.38% | 3.12% | 3.40% | 2.91% |
| % of incremental revenue | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% |
| Pre royalty/ad-fund SL EBITDAR | 7,771,227 | 5,443,573 | 8,250,706 | 8,755,807 | 9,139,839 | 8,994,634 | 927,815 | 705,980 | 461,465 | 763,656 | 419,556 | 584,412 | 955,224 | 808,490 | 470,326 | 1,252,591 | 849,908 | 853,914 | 955,649 | 727,160 | 475,796 | 787,032 |
| % margin | 22.74% | 23.07% | 23.44% | 24.10% | 24.48% | 24.31% | 26.47% | 26.43% | 18.51% | 26.25% | 17.44% | 21.95% | 27.05% | 27.34% | 15.11% | 29.67% | 25.46% | 25.99% | 26.47% | 26.43% | 18.55% | 26.26% |
| Cash rent, stores only | 1,902,770 | 1,262,710 | 2,350,283 | 2,416,887 | 2,485,411 | 2,439,913 | 202,752 | 202,752 | 204,611 | 182,508 | 209,548 | 208,700 | 207,102 | 208,949 | 208,700 | 208,836 | 208,836 | 209,503 | 208,836 | 210,418 | 167,635 | 204,631 |
| % of revenue | 5.57% | 5.35% | 6.68% | 6.67% | 6.66% | 6.67% | 5.79% | 7.59% | 8.21% | 6.27% | 8.71% | 7.83% | 5.89% | 7.27% | 6.95% | 4.95% | 6.26% | 6.38% | 5.77% | 7.58% | 8.20% | 6.26% |
| Pre royalty/ad-fund SL EBITDA | 5,868,457 | 4,180,863 | 5,900,424 | 6,318,920 | 6,654,428 | 6,454,721 | 725,063 | 503,229 | 256,853 | 581,129 | 209,988 | 376,029 | 747,292 | 599,541 | 261,399 | 1,044,182 | 641,073 | 444,339 | 747,147 | 518,657 | 265,378 | 599,381 |
| % margin | 17.17% | 17.72% | 16.76% | 17.43% | 17.82% | 17.64% | 20.68% | 18.84% | 10.30% | 19.12% | 8.73% | 14.13% | 21.16% | 20.27% | 8.67% | 24.74% | 19.20% | 19.61% | 20.69% | 18.85% | 10.34% | 20.00% |
| G&A, corporate | 1,054,255 | 702,837 | 1,085,883 | 1,118,459 | 1,152,013 | 1,129,644 | 93,205 | 93,205 | 93,205 | 93,205 | 96,001 | 96,001 | 96,001 | 96,001 | 96,001 | 96,001 | 96,001 | 96,001 | 96,001 | 96,001 | 96,001 | 96,001 |
| % of revenue | 3.09% | 2.98% | 3.03% | 3.00% | 3.00% | 3.00% | 2.66% | 3.49% | 3.74% | 3.20% | 3.99% | 3.61% | 2.72% | 3.25% | 3.19% | 2.27% | 2.88% | 2.92% | 2.66% | 3.49% | 3.74% | 3.20% |
| G&A, field | 106,695 | 94,259 | 109,896 | 113,193 | 116,589 | 113,589 | 1,245 | 5,694 | 20,388 | 46,500 | 3,380 | -3,177 | 11,481 | 1,905 | 3,946 | 8,389 | 8,963 | 5,859 | 1,283 | 5,865 | 21,000 | 47,695 |
| % of revenue | 0.31% | 0.40% | 0.31% | 0.31% | 0.31% | 0.31% | 0.04% | 0.21% | 0.82% | 1.59% | 0.14% | -0.12% | 0.35% | 0.06% | 0.13% | 0.20% | 0.27% | 0.18% | 0.04% | 0.21% | 0.82% | 1.59% |
| Hampton Bays mgmt (income) | -28,775 | -20,462 | -29,638 | -30,528 | -31,443 | -30,792 | -3,233 | -2,150 | -2,004 | -2,394 | -1,991 | -2,018 | -2,771 | -2,301 | -2,444 | -3,500 | -3,179 | -3,163 | -3,330 | -2,214 | -2,064 | -2,465 |
| % of revenue | -0.08% | -0.09% | -0.08% | -0.08% | -0.08% | -0.08% | -0.09% | -0.08% | -0.08% | -0.08% | -0.08% | -0.07% | -0.08% | -0.07% | -0.08% | -0.08% | -0.10% | -0.10% | -0.09% | -0.08% | -0.08% | -0.08% |
| Pre royalty/ad-fund Corporate EBITDA | 4,736,282 | 3,404,229 | 4,734,284 | 5,117,796 | 5,417,270 | 5,242,281 | 633,846 | 406,480 | 145,264 | 444,011 | 110,764 | 285,223 | 642,381 | 503,936 | 163,896 | 943,292 | 535,508 | 545,662 | 653,193 | 419,106 | 150,441 | 458,150 |
| % margin | 13.86% | 14.43% | 13.45% | 14.12% | 14.51% | 14.33% | 18.08% | 15.22% | 5.83% | 15.26% | 4.68% | 10.71% | 18.20% | 17.04% | 5.44% | 22.55% | 16.15% | 16.61% | 18.09% | 15.23% | 5.86% | 15.29% |
| Royalty | 342,461 | 236,706 | 358,894 | 375,600 | 928,919 | 381,084 | 36,448 | 28,097 | 26,328 | 30,494 | 25,459 | 29,021 | 36,714 | 30,973 | 94,610 | 130,839 | 104,352 | 102,848 | 112,624 | 86,821 | 81,392 | 94,268 |
| % of revenue | 1.00% | 1.00% | 1.02% | 1.04% | 2.49% | 1.04% | 1.04% | 1.05% | 1.05% | 1.05% | 1.00% | 1.08% | 1.04% | 1.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.12% | 3.16% | 3.17% | 3.15% |
| Ad fund | 1,027,384 | 710,118 | 1,076,681 | 1,126,800 | 1,305,876 | 1,143,253 | 109,343 | 84,292 | 78,985 | 91,487 | 76,377 | 84,062 | 110,141 | 92,918 | 110,578 | 152,645 | 121,744 | 119,989 | 131,394 | 101,291 | 94,957 | 109,979 |
| % of revenue | 3.01% | 3.01% | 3.06% | 3.11% | 3.50% | 3.12% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.50% | 3.50% | 3.50% | 3.50% | 3.64% | 3.69% | 3.70% | 3.67% |
| Corporate EBITDA before restructuring expenses | 3,366,438 | 2,457,406 | 3,298,709 | 3,615,397 | 3,182,475 | 3,717,944 | 488,054 | 294,090 | 39,950 | 322,020 | 10,764 | 173,141 | 495,727 | 380,046 | -41,092 | 659,808 | 313,192 | 322,824 | 409,175 | 230,894 | -25,907 | 253,903 |
| % margin | 9.83% | 10.41% | 9.19% | 9.63% | 8.15% | 10.16% | 13.92% | 11.03% | 1.60% | 11.07% | 0.45% | 6.50% | 14.04% | 12.85% | -1.36% | 15.65% | 9.38% | 9.85% | 11.33% | 8.39% | -1.01% | 8.47% |

# JB 13 Week Cash Flow Model

Weekly Cash Flow Analysis (Bankruptcy Period)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning of week ---> | 1/5/2015 | 1/12/2015 | 1/19/2015 | 1/26/2015 | 2/2/2015 | 2/9/2015 | 2/16/2015 | 2/23/2015 | 3/2/2015 | 3/9/2015 | 3/16/2015 | 3/23/2015 | 3/30/2015 | |
| | Mon | Mon | Mon | Mon | Mon | Mon | Mon | Mon | Mon | Mon | Mon | Mon | Mon | Total |
| | 2015-2 | 2015-3 | 2015-4 | 2015-5 | 2015-6 | 2015-7 | 2015-8 | 2015-9 | 2015-10 | 2015-11 | 2015-12 | 2015-13 | 2015-14 | 13 WCF |
| Weekly Cash Flow Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Beginning Balance (Book), pre-DIP** | 205,922 | 35,289 | (359,334) | (336,920) | (876,750) | (851,879) | (1,363,224) | (1,188,301) | (1,317,247) | (1,309,827) | (1,217,774) | (1,088,093) | (1,140,450) | 205,922 |
| *Beginning Balance (Book), post-DIP* | *205,922* | *1,035,289* | *640,666* | *663,080* | *615,417* | *640,288* | *128,943* | *303,866* | *163,369* | *170,788* | *262,842* | *392,522* | *340,165* | *205,922* |
| **Receipts** | | | | | | | | | | | | | | |
| Cash Receipts | 430,035 | 255,179 | 268,094 | 246,338 | 235,460 | 254,736 | 324,337 | 284,041 | 279,040 | 298,863 | 301,417 | 297,329 | 292,430 | 3,767,299 |
| Credit Card | 273,284 | 284,684 | 328,864 | 268,941 | 238,077 | 295,371 | 341,096 | 327,577 | 299,039 | 334,424 | 325,683 | 327,217 | 322,861 | 3,967,118 |
| Sales Tax Collection | 40,202 | 43,262 | 47,836 | 41,202 | 37,883 | 43,949 | 53,457 | 48,917 | 46,167 | 50,612 | 50,256 | 49,815 | 49,073 | 602,631 |
| Rebates | 0 | 0 | 0 | 0 | 0 | 0 | 250,000 | 0 | 0 | 0 | 0 | 0 | 0 | 250,000 |
| Hampton Bays mgmt income | 0 | 0 | 0 | 1,748 | 0 | 0 | 0 | 1,848 | 0 | 0 | 0 | 0 | 2,255 | 5,851 |
| FF&E recovery | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Selden real estate, net proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Receipts** | **743,520** | **583,125** | **644,795** | **558,229** | **511,421** | **594,056** | **968,890** | **662,383** | **624,245** | **683,899** | **677,356** | **674,361** | **666,618** | **8,592,898** |
| **Disbursements** | | | | | | | | | | | | | | |
| Food costs | 224,284 | 204,629 | 188,539 | 143,925 | 167,618 | 144,026 | 156,223 | 148,241 | 147,736 | 208,107 | 167,692 | 172,633 | 181,329 | 2,254,982 |
| Supplies | 23,964 | 22,219 | 20,719 | 15,178 | 17,969 | 15,348 | 17,541 | 15,238 | 15,232 | 22,823 | 18,221 | 18,174 | 19,569 | 242,818 |
| Sub-total | 248,247 | 226,848 | 209,258 | 159,104 | 185,588 | 159,374 | 173,882 | 163,983 | 162,968 | 230,930 | 185,913 | 190,807 | 200,898 | 2,497,800 |
| Sales Tax payments | 0 | 0 | 96,071 | 167,201 | 0 | 0 | 61,868 | 125,912 | 0 | 0 | 61,296 | 129,751 | 0 | 642,099 |
| Ad fund | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Royalty | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CC Fees | 6,559 | 6,832 | 7,893 | 6,455 | 5,714 | 7,089 | 8,186 | 7,862 | 7,177 | 8,026 | 7,816 | 7,853 | 7,749 | 95,211 |
| Bank fees | 0 | 6,500 | 0 | 2,300 | 0 | 0 | 6,500 | 2,300 | 0 | 0 | 6,500 | 0 | 2,300 | 26,400 |
| LSM | 0 | 0 | 16,767 | 0 | 0 | 0 | 12,706 | 0 | 0 | 0 | 12,263 | 0 | 0 | 41,736 |
| Rent | 0 | 140,815 | 0 | 168,960 | 0 | 0 | 0 | 0 | 168,960 | 0 | 0 | 0 | 168,960 | 647,696 |
| Utilities | 41,866 | 29,316 | 45,877 | 36,339 | 35,063 | 22,336 | 47,333 | 63,237 | 35,097 | 18,155 | 19,071 | 9,145 | 80,341 | 483,176 |
| Labor | 208,581 | 304,051 | 192,394 | 172,787 | 178,033 | 169,470 | 230,488 | 196,923 | 187,245 | 197,010 | 196,972 | 216,700 | 200,651 | 2,651,305 |
| Insurance | 162,000 | 80,000 | 0 | 145,000 | 0 | 80,000 | 0 | 145,000 | 0 | 80,000 | 0 | 0 | 120,000 | 812,000 |
| R&M | 11,246 | 12,475 | 13,107 | 12,043 | 11,511 | 12,454 | 15,856 | 13,886 | 13,642 | 14,611 | 14,736 | 14,536 | 14,297 | 174,401 |
| Other | 5,828 | 136,465 | 6,792 | 26,241 | 5,965 | 81,453 | 8,217 | 7,196 | 7,069 | 7,571 | 7,636 | 7,532 | 7,408 | 315,372 |
| Property Taxes | 130,888 | 0 | 0 | 0 | 31,131 | 19,493 | 0 | 30,121 | 0 | 0 | 0 | 5,720 | 0 | 217,354 |
| FUTA / SUTA | 0 | 0 | 0 | 167,604 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 167,604 |
| Field G&A | 7,202 | 7,710 | 7,488 | 7,290 | 6,809 | 7,580 | 9,234 | 8,172 | 7,932 | 8,806 | 8,737 | 8,498 | 8,326 | 103,785 |
| Corp. G&A | 20,274 | 20,274 | 20,274 | 20,274 | 20,274 | 20,274 | 20,274 | 20,274 | 20,274 | 20,274 | 20,274 | 20,274 | 20,274 | 263,564 |
| **Operating Outflows** | **842,691** | **971,287** | **615,920** | **1,091,597** | **480,089** | **579,523** | **594,546** | **784,866** | **610,365** | **585,384** | **541,214** | **605,097** | **836,924** | **9,139,502** |
| **Operating Cashflow ("OCF")** | **(99,171)** | **(388,162)** | **28,875** | **(533,368)** | **31,332** | **14,532** | **374,344** | **(122,484)** | **13,881** | **98,515** | **136,142** | **69,265** | **(170,306)** | **(546,604)** |
| Maint. Capex | 6,462 | 6,462 | 6,462 | 6,462 | 6,462 | 6,462 | 6,462 | 6,462 | 6,462 | 6,462 | 6,462 | 6,462 | 6,462 | 84,000 |
| **Total Debt, Interest and Capex** | **6,462** | **6,462** | **6,462** | **6,462** | **6,462** | **6,462** | **6,462** | **6,462** | **6,462** | **6,462** | **6,462** | **6,462** | **6,462** | **84,000** |
| Total Filing, Legal, FA and Associated Fees Fees | 50,000 | 0 | 0 | 0 | 0 | 0 | 192,960 | 0 | 0 | 0 | 0 | 115,160 | 0 | 358,120 |
| Deferred rent on stores to remain open | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deferred prop. tax on stores to remain open | 0 | 0 | 0 | 0 | 519,416 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 519,416 |
| GE, DIP Commitment, Exit and Unused Fees | 15,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15,000 |
| **Total Disbursements** | **914,153** | **977,748** | **622,382** | **1,098,058** | **486,550** | **1,105,401** | **793,967** | **791,328** | **616,826** | **591,845** | **547,676** | **726,718** | **843,386** | **10,116,038** |
| Adjustments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Change in Cash** | **(170,633)** | **(394,623)** | **22,413** | **(539,829)** | **24,871** | **(511,345)** | **174,923** | **(128,945)** | **7,419** | **92,054** | **129,680** | **(52,357)** | **(176,767)** | **(1,523,140)** |
| **Ending Balance (Book), pre-DIP** | **35,289** | **(359,334)** | **(336,920)** | **(876,750)** | **(851,879)** | **(1,363,224)** | **(1,188,301)** | **(1,317,247)** | **(1,309,827)** | **(1,217,774)** | **(1,088,093)** | **(1,140,450)** | **(1,317,218)** | **(1,317,218)** |
| DIP drawdown (receipt) | 1,000,000 | 0 | 0 | 500,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,500,000 |
| DIP interest paid (disbursement) | 0 | 0 | 0 | 7,833 | 0 | 0 | 0 | 11,552 | 0 | 0 | 0 | 0 | 12,795 | 32,180 |
| **Ending Balance (Book), post-DIP** | **1,035,289** | **640,666** | **663,080** | **615,417** | **640,288** | **128,943** | **303,866** | **163,369** | **170,788** | **262,842** | **392,522** | **340,165** | **150,602** | **150,602** |

**NOTE:**   This 13 week forecast represents the first 13 weeks of a contemplated 17-week postpetition period.